**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel:  (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LINDSAY OKONOWSKY, an individual, <br><br>         Plaintiff, <br><br>   vs. <br><br> MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS, <br><br>         Defendants. | **Case No.: 2:21-cv-07581-VAP-ASx** <br><br> **PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> *[Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay Okonowsky; Declaration of Lindsay L. Bowden; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]* <br><br> **Hearing: April 3, 2023** <br> **Time: 2:00 pm** <br> **Courtroom: 6A** |

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff LINDSAY OKONOWSKY hereby opposes Defendant MERRICK B GARLAND's Motion for Summary Judgment ("Motion"). Plaintiff's Opposition is based on the attached Memorandum of Points and Authorities; Plaintiff's Compendium of Evidence, filed concurrently herewith; all pleadings and documents on file in this matter; and any and all arguments that might be raised at the April 3, 2023, hearing in this matter.

DATED: March 13, 2023                BROCK & GONZALES, LLP

By: _____

D. AARON BROCK
CORY H. HURWITZ
LINDSAY L. BOWDEN
Attorneys for Plaintiff

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................... 1

II.  DEFENDANT'S MOTION IS UNTIMELY BASED ON PARA. 6 OF THE
STANDING ORDER AND SHOULD BE STRICKEN ...................................... 3

III. STATEMENT OF FACTS .................................................................... 4

   A.   Dr. Okonowsky's Stellar Employment History ........................................ 4

   B.   Dr. Okonowsky Discovers An Unofficial FCC Lompoc Instagram Page
Run By One Of Its Senior Lieutenants ...................................................... 4

   C.   Dr. Okonowsky Reported The Page To Defendant; Lt. Hellman
Immediately Targeted Her ........................................................................ 6

   D.   After Lt. Hellman's Personal Attacks, Dr. Okonowsky Elevated Her
Complaints ............................................................................................... 7

   E.   Lt. Hellman's Unofficial FCC Lompoc Page Bled Into Dr. Okonowsky's
Physical Workplace .................................................................................. 8

   F.   Per Defendant's Request, Dr. Okonowsky Continued To Report New
Offensive Posts ....................................................................................... 9

   G.   Defendant Failed To Promptly Investigate Dr. Okonowsky's Complaints
And Allowed The Harassment To Continue ............................................. 10

   H.   Defendant's Own Threat Assessment Team Confirmed The Harassing
Memes Were Directed at Dr. Okonowsky ............................................... 11

   I.   Defendant Issued Lt. Hellman A Cease-and-Desist Letter To Force Him
To Take Down His Unofficial FCC Lompoc Instagram Page ..................... 12

   J.   Lt. Hellman Continued To Harass Dr. Okonowsky Even After Being
Issued A Cease-and-Desist Letter ............................................................ 13

IV.  LEGAL ARGUMENT ........................................................................ 13

**A.    Plaintiff Was Subject to "Workplace" Harassment** ................................ 14

**B.    The Harassment Was Severe And Pervasive** ........................................... 18

*1.    The Page's Discriminatory Posts Outside of Plaintiff's Protected Classes Are Relevant To Her Harassment Claim* ............................................................ *20*

*2.    Lt. Hellman Is A Supervisor; Therefore, Defendant Is Vicariously Liable Even If They Took Immediate And Corrective Action* ...................................... *21*

*3.    Defendant Failed To Immediately Take Steps To Prevent The Harassment After Becoming Aware Of It* .............................................................................. *22*

**V.    CONCLUSION** ........................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

<u>Burlington Industries, Inc. v. Ellerth</u> (1998) 524 US 742, 757 .............................. 21

<u>Clairmont v. Sound Mental Health,</u> 632 F.3d 1091, 1107 (9th Cir. 2011) (citation omitted) ...................................................................................................................... 18

<u>Davis v. Team Elec. Co.</u> (9th Cir. 2008) 520 F3d 1080, 1096 ................................ 18

<u>Dodge v. Evergreen</u>, 56 F.4th 767, 781-82 (9th Cir. 2022) (citing <u>Hufford v. McEnaney</u>, 249 F.3d 1142, 1148 (9th Cir. 2001)) ................................................. 18

<u>Doe v. Oberweis Dairy</u> (7th Cir. 2006) 456 F3d 704, 715 ..................................... 14

<u>Eastman Kodak Co. v. Image Technical Services, Inc.</u>, 504 U.S. 451, 456 (1992  14

<u>EEOC v. Fry's Electronics, Inc.</u>, 2:10-CV-1562-RSL ........................................... 15

<u>EEOC v. PVNF, L.L.C.</u> (10th Cir. 2007) 487 F3d 790, 798 .................................. 19

<u>Faragher v. City of Boca Raton</u> (1998) 524 US 775, 807 ...................................... 21

<u>Ferris v. Delta Air Lines</u>, *Inc.* (2nd Cir. 2001) 277 F3d 128, 135 .......................... 14

<u>Fisher v. Mermaid Manor Home for Adults, LLC</u>, 192 F.Supp.3d 323, 326 (E.D.N.Y., 2016) .................................................................................................... 16

<u>Hafford v. Seidner</u> (6th Cir. 1999) 183 F.3d 506, 515 .......................................... 20

<u>Harris v. Forklift Sys., Inc.</u>, (1993) 510 U.S. 17, 23 ............................................. 14

<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). ............................................................................................................. 19

<u>Hicks v. Gates Rubber Co.</u>, (10th Cir. 1987) 833 F.2d 1406, 1416 ....................... 20

<u>Huston v. Procter & Gamble Paper Products Corp.</u>, (3rd Cir. 2009) 568 F3d 100, 107-108 ................................................................................................................... 23

<u>McGinest v. GTE Service Corp.</u> (9th Cir. 2004) 360 F3d 1103, 1121 .................. 23

<u>McGinest v. GTE Service Corp.</u>, (9th Cir. 2004) 360 F.3d 1103, 1117 ................ 21

<u>Meritor Sav. Bank, FSB, v. Vinson</u>, (1986) 477 U.S. 57, 65. ................................ 14

<u>Parker v. Reema Consulting Services, Inc.</u> (4th Cir. 2019) 915 F3d 297, 303 ...... 19

<u>Robinson v. York</u>, 566 F.3d 817, 824 (9th Cir. 2009) ............................................ 18

Schwapp v. Town of Avon, (2nd Cir. 1997) 118 F.3d 106, 111 ........................... 15

Swinton v. Potomac Corp. (9th Cir. 2001) 270 F3d 794, 804 ............................... 22

Vance v. Ball State Univ., (2016) 570 US 421, 431 ............................................ 22

Waltman v. International Paper Co. (5th Cir. 1989) 875 F2d 468, 471 ................. 22

**Other Authorities**

Young, Conaway, Stargatt & Taylor, *Six Sexual Harassment Myths Shattered,* 2
   No. 4 *Del. Employment L. Letter* 1 (April 1997) .................................................. 21

# MEMORAUNDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

There is a clear dispute whether MERRICK GARLAND, ATTORNEY GENERAL, DEP'T OF JUSTICE, BUREAU OF PRISONS ("Defendant") failed to prevent ongoing harassment of staff psychologist, LINDSAY OKONOWSKY, Ph.D. ("Dr. Okonowsky"), who was the repeated target of sexist memes. Defendant allowed a "supervisor," Lieutenant Steven Hellman, to run an Instagram page[1] that he used to make comments clearly referring to Dr. Okonowsky as a "staff member" that's a "giant cunt" that "loves inmates" and "tells on staff." Such an Instagram post, which is only one of many that is sexist and derogatory towards women, was viewed by Dr. Okonowsky's co-workers, supervisors, and human resources. Instead of taking corrective action, "liked" and commented on the posts, which created a hostile work environment.

Specifically, Defendant's Motion should be denied because abundant genuine issues of fact exist as to Dr. Okonowsky's hostile work environment claim based on sex/gender under Title VII.

First, Defendant claims that Dr. Okonowsky only complained about conduct outside of the workplace because it occurred online, however the critical inquiry is not whether the harassment occurred within the four corners of the worksite, but whether the harassment is sufficiently related to their employment to constitute a "work environment." Here, the off-site encounters between Dr. Okonowsky and Lt. Hellman on Lt. Hellman's Instagram page were sufficiently related to their employment, while also infiltrating the actual workplace, such as to constitute a hostile work environment. Lt. Hellman's page was followed by over a hundred employees at FCC Lompoc, including a Human Resources Manager and the

---

[1] "Instagram is a social media service that permits users to share, or 'post,' photographs through an online network." Fisher v. Mermaid Manor Home for Adults, LLC, 192 F. Supp. 3d 323, 326 n.2 (E.D.N.Y. 2016).

1

Union President. FCC Lompoc employees frequently liked and commented on posts pertaining to workplace interactions, including interactions with Dr. Okonowsky.

Second, the Instagram page was so intimately intertwined with conduct in the workplace that it is impossible to separate the offsite conduct from the onsite activities and was severe and pervasive. Not only did the memes refer to Dr. Okonowsky, but many of the memes posted would only make sense to FCC Lompoc employees. Dr. Okonowsky viewed the page as an unofficial FCC Lompoc Instagram page because her workplace activities and interactions were regularly referenced and ridiculed. Even beyond this, Defendant ultimately punished Lt. Hellman for violating Defendant's policy and issued him a cease-and-desist letter from posting on social media. Defendant's admission that it punished Lt. Hellman, is irrefutable evidence that Lt. Hellman's conduct offsite had a direct effect at the workplace.

Third, Defendant is strictly liable for Lt. Hellman's conduct *regardless of its subsequent actions* because he is a "supervisor." Defendant minimizes Lt. Hellman's position as "a corrections officer," and ignores the legal impact of his supervisory position. He supervised custody staff at FCC Lompoc and oversaw operations. He was also responsible for overseeing the facility, had several direct reports, and, as a member of the Special Investigative Services, was responsible for investigating suspected violations of the law and prison rules. Significantly, the Cease-and-Desist letter Defendant issued Lt. Hellman reminded him that as a "supervisor" he is held to a higher standard of conduct.

Lastly, even if Lt. Hellman is found not to be a supervisor (though there is nothing in the record indicating he is not), Defendant will nevertheless be held liable for failing to take immediate and corrective action. Defendant was aware of the harassment long before they allegedly took steps to end it. Here, Human Resources Manager Taulbee McGinnis was an active follower of Lt. Hellman's

page and had McGinnis, an H.R. manager responsible for dealing with sexual harassment complaints, taken steps to end the conduct, Dr. Okonowsky would never have been harassed. This alone is sufficient evidence to deny summary judgment on whether the Defendant took prompt corrective and preventative action.

Moreover, even after Dr. Okonowsky complained, the harassment continued without fail. Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020. *In the meantime, Dr. Okonowsky continued to be harassed* and Defendant repeatedly dismissed Dr. Okonowsky's complaints. Defendant could have, but failed, to curb the harassment Dr. Okonowsky had repeatedly complained of.

The explosion of social media has become part of the workplace culture. Title VII prohibits unlawful employment practice and "[c]ourts should not let the fact that the harassing comments or photos are posted online be a barrier to recovery for the victim….  In instances when social media is part of the workplace culture, the court should give as much weight to online harassment as it does to face-to face harassment."[2]

For all these reasons, Defendant's motion for summary judgement should be denied.

## II.   DEFENDANT'S MOTION IS UNTIMELY BASED ON PARA. 6 OF THE STANDING ORDER AND SHOULD BE STRICKEN

According to Court's Standing Order: "The 'e-filing' of all documents required to be 'e-filed' in this matter pursuant to General Order No. 10-07 and Local Rule 5-4 shall be completed by **4:00 p.m. on the date due.** Any documents 'e-filed' after 4:00 p.m. on the date due will be considered **untimely**." (Court's Standing

---

[2] Stephanie A. Kevil, <u>When Your Boss "Friends" You: Social Media and the Hostile Environment Claim When Your Boss "Friends" You: Social Media and the Hostile Environment Claim</u>, DePaul Journal of Women, Gender and the Law, Vol. 1, p. 75, (2011).

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Order, Para. 6; emphasis in original).

Defendant's motion was filed at 11:50 p.m. PST on March 6, 2023, almost 8 hours <u>after</u> the filing cutoff. Since the filing was untimely, Defendant's motion should be stricken as the moving papers require 28 days' notice prior to a hearing. (C.D. L.R. 6-1). Plaintiff has been prejudiced by limiting an already short opposition period and she respectfully requests that the Court strike Defendant's Motion.

## III.   STATEMENT OF FACTS

### A. Dr. Okonowsky's Stellar Employment History

Lindsay Okonowsky, Ph.D., a 35-year-old female, began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018. Pl. SUF ¶ 1.  She was never disciplined and received consistent positive reviews and feedback.  Pl. SUF ¶ 2. As a Staff Psychologist, Dr. Okonowsky completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. Pl. SUF ¶ 3.

### B. Dr. Okonowsky Discovers An Unofficial FCC Lompoc Instagram Page Run By One Of Its Senior Lieutenants

On February 16, 2020, Dr. Okonowsky became aware of the Instagram page "8_and_hitthe_gate" when the page came up on her personal Instagram as a suggested page she should follow. Pl. SUF ¶ 4.

Lieutenant Steven Hellman created and ran the Instagram page. Pl. SUF ¶ 5. He is an FCC Lompoc employee, has been a supervisor for years, and worked with Dr. Okonowsky. Pl. SUF ¶ 6. As a Lieutenant, he had the authority to supervise the custody staff and oversee operations. Pl. SUF ¶ 7. He was also responsible for overseeing the facility, had several direct reports, and was a member of the Special Investigative Services ("SIS"). Pl. SUF ¶ 8. As an SIS Lieutenant, Lt. Hellman was also responsible for investigating suspected violations of the law and prison rules and policies by both inmates and staff. Pl. SUF ¶ 9.

Followers of Lt. Hellman's page were made up of hundreds of FCC Lompoc employees, including the Human Resources Manager and Union President. Pl. SUF ¶ 10. The prison and working conditions were regularly discussed as well as work meetings and events. Pl. SUF ¶ 11. For example, Lt. Hellman posted a meme of Jefferey Epstein on Valentine's Day and dedicated it to the "The SHU Crew" (aka the Special Housing Unit) at FCC Lompoc and around that time, Dr. Okonowsky heard the officers in the SHU Department talking about how funny they thought the post was. Pl. SUF ¶ 12.

Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, Dr. Okonowsky determined that this was an unofficial FCC Lompoc employee Instagram page.  Pl. SUF ¶ 13.

Unfortunately, Lt. Hellman often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic. Pl. SUF ¶ 14. Those offensive memes would often get liked[3] and commented on by the other employees. Pl. SUF ¶ 15.



///

///

---

[3] The Instagram like button is indicated by a heart symbol. In addition to tapping the heart symbol on a post, users can double tap an image to "like" it. *See* Padilla, Mariel (18 July 2019). "Instagram is Hiding Likes. Will That Reduce Anxiety?". The New York Times. Archived from the original on 26 November 2020.

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**



Pl. SUF ¶¶ 12-27.

Dr. Okonowsky was shocked at the content, especially since Lt. Hellman was a supervisor and Lieutenant at her workplace. Pl. SUF ¶ 28. As a woman, she was especially offended at the sexist memes that were overtly demeaning and derogatory. Pl. SUF ¶ 29. Dr. Okonowsky considered Lt. Hellman a high-level leader, and the co-worker "likes," and comments caused her concern.  Pl. SUF ¶ 30. She also believed that his page violated FCC Lompoc policy. Pl. SUF ¶ 31.

**C. Dr. Okonowsky Reported The Page To Defendant; Lt. Hellman Immediately Targeted Her**

On February 17, 2020, the day after she found the Instagram page, Dr. Okonowsky reported the page to two supervisors, including her immediate supervisor, Dr. Carl Clegg and Drug Abuse Program Coordinator, Dr. Anne Clemmer. Pl. SUF ¶ 32.

On February 18, 2020, Dr. Okonowsky complained to Safety Manager Robert Grice about the page. Pl. SUF ¶ 33. Grice was one of many employees that regularly liked and commented on the memes. Pl. SUF ¶ 34. He said he thought the posts were "funny" and told her, "Sorry, not sorry" and told her to get thicker skin. Pl. SUF ¶ 35.

1   Dr. Okonowsky was shocked. Pl. SUF ¶ 36.

2       Later that day, Dr. Okonowsky saw a meme of Nancy Pelosi ripping up

3   President Trump's State of the Union address on Lt. Hellman's page, with captions

4   that said, "*When you get butt hurt by memes*" and "*Tomorrow's forecast: hot enough

5   to melt a snowflake*" and the hashtag, *#youcantakeadickbutnotajoke*. Pl. SUF ¶ 37.

6   Dr. Okonowsky felt the meme was in response to her complaint just hours earlier. Pl.

7   SUF ¶ 38. She did not feel safe at work. Pl. SUF ¶ 39.

8   **D. After Lt. Hellman's Personal Attacks, Dr. Okonowsky Elevated Her**

9   **Complaints**

10      On February 18, 2020, Dr. Okonowsky spoke with Acting Warden James

11  Engleman about the page and the offensive posts. Pl. SUF ¶ 40. Engleman said he

12  would have SIA Victor Gonzales, who was Lt. Hellman's supervisor, submit a

13  referral to the Office of Internal Affairs. Pl. SUF ¶ 41.

14      Dr. Okonowsky met with Gonzales and shared some of the printed memes.  Pl.

15  SUF ¶ 42. Gonzales told her words to the effect of: "*I looked at the page and I don't

16  really see anything that's a problem*." Pl. SUF ¶ 43. Despite many of the memes

17  being obviously sexist, he insisted that Dr. Okonowsky explain why each one was

18  sexist and harassing. Pl. SUF ¶ 44.

19      During a second meeting a week later, Dr. Okonowsky explained to Gonzales

20  that the page contained posts that made explicit references to FCC Lompoc and that

21  people working at prison were commenting and that only employees of FCC Lompoc

22  would understand most of the purported humor. Pl. SUF ¶ 45.

23      Later, Dr. Okonowsky spoke with Defendant's Human Resources Manager,

24  Taulbee McGinnis, who was an active follower of Lt. Hellman's page and told her

25  the memes were "funny." Pl. SUF ¶ 46.

26      Throughout February and March 2020, Dr. Okonowsky complained to Dr.

27  Clemmer that many co-workers were "liking" Lt. Hellman's posts and regularly

28  interacting with the page. Pl. SUF ¶ 47. Dr. Okonowsky also told Dr. Clemmer

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

that she feared retaliation and also expressed concern that her complaints were not taken seriously because the investigators (i.e. the acting HR Manager, Union President and SIS staff) were followers of the page themselves. Pl. SUF ¶ 48.

### E.   Lt. Hellman's Unofficial FCC Lompoc Page Bled Into Dr. Okonowsky's Physical Workplace

Lt. Hellman's postings continued to offend Dr. Okonowsky. Pl. SUF ¶ 49. Many of the posts were critical of her as a female employee. Pl. SUF ¶ 50. Dr. Okonowsky feared that since many employees liked and commented on the posts targeting her, her physical workspace could be in danger. Pl. SUF ¶ 51. She worked in a dangerous Federal Prison and if her co-workers were influenced by Lt. Hellman's disrespect towards her and other females, safety could be compromised. Pl. SUF ¶ 52. She wondered: if I'm attacked by an inmate, will Lieutenant Hellman's crew help me or treat me like the female joke he portrays? Pl. SUF ¶ 53.

Dr. Okonowsky repeatedly complained that she was offended by the posts and expressed that they affected her at work because she felt ostracized at the brunt of jokes and was constantly worried about which employees had seen her targeted memes. Pl. SUF ¶ 54. Because of the harassment and effects on her mental health, her productivity suffered, and she had to work harder to get the same tasks completed. Pl. SUF ¶ 55.

Dr. Okonowsky's fears were realized after she heard conversations among co-workers discussing Lt. Hellman's page. Pl. SUF ¶ 56. She also witnessed co-workers discussing the content of the page during working hours. Pl. SUF ¶ 57. Dr. Okonowsky was confident that any employees who viewed the page would know that she was the subject of the offensive memes. Pl. SUF ¶ 58.

On March 7, 2020, Dr. Okonowsky was shocked to see Lt. Hellman posted a meme that was clearly targeting her: Pl. SUF ¶ 59.

///



Pl. SUF ¶ 60.

The meme shows Dr. Okonowsky's likeness and included comments that were derogatory towards women. Pl. SUF ¶ 61. The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." Pl. SUF ¶ 62. The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." (Id.) Seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post. Pl. SUF ¶ 63.

### F. Per Defendant's Request, Dr. Okonowsky Continued To Report New Offensive Posts

On March 7, 2020, Dr. Okonowsky reported to Dr. Clegg and Engleman that the social media posts targeting her on the Lompoc page had continued. Pl. SUF ¶ 64.

The following day, Gonzales called Dr. Okonowsky and informed her that he had not yet submitted the referral to the Office of Inspector General because he "*could not figure out how to print the memes*" and "*had other things going on.*" Pl. SUF ¶ 65.

On March 9, 2020, Dr. Okonowsky expressed her frustration to Dr. Clemmer that the harassment was continuing. Pl. SUF ¶ 66. Later, Dr. Okonowsky was required to work in the Receiving and Discharge department along with Lt. Hellman. Pl. SUF ¶ 67. She was petrified. Pl. SUF ¶ 68. Not only did she feel that her complaints were ignored, but his physical presence caused her to shift focus

from helping prisoners with their mental health needs – i.e. her job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against her. Pl. SUF ¶ 69.

On March 11, 2020, Dr. Okonowsky submitted a 48-page memo to Associate Warden Gutierrez detailing the harassing memes that continued to be posted by Lt. Hellman and detailing why each meme was offensive and harassing. Pl. SUF ¶ 70. At this time, the page had over 570 posts and Dr. Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted her and other employees at FCC Lompoc. Pl. SUF ¶ 71.

For example, there was a meme that said, "*When psychology services doesn't get their way and they cry*" and an FCC Lompoc employee posted a comment directly referencing a SHU meeting, which was attended by Dr. Okonowsky and where a correctional officer told her: *"I intentionally don't help you."* Pl. SUF ¶ 72. Dr. Okonowsky then saw the meme referencing her job at psychological services, that several FCC Lompoc employees had liked the meme including Grice, and that another FCC Lompoc employee who was also at that meeting left a comment referencing this specific workplace interaction that Dr. Okonowsky was involved in. Pl. SUF ¶ 73.

## G. Defendant Failed To Promptly Investigate Dr. Okonowsky's Complaints And Allowed The Harassment To Continue

Dr. Okonowsky's complaints were repeatedly dismissed by the Defendant and the memes only continued. Pl. SUF ¶ 74. On March 13, 2020, instead of addressing Dr. Okonowsky's complaints of harassment, Dr. Okonowsky was provided a referral to Defendant's Employee Assistance Program, which provides counseling to Defendant's employees to help them address concerns that may negatively impact job performance and overall well-being. Pl. SUF ¶ 75.

On March 27, 2020, Dr. Okonowsky submitted a memo to Defendant

detailing how Lt. Hellman continued to post offensive and sexist content. Pl. SUF ¶ 76. For example, one new meme suggested that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" Pl. SUF ¶ 77. Dr. Okonowsky detailed in her memo how Defendant had failed to promptly investigate her complaints and stop the harassing conduct. Pl. SUF ¶ 78.

That same day, March 27, 2020, Lt. Hellman targeted Dr. Okonowsky with a meme referring to her as a "*giant cunt*" and someone who "relentlessly tells on staff." Pl. SUF ¶ 79. Several FCC Lompoc staff members "liked" the post, including Grice, who Dr. Okonowsky previously lodged a complaint.  Pl. SUF ¶ 80.



Pl. SUF ¶¶ 81-82.

Dr. Okonowsky immediately complained to Engleman. Pl. SUF ¶ 83. However, he did not investigate any of Dr. Okonowsky's complaints and only forwarded them on to Gonzales. Pl. SUF ¶ 84.

**H. Defendant's Own Threat Assessment Team Confirmed The Harassing Memes Were Directed at Dr. Okonowsky**

On April 13, 2020, more than two months after Dr. Okonowsky's initial complaints, a Threat Assessment Team was convened to review Dr. Okonowsky's

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

"concerns about [a] hostile work environment and social media use in violation of policy," as detailed in a memorandum and supporting documentation she submitted to management on March 11, 2020. Pl. SUF ¶ 85.

Dr. Okonowsky told the Threat Assessment Team that since she submitted her memorandum, she continued to see memes on the page directed at her. Dr. Okonowsky also explained to the investigators, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work. Pl. SUF ¶ 86. During meeting, Dr. Okonowsky was advised to both not look at the page but also to continue to look at the page to report any additional posts. Pl. SUF ¶ 87. Dr. Okonowsky did not consent to continue viewing the page, she was told by management that she needed to. Pl. SUF ¶ 88.

Significantly, on April 16, 2020, the Threat Assessment Team issued a report and determined that Lt. Hellman "*unconvincingly*" denied that the memes were directed at Dr. Okonowsky. Pl. SUF ¶ 89. Additionally, they determined that "Hellman's actions towards Dr. Okonowsky (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within the 'bullying' language/definition" from Defendant's Anti-Harassment Policy. Pl. SUF ¶ 90.

## I. Defendant Issued Lt. Hellman A Cease-and-Desist Letter To Force Him To Take Down His Unofficial FCC Lompoc Instagram Page

The Threat Assessment Team also made several recommendations to Defendant including referring Lt. Hellman to the Office of Internal Affairs for possible policy violations; issuing a cease-and-desist letter from posting on social media any memes/information which violates Agency policy; and a referral to the Employee Assistance Program. Pl. SUF ¶ 91.

Defendant followed the recommendations. Pl. SUF ¶ 92. On April 16, 2020, Defendant issued Lt. Hellman a Cease-and Desist Order, ordering him to cease

and desist posting content on social media in violation of Defendant's policies, including content that could reasonably be deemed as harassing or bullying of another employee and any information which discredits the Bureau of Prisons. (Id.) This Cease-and-Desist Order reminded Lt. Hellman that as a "supervisor" he is held to a higher standard of conduct. Pl. SUF ¶ 93. On April 16, 2020, Defendant also issued Lt. Hellman a referral to the Employee Assistance Program. Pl. SUF ¶ 94.

### J. Lt. Hellman Continued To Harass Dr. Okonowsky Even After Being Issued A Cease-and-Desist Letter

Even after Lt. Hellman was issued a cease-and-desist letter on April 16, 2020, almost two months after Dr. Okonowsky's initial complaints, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and one mocking the workplace violence committee process. Pl. SUF ¶ 95.

Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020[4]. Pl. SUF ¶ 96. Lt. Hellman admits he ultimately took the page down because of Dr. Okonowsky's complaints and the related investigation. Pl. SUF ¶ 99. However, Lt. Hellman also claims that he was never interviewed as part of Defendant's alleged investigation. Pl. SUF ¶ 100.

Defendant also continues to allow its staff to be targeted by misogynistic Instagram posts. A copycat account from FCI Victorville made the news in 2022.[5]

## IV.   LEGAL ARGUMENT

Considering all the evidence and considering such evidence in the light most

---

[4] On January 24, 2021, because of the harassment she experienced at FCC Lompoc, Dr. Okonowsky transferred to FCC Seagoville, TX. On July 6, 2022, Dr. Okonowsky resigned from Defendant and now works as a psychologist for Dallas Fire-Rescue. Pl. SUF ¶¶ 97-98.
[5] https://www.ktvu.com/news/whistleblower-outs-racist-misogynistic-instagram-page-at-california-federal-prison.

favorable to Dr. Okonowsky, while resolving any doubts her favor, Dr. Okonowsky has more than sufficient evidence to create triable issues as to her claim for gender/sex discrimination/harassment in violation of Title VII.[6] (*See* Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992). To prevail on a hostile work environment claim, a plaintiff must prove: (1) that she was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Swinton v. Potomac Corp., 270 F.3d 794, 803-05 (9th Cir. 2001).

### A.    Plaintiff Was Subject to "Workplace" Harassment

A hostile work environment claim must be evaluated by looking at the totality of the circumstances. *See* Harris v. Forklift Sys., Inc.*, (1993) 510 U.S. 17, 23. Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Meritor Sav. Bank, FSB, v. Vinson, (1986) 477 U.S. 57, 65. While the conduct complained of must occur at the "workplace" to be actionable, Courts have expanded the meaning of the "workplace" to recognize the reality that harassment not committed at the workplace may still have consequences there. *See* Ferris v. Delta Air Lines*, Inc.* (2nd Cir. 2001) 277 F3d 128, 135 [The rape of a female flight attendant by a male flight attendant in a hotel room the airline provided during a layover in a foreign country occurred in a "work environment" under Title VII.]; *see also* Doe v. Oberweis Dairy (7th Cir. 2006) 456 F3d 704, 715

---

[6] The 9th Circuit has "emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." (McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004).) Therefore, "very little evidence" is needed to survive summary judgment. *(Lam v. Univ. of Hawaii, 40 F3d 1551, 1564 (9th Cir. 1994).)

[A supervisor's statutory rape of a minor employee at his apartment was workplace-related sexual harassment: "The sexual act need not be committed in the workplace, however, to have consequences there."].

Indeed, the critical inquiry is not whether the harassment occurred within the four corners of the worksite, or even if the victim was present at the time of the harassing conduct, but whether the harassment between the employees is sufficiently related to their employment to constitute a "work environment." *See* Schwapp v. Town of Avon*, (2nd Cir. 1997) 118 F.3d 106, 111; *see also* Young, Conaway, Stargatt & Taylor, *Six Sexual Harassment Myths Shattered,* 2 No. 4 *Del. Employment L. Letter* 1 (April 1997) (observing that "[i]t is clear today that the fact that the harassment occurred away from the workplace will carry little weight with the courts."). Thus, Courts have routinely found "workplace" conduct extends to conduct in text messages and on social media. For instance, in EEOC v. Fry's Electronics, Inc.*, 2:10-CV-1562-RSL, Fry's Electronics was ordered to pay $2.3 million to settle a lawsuit brought by the EEOC which alleged sexual harassment based on an assistant store managers text messages to a young employee. In addition, a court upheld a $1.6 million verdict in favor of an employee who was harassed by co-workers on a blog outside the workplace. (*See* Espinoza v. County of Orange (Cal. Ct. App., Feb. 9, 2012) 26 A.D. Cases 31, as modified on denial of reh'g (Mar. 12, 2012).) Further, in Blakey v. Continental Airlines, Inc. a court found that just because an electronic bulletin board may be located outside of a workplace, does not mean that an employer has no duty to correct off-site harassment by co-employees. Blakey v. Continental Airlines, Inc. (2000) 164 N.J. 38, 57.[7]

---

[7] The cases cited by Defendant in its Motion are all unpublished and/or distinguishable from the instant case. Defendant repeatedly cites to Fuller v. Idaho Dep't of Corr., 694 F. App'x 590, 591 (9th Cir. 2017), and contrary to Defendant's assertions, the Court held, "In an opinion filed today, we vacate that summary judgment insofar as it involved Fuller's claim that a hostile work environment was caused by the IDOC's actions after she was raped." Additionally, in the

15

1   Here, the off-site encounters between Dr. Okonowsky and Lt. Hellman on

2   Lt. Hellman's Instagram page were sufficiently related to their employment, while

3   also infiltrating the actual workplace, such as to constitute a hostile work

4   environment. *See e.g.*, Fisher v. Mermaid Manor Home for Adults, LLC, 192

5   F.Supp.3d 323, 326 (E.D.N.Y., 2016) (holding that a reasonable juror could find

6   that a single Instagram post comparing the plaintiff to a fictional chimpanzee from

7   the Planet of the Apes movie, along with a post stating, "Yo dont my f***ing

8   coworker looks like conellsussssssssssss from the movie PLANET of the APES

9   lmfaooo," created a hostile work environment.)

10   First, Lt. Hellman's page was followed by over a hundred employees at FCC

11   Lompoc, including a Human Resources Manager and the Union President.

12   Employees frequently liked and commented on these posts about interactions in the

13   workplace, including interactions with Dr. Okonowsky. Dr. Okonowsky also

14   talked to several employees who regularly liked and commented on the page. In

15   fact, both Safety Manager Robert Grice and HR Manager Taulbee McGinnis told

16   Dr. Okonowsky at work that they thought the memes were funny. Dr. Okonowsky

17   also overheard her coworkers talking about the page at work.

18   In the instant case, the Instagram page was so intimately intertwined with

19   conduct in the workplace that it is impossible to separate the offsite conduct from

20

21   _____

22   published opinion in Fuller, 865 F.3d 1154, 1162, that is not cited by Defendant, the Court
explains its holding and found "viewing the evidence in the light most favorable to Fuller, a

23   reasonable trier of fact could also find that the IDOC's actions were sufficiently severe or
pervasive to create a hostile work environment." Several of the other unpublished cases cited by

24   Defendant are also distinguishable from the instant case. *See* Candelore v. Clark Cnty. Sanitation
Dist., 975 F.2d 588, 590 (9th Cir. 1992) (holding that "A co-worker's romantic involvement with

25   a supervisor does not by itself create a hostile work environment."); Jenott v. St. Alphonsus Reg'l
Med. Ctr., No. CV08-322-S-EJL, 2009 WL 5200524, at *7 (D. Idaho Dec. 23, 2009) (granting

26   summary judgment when, " Significantly, the incidents occurred over a two and half year period
and were never aimed at the Plaintiff."); Bottenberg v. Carson Tahoe Hosp., No. 5-cv-684, 2007

27   WL 9771085 at *4 (D. Nev. May 17, 2007) (granting summary judgement when Plaintiff never
reported the harassing incidents to anyone at Defendant.)

28

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

BROCK& GONZALES

the onsite activities. Not only did the memes refer to Dr. Okonowsky, but they would only make sense to FCC Lompoc employees. Further, Lt. Hellman posted memes that were in direct response to Dr. Okonowsky's complaints at the workplace, including one post with the hashtag *#youcantakeadickbutnotajoke* and another targeted post referring to Dr. Okonowsky as a "*cunt.*" Dr. Okonowsky also explained to the Threat Assessment Team, that the harassment bled into the workplace because interactions she was having at work were showing up on the page and coworkers were talking about the page.

Finally, and as conclusive evidence that the conduct was workplace related, Defendant disciplined Lt. Hellman for his conduct for violating its Anti-Harassment policy. Defendant issued Lt. Hellman a cease-and-desist letter from posting on social media in violation of Defendant's policy. In fact, Lt. Hellman admitted that he took the page down after the continued complaints and investigation by Defendant. How and why would Defendant punish Lt. Hellman if his conduct was not related to the workplace? Defendant's admission that it punished Lt. Hellman, is evidence that Lt. Hellman's conduct offsite had a direct effect at the workplace.

By forcing Lt. Hellman to take his harassing page down, Defendant exercised its power as his employer. The enforcement of employer policies over a seemingly personal website demonstrates that Defendant recognized that his page was an extension of the workplace or could be seen as government sanctioned. This affirmative action creates a genuine issue as to whether the harassment occurred in the workplace.

A jury could certainly find that by enforcing its employment policies on a public employee's personal Instagram page and ordering him to take it down is strong evidence that the harassment was a workplace disruption. "[P]romoting workplace efficiency and avoiding workplace disruption" is a valid government interest that can justify speech restrictions. Dodge v. Evergreen, 56 F.4th 767, 781-

82 (9th Cir. 2022) (citing <u>Hufford v. McEnaney</u>, 249 F.3d 1142, 1148 (9th Cir. 2001)). Indeed, the 9th Circuit limits the speech of government employees under very limited circumstances:

> Whether speech disrupted the workplace is fact-specific and depends on 'the manner, time, and place in which' the employee's speech took place." <u>Clairmont v. Sound Mental Health</u>, 632 F.3d 1091, 1107 (9th Cir. 2011) (citation omitted). Speech is disruptive only when there is an 'actual, material and substantial disruption,' or [there are] 'reasonable predictions of disruption' in the workplace." Disruption 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.' <u>Dodge</u>, 56 F.4th at 781-82 (citations omitted.)

Defendant's actions in limiting Lt. Hellman's speech demonstrates that the page was an "actual, material and substantial disruption,' or 'reasonable predictions of disruption' in the workplace." <u>Robinson v. York</u>, 566 F.3d 817, 824 (9th Cir. 2009). As such, in construing the facts in the light most favorable to Dr. Okonowsky, there is a genuine dispute as to whether she suffered "workplace" harassment.

## B. The Harassment Was Severe And Pervasive

Where the severity or pervasiveness of abuse is questionable, "it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." <u>Davis v. Team Elec. Co.</u> (9th Cir. 2008) 520 F3d 1080, 1096. "Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological

18

well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).

It need not be shown that the offensive comments or conduct were intended to be seen or heard by the victim. <u>EEOC v. PVNF, L.L.C.</u> (10th Cir. 2007) 487 F3d 790, 798 (vulgar and offensive email between 2 male employees concerning female coworker's genitalia could be evidence of harassment even though she was not intended recipient of the email.) It is enough that the conduct, whether blatant or subtle, discriminates against a person solely *because of* the person's sex. *See* <u>Parker v. Reema Consulting Services, Inc.</u> (4th Cir. 2019) 915 F3d 297, 303 (false workplace rumors that employee was promoted because of sexual relationship with superior could support sex-based harassment claim "because 'traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior stubbornly persist in our society,' and 'these stereotypes may cause superiors and coworkers to treat women in the workplace differently from men'")

In the present case, the harassment Dr. Okonowsky was both severe and pervasive. Lt. Hellman posted over *900* hundred sexist, racist, homophobic, transphobic, and otherwise offensive memes on his Instagram page that was followed by of *hundreds* of FCC Lompoc employees. Lt. Hellman was also posting memes clearly targeting Dr. Okonowsky. One such post referred to Dr. Okonowsky as a "giant cunt," another referred to a party Dr. Okonowsky planned on hosting as a "gang bang," another targeted Dr. Okonowsky based on her complaints and her sex with a caption that said, "When you can't get a man, so you get offended," and another using a sexist hashtag "#youcantakeadickbutnotajoke." Lt. Hellman also regularly posted memes that included sexually explicit images of woman in various states of undress including images of women with their breasts

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

exposed and in short skirts and shorts. FCC Lompoc employees were "liking" and commenting on these posts and discussing them at work. As such, the harassment bled into the workplace because interactions Dr. Okonowsky was having at work were showing up on the page.

Dr. Okonowsky also feared for her safety at work as the posts targeting her increased. Dr. Okonowsky worked in an inherently dangerous environment and if her co-workers were influenced by Lt. Hellman's disrespect towards her and other women, safety would be compromised. Dr. Okonowsky was deeply offended by the posts and expressed that they affected her at work because she felt ostracized at the brunt of jokes and was constantly worried about which employees had seen her targeted in these memes. The harassment undoubtedly had effects on her mental health as her productivity suffered and she began having to work harder to get the same tasks completed. Again, Defendant's own Threat Assessment Team also determined that the memes were directed at Dr. Okonowsky and that Lt. Hellman's actions violated the definition of "bullying" from Defendant's Anti-Harassment Policy.

1. **The Page's Discriminatory Posts Outside of Plaintiff's Protected Classes Are Relevant To Her Harassment Claim**

To support a hostile work environment claim, plaintiffs can combine evidence of several different types of harassment. *See* Hafford v. Seidner (6th Cir. 1999) 183 F.3d 506, 515 (evidence of religious harassment could help support racial hostile work environment); Hicks v. Gates Rubber Co., (10th Cir. 1987) 833 F.2d 1406, 1416 (court may aggregate evidence of racial hostility and sexual hostility in determining pervasiveness of harassment). Because the inquiry focuses on the workplace environment as a whole, a hostile environment may exist even if some of the hostility is directed at other workers. Thus, where racial slurs have been directed at a minority race of which plaintiff is a member, similar slurs

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

directed at other minorities may contribute to the overall hostility of the working environment. <u>McGinest v. GTE Service Corp.</u>, (9th Cir. 2004) 360 F.3d 1103, 1117 ("if racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff.").

Lt. Hellman posted *hundreds* of sexist, racist, homophobic, and offensive memes that made explicit references to FCC Lompoc and its employees. At the time Dr. Okonowsky submitted her March 11, 2020 memorandum to Defendant, the page had over 570 posts and Dr. Okonowsky's 48-pages memo contained over 30 examples of sexist and harassing posts.  Lt. Hellman continued posting hundreds of sexist and discriminatory memes for at least another two months. Dr. Okonowsky's submitted another Memorandum to Defendant on May 12, 2020 detailing how Lt. Hellman had made over *930* posts since January 2020 most of which were explicitly sexist, racist, homophobic and harassing and how FCC Lompoc employees were continuing to view and interact with the page. Lt. Hellman's blatant hostility towards other protected groups is further evidence of the hostile work environment he created.

## 2. <u>Lt. Hellman Is A Supervisor; Therefore, Defendant Is Vicariously Liable Even If They Took Immediate And Corrective Action</u>

First, Defendant is strictly liable for Lt. Hellman's conduct *regardless of its subsequent actions*. Under Title VII, a supervisor is treated as the employer's agent so that the employer is subject to vicarious liability to a victimized employee for the supervisor's conduct. *See* <u>Faragher v. City of Boca Raton</u> (1998) 524 US 775, 807. Thus, where the requirements for sexual harassment exist, the employer is vicariously liable for the supervisor's harassment, and it is immaterial whether the employer was aware or should have been aware or was negligent in failing to prevent it. *See* <u>Burlington Industries, Inc. v. Ellerth</u> (1998) 524 US 742, 757.

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

An employee is a "supervisor" for purposes of subjecting the employer to Title VII vicarious liability when that employee has the authority to make tangible employment decisions. <u>Vance v. Ball State Univ.</u>, (2016) 570 US 421, 431.

Lt. Hellman is a supervisor. Critically, the Cease-and-Desist letter Defendant issued Lt. Hellman reminded him that as a "supervisor" he is held to a higher standard of conduct. He supervised the custody staff at FCC Lompoc and ran operations. He was also responsible for overseeing the facility, had several direct reports, and was a member of the Special Investigative Services and was responsible for investigating violations of the law and prison rules regarding the prison. . Even beyond this, there is nothing in the record indicating that he was not a supervisor. Therefore, Defendant is strictly liable for Lt. Hellman's harassing and discriminatory conduct and at a minimum, Lt. Hellman's status as a supervisor remains a genuine issue.

### 3. <u>Defendant Failed To Immediately Take Steps To Prevent The Harassment After Becoming Aware Of It</u>

Second, even if Lt. Hellman is not found to be a supervisor, Defendant was nonetheless aware of the harassment long before they allegedly took steps to end it. Initially, it must be noted that Defendant did not become aware of the harassment when Dr. Okonowsky reported it – *the record indicates they knew about the harassment long before then*! Specifically, Human Resources Manager Taulbee McGinnis was an active follower of Lt. Hellman's page. An employer may be liable when an employer's management knows or should have known of the harassment by plaintiff's coworkers or others or through other circumstances and failed to take appropriate corrective action. <u>Swinton v. Potomac Corp.</u> (9th Cir. 2001) 270 F3d 794, 804; *see* <u>Waltman v. International Paper Co.</u> (5th Cir. 1989) 875 F2d 468, 471 (employer had constructive notice of harassment where "sexually explicit pictures and graffiti derogating the plaintiff" were posted in common areas.) Knowledge of sexual harassment is imputed to the employer when

reported to an employee *specifically employed to deal with sexual harassment*; e.g., part of the employer's human resources, personnel or employee relations group or department. Huston v. Procter & Gamble Paper Products Corp., (3rd Cir. 2009) 568 F3d 100, 107-108. Merely persuading identified harassers to cease their activities may not be adequate remediation where the employer took no action to ensure that harassment did not continue by others. McGinest v. GTE Service Corp. (9th Cir. 2004) 360 F3d 1103, 1121.

In this case, McGinnis was an H.R. manager responsible for responding to harassment complaints. Had he taken affirmative steps to end the conduct, Dr. Okonowsky would either not have been harassed at all or the harassment would have ceased.

Moreover, even after Dr. Okonowsky complained, Defendant did not take immediate corrective and preventative action. Dr. Okonowsky initially complained about Instagram page on February 18, 2020; however, the page was not taken down until after May 12, 2020. *In the meantime, Dr. Okonowsky continued to be harassed* and Lt. Hellman posted *hundreds* of additional memes.

The evidence also indicates that the delay in Defendant's action was not due to the pandemic – Defendant certainly offered no evidence in the record to support such action. The more likely reason for the delay was because Dr. Okonowsky's complaints were repeatedly dismissed, forcing her to continue to complain. For instance, when she initially complained, management told her there was no reason to investigate or convene a Threat Assessment Team. Dr. Okonowsky was also told that the memes were not a problem, that she needed to get thicker skin, and that she should just stop looking at the page. Thus, the harassing memes targeting Dr. Okonowsky continued, and Defendant took no action. In fact, had Dr. Okonowsky not complained, Lt. Hellman would most likely still be targeting women at FCC Lompoc with his disgusting Instagram page.

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Finally, even after Defendant held put together a Threat Assessment Team on April 13, 2020, almost two months after Dr. Okonowsky's initial complaints, Lt. Hellman continued to post sexist and offensive memes targeting her. Importantly, Lt. Hellman claims that he was never even interviewed as part of Defendant's alleged investigation. Thus, Defendant failed to take immediate corrective action and Dr. Okonowsky utilized the appropriate complaint procedures so Defendant cannot utilize this defense.  At a minimum, the issue remains a factual question for the jury.

## V.   **CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied in its entirety.

DATED:  March 13, 2023                BROCK & GONZALES, LLP

By: _____

D. AARON BROCK

CORY H. HURWITZ

LINDSAY L. BOWDEN

Attorneys for Plaintiff

**PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **PLAINTIFF'S NOTICE OF OPPOSITION AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒  **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

_____
Jessica Sanchez

25
**PROOF OF SERVICE**