**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an individual,

        Plaintiff,

  vs.

MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,

        Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**DECLARATION OF LINDSAY OKONOWSKY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*[Plaintiff's Notice of Opposition and Opposition to Defendant's Motion for Summary Judgment; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay L. Bowden; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**
**Courtroom: 6A**

---

1

**DECLARATION OF LINDSAY OKONOWSKY**

# DECLARATION OF LINDSAY OKONOWSKY

I, Lindsay Okonowsky, declare and state as follows:

1. I am over the age of 18 and I have personal knowledge of the matters set forth herein. If called to testify, I could and would testify competently to the following facts:

2. I am a 35-year-old female and began working as a GS-12 Staff Psychologist at FCC Lompoc on September 17, 2018.

3. My immediate supervisor was Chief Psychologist, Dr. Carl Clegg. As a Staff Psychologist, I completed intakes, protective custody reviews, sexual abuse interventions, responded to spontaneous mental health demands/crises, and facilitated group and individual treatment for patients with serious mental illnesses, among other duties. I was never disciplined and received consistent positive reviews and feedback.

4. On February 16, 2020, I became aware of the Instagram page "8_and_hitthe_gate" when the page came up on my personal Instagram as a suggested page I should follow. I later learned that Lieutenant Steven Hellman created and ran the Instagram page "8_and_hitthe_gate."

5. When I first began working at FCC Lompoc, I was informed about the chain of command at the prison and the reporting structure. At this time, Lt. Hellman was an SIS Lieutenant, so he had the authority to supervise the custody staff at FCC Lompoc and oversaw operations. Lt. Hellman also was responsible for overseeing the facility in the absence of the wardens, had several direct reports, and was a member of the Special Investigative Services ("SIS"). As an SIS Lieutenant, Lt. Hellman was also responsible for investigating suspected violations of the law, prison rules, and policies by both inmates and staff.

6. I saw that Lt. Hellman's page "8_and_hitthe_gate" was followed by over a hundred employees at FCC Lompoc, including Human Resources Manager, Taulbee McGinnis, Union President Ryan Enos, SIS Technician Justin Bender, and

Safety Specialist Robert Grice. There were many sexist posts on the page that were overtly demeaning and derogatory towards women and he often posted offensive memes that referenced work, including those that were sexist, racist, and homophobic.

7.    In viewing the page, I also saw that FCC Lompoc employees frequently liked and commented on these offensive posts. I also witnessed FCC Lompoc employees speaking about the posts at work. For example, Lt. Hellman posted a meme of Jefferey Epstein on Valentine's Day and dedicated it to the "The SHU Crew" (aka the Special Housing Unit) at FCC Lompoc and around that time, I heard the officers in the SHU Department talking about how funny they thought the post was.

8.    Based on the creator's high-level position, the subject matter of the page, and the makeup of its followers, I determined that this was an unofficial FCC Lompoc employee Instagram page.

9.    I was shocked at the content, especially since Lt. Hellman was a supervisor and Lieutenant at FCC Lompoc. As a woman, I was especially offended at the sexist memes that were overtly demeaning and derogatory. I considered Lt. Hellman a high-level leader, and I was concerned about how many of my coworkers "liked," and commented on the posts. I also believed that his page violated FCC Lompoc policy.

10.    On February 17, 2020, the day after I found the Instagram page, I reported the page to two supervisors, including my immediate supervisor, Dr. Carl Clegg.

11.    On February 18, 2020, I also complained to Safety Manager Robert Grice about the page. Grice was one of many employees that regularly liked and commented on the memes. He said he thought the posts were "funny" and told me, "Sorry, not sorry" and told me to get thicker skin. I was shocked by his response and how quickly he dismissed me.

12.     Later that day, I saw a meme of Nancy Pelosi ripping up President Trump's State of the Union address on Lt. Hellman's page, with captions that said, "When you get butt hurt by memes" and "Tomorrow's forecast: hot enough to melt a snowflake" and the hashtag, #youcantakeadickbutnotajoke. It was clear to me that the meme was in response to my complaint just hours earlier and I did not feel safe at work.

13.     On February 18, 2020, I spoke with Acting Warden James Engleman about the page and the offensive posts. Engleman told me he would have SIA Victor Gonzales, who was Lt. Hellman's supervisor, submit a referral to the Office of Internal Affairs.

14.     I subsequently met with Gonzales and shared some of the printed memes.  Gonzales told me words to the effect of: "I looked at the page and I don't really see anything that's a problem." Despite many of the memes being obviously sexist, he insisted that I explain why each one was sexist and harassing and subsequently continued to express his personal disagreement.

15.     During a second meeting a week later, I explained to Gonzales that the page contained posts that made explicit references to FCC Lompoc and that people working at prison were commenting and that only FCC Lompoc employees would understand most of the purported humor.

16.     Later, I spoke with Defendant's Human Resources Manager, Taulbee McGinnis, who was an active follower of Lt. Hellman's page and he also told me that he thought the memes were "funny."

17.     Throughout February and March 2020, I continued to complain to Dr. Clemmer that many co-workers were "liking" Lt. Hellman's posts and regularly interacting with the page. I also told Dr. Clemmer that I feared retaliation and the concerns that I had about my complaints not being taken seriously because the investigators (i.e. the acting HR Manager, Union President and SIS staff) were followers of the page themselves.

DECLARATION OF LINDSAY OKONOWSKY

18.     Lt. Hellman's postings continued to offend me. Many of the posts were critical of me as a female employee. I also feared that since many employees liked and commented on the posts targeting me, that my physical workspace could be in danger. I worked in a dangerous Federal Prison and if my co-workers were influenced by Lt. Hellman's disrespect towards me and other women, safety could be compromised. I wondered: if I'm attacked by an inmate, will Lt. Hellman's crew help me or treat me like the female joke he portrays?

19.     I repeatedly complained that I was offended by the posts and expressed that they were affecting me at work because I felt ostracized at the brunt of jokes and was constantly worried about which employees had seen the memes targeting me. Because of the harassment and effects on my mental health, my productivity suffered, and I had to work harder to get the same tasks completed.

20.     My fears were realized when I witnessed co-workers discussing the content of the page during working hours. I was confident that any employees who viewed the page would know that I was the subject of the offensive memes.

21.     On March 7, 2020, I was shocked to see Lt. Hellman posted a meme that was clearly targeting me. The meme showed a woman with my likeness and included comments that were derogatory towards women.  The meme posted depicted a curvy woman in minimal clothing, coyly posed, and stated, "Feeling cute, might put one on watch later." The caption of the post stated, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." I saw that seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post.

22.     On March 7, 2020, I reported to Dr. Clegg and Engelman that the social media posts targeting me on the FCC Lompoc page had continued.

23.     The following day, Gonzales called me and told me that he had not yet submitted the referral to the Office of Inspector General because he "could not figure out how to print the memes" and "had other things going on."

24.     On March 9, 2020, I again expressed my frustration to Dr. Clemmer that the harassment was continuing.  She told me she had confirmed that Lt. Hellman was operating the page. Later that day, I was required to work in the Receiving and Discharge department along with Lt. Hellman.  I was petrified. Not only did I feel that my complaints were ignored, but his physical presence caused me to shift focus from helping prisoners with their mental health needs – i.e. my job - to reliving Lt. Hellman's harassment and standing guard in case he decided to further harass or retaliate against me, or observe me with the intent to create additional disparaging content about me for his Instagram page.

25.     On March 11, 2020, I submitted a 48-page memorandum to Associate Warden Gutierrez detailing the harassing memes that continued to be posted by Lt. Hellman and detailing why each meme was offensive and harassing. At this time, the page had over 570 posts and my 48-pages memo contained over 30 examples of sexist and harassing posts from the page including those that specifically targeted me and other employees at FCC Lompoc. Attached hereto as **Exhibit 1** is a true and correct copy of my March 11, 2020 Memorandum.

26.     One of the memes contained in the memo said, "When psychology services doesn't get their way and they cry" and an FCC Lompoc employee posted a comment directly referencing a SHU meeting, that I attended and where a correctional officer told me: "I intentionally don't help you." I then saw the meme referencing me and my role in psychology services, that several FCC Lompoc employees had liked the meme including Grice, and that another FCC Lompoc employee who was also at that meeting left a comment referencing this specific workplace interaction that I was clearly involved in.

27.     My complaints were repeatedly dismissed by management and the memes only continued. On March 13, 2020, instead of addressing my complaints of harassment, I was provided a referral to the Employee Assistance Program, which provides free counseling services.

28.     On March 27, 2020, I submitted another memorandum detailing how Lt. Hellman continued to post offensive and sexist comments, including those additional memes targeting me. For example, one new meme suggested that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?" I also detailed in my memo how management had failed to promptly investigate my complaints and stop the harassing conduct. Attached hereto as **Exhibit 2** is a true and correct copy of my March 27, 2020 Memorandum.

29.     That same day, on March 27, 2020, another meme targeting me was posted after Lt. Hellman learned of my complaints and clearly referred to me as a "giant cunt" that "relentlessly tells on staff." Several FCC Lompoc staff members "liked" the post, including Grice, who I had previously complained to.

30.     I immediately complained to Engleman. However, he did not respond to my email.

31.     On March 30, 2020, I submitted another memorandum and included the meme that referred to me as a "giant cunt" and expressed that I felt management was not taking my complaints seriously and how Lt. Hellman was the first person I had seen that morning in the parking lot. Attached hereto as **Exhibit 3** is a true and correct copy of my March 30, 2020 Memorandum.

32.     On April 13, 2020, more than two months after my initial complaints, a Threat Assessment Team was convened to review my "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in the memorandum and supporting documentation I submitted to management on March 11, 2020.

33.     During the meeting, I did not state that I had "no personal or direct knowledge as to who ran the page and that the offending conduct occurred exclusively online." I would not have said that because it is not true.  I was told prior to this meeting that Lt. Hellman was operating the page so I would not have said I did not

**DECLARATION OF LINDSAY OKONOWSKY**

know.  Also, I did not ever believe that the harassment occurred "exclusively online," so I would not have said that.  As I explained to the investigators, I felt the harassment not only occurred on the page but bled into the workplace because interactions I was having at work were showing up on the page and people were talking about the page at work.

34.     Even after the Threat Assessment Team was convened, Lt. Hellman continued to post sexist and offensive memes including at least one post targeting Psychology Services and at least one mocking the workplace violence committee meeting process, which I took as ridiculing me. I submitted several additional memos detailing the continued posts including one on April 27, 2020 and another on May 12, 2020. Attached hereto as **Exhibits 4 and 5** are true and correct copies of my April 27, 2020 and May 12, 2020 Memorandums.

35.     I initially complained about Instagram page on February 18, 2020; however, the page was not taken down until sometime after May 12, 2020.

36.     On January 24, 2021, because of the harassment I experienced at FCC Lompoc, I transferred to FCC Seagoville, TX.

37.     On July 6, 2022, I resigned from the Bureau of Prisons and I now work as a psychologist for Dallas Fire-Rescue working with first responders.

Pursuant to Title 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this March 11, 2023, at _____Forney_____, Texas.

_____
Lindsay Okonowsky (Mar 11, 2023 12:37 CST)
Lindsay Okonowsky

**DECLARATION OF LINDSAY OKONOWSKY**

# EXHIBIT 1



UNITED STATES GOVERNMENT
## MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

March 11, 2020

**MEMORANDUM FOR:**     G. Gutierrez, Associate Warden

**FROM:**     L. Okonowsky, Ph.D., Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy**

**Supplementary Materials:**
      **-Highlighted "Guidance on the personal Use of Social Media by Department Employees"**
      **-Catalogue of Lieutenant Hellman's Memes with Explanations Illustrating Contribution to a**
      **Hostile Work Environment/Poor Representation of the Bureau and FCC Lompoc**

On 02-16-2020, I, Lindsay Okonowsky, Ph.D., became aware of an Instagram page (Attachment B) containing hundreds of "memes" clearly targeting the Bureau of Prisons, FCC Lompoc staff, and inmates. Further, I felt several of the memes targeted me, specifically, given they clearly referenced previous conversations I have had with staff and also included derogatory images resembling my likeness in an exaggerated, defamatory, manner.

The attached memorandum titled, "Guidance on the Personal Use of Social Media by Department Employees" (March 24, 2014) (Attachment A) highlights standards of conduct applying to online communications using personal social media. At all times, regardless of whether department employees are at work or outside of the office, they are expected to refrain from discrimination or harassment. I have highlighted information in the memorandum pertinent to the current situation. I request that readers of letter visit the attached memorandum. A close reading will illuminate that the conduct I outline below is strikingly contradictory to the guidance provided in the attached memorandum, violates policy, and contributes to a hostile work environment.

On 02-17-2020, I forwarded the images to the Chief Psychologist. Dr. Carl Clegg, and NRDAP Coordinator, Dr. Anne Clemmer, via text message. I expressed my concern, disapproval, and discomfort about the images. At that time, I also shared my belief that these images created a

Page **1** of **48**

hostile work environment for me and other staff members. That same weekend, I contacted another staff member, Mr. Robert Grice (Acting Safety Manager) via the Instagram messaging platform. At that time, I had an existing friendly relationship with Mr. Grice. I was concerned that Mr. Grice was was "liking" and commenting on the page. In an attempt to handle this matter on an individual basis, I expressed my concern about the content of the page to Mr. Grice and also noted that I felt disappointed that he was condoning the behavior. I stated that he previously had been supportive of me, so I was having difficulty reconciling why he was affirming the same derogatory messages about which he had formerly been critical. He then said, "Sorry, not sorry," and also commented further that he thought many of the posts were funny and suggested I did not have a sense of humor. I share this information to highlight that his response reflects how I believe others at my institution would also respond. Further, my conversation with Mr. Grice led me to believe that he was aware of who was posting the memes; I asked Mr. Grice who was posting the memes, and he said he would talk to me in person about it at work.

On the morning of 02-18-2020, I met with the Chief Psychologist, Dr. Clegg, to further discuss the Instagram page and my concerns related to personally being targeted, as well as my concerns about the content of the page poorly representing the institution and the Bureau of Prisons. I noted that if a member of the community or the media came across the public page, the Bureau of Prisons would have a significant public relations problem given the memes are routinely racist, sexist, homophobic, and transphobic. Further, the memes and images convey harmful messages about inmate suicide, inmate homicide/deaths, and PREA. Given the negative press the Bureau of Prisons has been facing subsequent to the death of Mr. Jeffrey Epstein, I found the potential for the media to see the content of the page as significantly problematic. Notably, there is a meme which makes light of Jeffrey Epstein's suicide (Attachment C). By the end of the conversation with Dr. Clegg, I came to the conclusion that I believed the issue was serious enough to warrant me speaking directly with Acting Warden Engleman. Dr. Clegg also stated that he was concerned enough about the situation to relocate my office from USP Lompoc to FCI Lompoc, which has required disruptions in the Psychology Services department as many of us adjust to new roles.

At about 11:00am on 02-18-2020, I requested to meet with Warden Engleman in his office. We spent about 10 minutes briefly discussing my concerns. Warden Engleman informed me that he would ask SIA Gonzales to submit a referral to the Office of Inspector General.

Later in the day on 02-18-2020, while I was at home, I received an Instagram message from Mr. Grice. He mentioned that he saw me at mainline and supposed that I was angry with him because I did not greet him at mainline. I stated that I did not see him at mainline. I again expressed my dissatisfaction with the content of the page. Notably, Mr. Grice's wife, the Associate Warden's Secretary, who also follows the Instagram page, was working in the Warden's office area when I went to sit down with Warden Engleman earlier in the day.

On 02-18-2020, two hours after I had the brief Instagram conversation with Mr. Grice, a meme,

<div align="center">Page 2 of 48</div>

OKONOWSKY_000350

clearly targeting me, was posted (Attachment D). The meme is a picture of Nancy Pelosi ripping up President Trump's State of the Union Address. The caption above the meme states, "When you get butthurt by memes." The caption below the meme states, "Tomorrow's forecast? Hot enough to melt a snowflake." The hashtag under the second caption states, "#youcantakeadickbutnotajoke." I believe Mr. Grice informed the creator of the memes that I was upset. I interpreted the meme as menacing and did not feel comfortable attending work the following day (02-19-2020). I had been feeling sick, but was going to attempt to try to go to work that day. However, after seeing the post, I decided I did not want to put myself in a potentially hostile work situation. Further, I was sickened by the insinuation that I "could take a dick, but not a joke." On 02-19-2020, after seeing the meme, I sent an email to Warden Engleman requesting to speak with him again. I felt the post was menacing, felt I was being targeted for reporting the Instagram page, and wanted him to be aware of my feelings and the severity of the situation. I did not receive a phone call from Warden Engleman.

I received a call from SIA Gonzales on 02-19-2020, after I had requested to speak again with Warden Engleman, during which SIA Gonzales indicated he wanted to meet to discuss the situation so he could put together a referral to the Office of Inspector General. He stated he did not want to meet while I was feeling sick, so we decided to meet with each other after I returned from my vacation. During the phone call, SIA Gonzales stated, "I looked at the page and I don't really see anything that's a problem." I highlighted that many of the posts were sexist, racist, sexually explicit, targeted me/other staff members, and poorly represented the institution/Bureau of Prisons. I did not feel comfortable upon the conclusion of the phone call with SIA Gonzales and have repeatedly internally questioned his ability to accurately capture the severity of the situation and my concerns in his referral to the Office of Inspector General. My concerns led me to compose and forward this detailed memo to appropriate staff.

I took previously scheduled leave from 02-20-2020 through 02-24-2020. During this time, the individual running the Instagram page posted around 10 memes with problematic content per day. When I returned to work on 02-25-2020 I had to catch up on my duties and spend time adjusting to my new work environment at FCI Lompoc. Dr. Clemmer and I met with SIA Gonzales in his office on 02-26-2020. Notably, while we met, SIS Technician Justin Bender saw Dr. Clemmer and I enter SIA Gonzales' office. Importantly, Mr. Bender has "liked" and commented on several posts on the page, including posts I feel are targeted toward me. During the meeting with SIA Gonzales, he demonstrated a lack of awareness about Instagram, difficulty navigating his computer/printer system, and ignorance regarding systemic racism/sexism. His presentation also led me to feel uncomfortable about his ability to maintain confidentiality in more nuanced ways than just not telling others about our conversations. For example, he asked Dr. Clemmer and I to meet him in his office with other staff nearby, summoned me over the radio system before the meeting, and insisted on printing the memes to a public printer. By the conclusion of the meeting, I was, again, confident that I would have to spend personal time preparing my own report of events.

Several days went by without any update on the status of the situation. At some point, Dr.

Page 3 of 48

OKONOWSKY_000351

Clemmer contacted Acting Human Resources Manager Taulbee McGinnis to inquire about the Instagram page, which he followed. To my knowledge, during the conversation, Mr. McGinnis reported to Dr. Clemmer that the person running the Instagram page was a Lieutenant. Learning this heightened my concern given the person is in a position of power and is someone on whom I would rely in an institutional emergency. Additionally, as a psychologist, I routinely work with lieutenants in various situations. Of further concern, many of the memes speak about line staff in a disparaging manner. I did not think it was appropriate for a supervisor to be posing in racist, sexist, and homophobic manners about his subordinates and the inmates for whom they are charged with caring. A supervisor condoning racist, sexist, and hostile language perpetuates and condones problematic ideologies and rhetoric among line staff. Further, the fact that the Acting Human Resource Manager was aware of the page and failed to report the policy violations is another significant concern.

On Saturday 03-07-2020, the creator of the Instagram page blocked me from being able to view the content of the page. Given my belief that I would have to submit a detailed memo of my own, I felt it pertinent for me to be able to continue to view the content of the page. I created another Instagram account and was able to view the page once again. On 03-07-2020, shortly after my first account was blocked from viewing the page, another meme was posted, clearly targeting me. My belief is that the poster blocked me before posting the new meme because it was strikingly offensive and he did not want me to see the post (Attachment E). The post depicts a heavy woman in minimal clothing, coyly posed, and states, "Feeling cute, might put one on watch later." The caption of the post states, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind." Seventeen people "liked" the post (many of whom work at FCC Lompoc) and two FCC Lompoc employees commented on the post. The post is derogatory toward women, is critical of women's bodies, and diminishes the role of Psychology Services. Further, it minimizes the importance of placing inmates on suicide watch, which protects inmates and the Bureau of Prisons from an inmate dying while under the Bureau's care. I found this post significantly upsetting, and the fact that I was blocked from the page shortly before it was posted leads me to feel confident in my belief that it was directed toward me.

After seeing this post, on 03-07-2020, I emailed Warden Engleman and stated, "Is there any update on this situation? I'm growing increasingly more uncomfortable. This is completely inappropriate and is setting the tone for a strikingly hostile work environment." I did not receive a call from Warden Engleman. SIA Gonzales called me at home on 03-08-2020. He stated he had not yet submitted the referral to the Office of Inspector General because he "could not figure out how to print the memes" and "had other things going on." He stated he was scheduled to take leave the following week, but planned to come to work on 03-09-2020 to finish the referral and submit it to the Office of Inspector General. I was shocked to hear that after making my initial report to Warden Engleman on 02-18-2020, the referral still had not been submitted. Apparently, the referral was eventually submitted on 03-09-2020.

On 03-09-2020, Dr. Clemmer contacted Mr. McGinnis about the Instagram page again. During

**Page 4 of 48**

OKONOWSKY_000352

the contact, to my knowledge, Mr. McGinnis confirmed that the individual running the Instagram account was SIS Lieutenant Steven Hellman. SIS Lieutenants are in positions of power and increased trust. They are charged with handling sensitive information and situations. A reasonable expectation of an SIS Lieutenant would be to take a report from someone like me expressing concerns about a hostile work environment. I do not believe an individual engaging in behavior resembling Mr. Hellman's should maintain this position. Further, I do not believe I should be subjected to working in an environment in which Mr. Hellman is someone on whom I am expected to rely in potentially dangerous work situations (i.e., day watch Operations Lieutenant). Further, the role of a psychologist frequently involves closely working with lieutenants, especially on day watch. I have concerns about Mr. Hellman's ability to work with me in a productive, respectful, and collaborative manner given his repeated decisions to defame my character, criticize my physical appearance, diminish the role of Psychology Services, shame me via jokes for reporting unethical behavior, and question my competence/decisions as a psychologist.

On 03-09-2020, I had a conversation with Dr. Clegg about our concerns subsequent to being informed the creator of the page was Mr. Hellman, a supervising lieutenant in the SIS department. Dr. Clegg would contact his supervisor to obtain more of an understanding on the status of the situation. Later that day, my job duties required me to go to Receiving and Discharge (R&D) at FCI Lompoc to conduct Intake Screenings on 18 inmates. Mr. Hellman was in R&D conducting Intake Screenings at the same time. The situation required me to maintain professionalism, screen inmates for mental health issues/suicide risk, and navigate my concerns about a hostile work environment simultaneously. I successfully completed the demands of my job, but believe it is inappropriate for me to have to juggle completing my duties alongside an individual who has made it so apparent that he does not respect me and has created a hostile work environment for me.

On 03-10-2020 at approximately 11:00am, Dr. Clegg and I sat down with AW Gutierrez to discuss the situation further, given very little had been done up until that point. I expressed my concerns about the culture of the institution as a whole, and noted that individuals charged with taking reports of hostile work environment were following the Instagram page. For example, the Union President Ryan Enos and Acting Human Resource Manager Taulbee McGinnis both follow the page. This institution is currently experiencing a cultural issue related to individuals perpetuating racist, sexist, sexually explicit, and homophobic ideology by condoning and providing support for the content of the page. There is a striking pattern of employees failing to report unethical behavior that violates policy. Dr. Clegg emphasized his concerns about my wellbeing and safety and suggested that a Workplace Violence committee be convened. I expressed my willingness to sit down and talk with Mr. Hellman to AW Gutierrez. Later that day, Dr. Clegg and I were informed that AW Engleman did not determine a Workplace Violence meeting was warranted. I expressed my dissatisfaction that a Workplace Violence meeting would not be held to AW Gutierrez via phone at the end of the day on 03-10-2020.

After Dr. Clegg and I expressed concern about me having to work in the same location as

**Page 5 of 48**

OKONOWSKY_000353

Lieutenant Hellman, and requesting a workplace violence committee meeting, which was not granted (03-10-2020), Lieutenant Hellman was the first person I saw in the parking lot this morning (03-11-2020) and is also working day watch operations today at FCI Lompoc. While I was never told explicitly that anyone counseled Mr. Hellman directly yesterday, based on conversations I had with my supervisor and AW Gutierrez on the afternoon of 03-10-2020, I was able to infer that someone likely spoke with Mr. Hellman about the situation. Problematically, Mr. Hellman published more posts on his Instagram account last night (03-10-2020), after likely being counseled. While the posts last night were not directed toward me, this behavior demonstrates poor decision making, risk taking, and willful disregard of anything he may have been told yesterday, if he in fact was counseled. A point of further concern is that, if Mr. Hellman was counseled, I was not provided any information about what he was told, whether he knew I was the individual raising concern (I believe he does know), or whether I would continue to have to be working alongside him; he was provided information, and, as the party expressing hostile workplace concerns, I was not. Showing up to work this morning with him working the Operations Lieutenant post confirms my concerns about not being insulated from the situation or well-informed were valid. If I encounter a dangerous situation today, which is possible in a prison environment, the person in charge of responding to my needs is potentially aware that I have made a report about his behavior, has demonstrated hostility toward me on his social media page, and has demonstrated poor decision making by continuing to post on the Instagram page.

I will continue to perform my job duties with a high degree of professionalism, efficiency, expediency, accuracy, a focus on ethics, and attention to detail. My priority is, and has always been, providing good mental health care to inmates in an effort to uphold the mission of the Bureau of Prisons and my ethical standards as a psychologist. FCC Lompoc is currently facing an overwhelmingly problematic culture among its employees. FCC Lompoc employees should not have to fear being mocked on a public forum, which many of their peers follow, by a supervisor, simply for doing their jobs or even making mistakes; this is the essence of a hostile work environment. My hope is that my experience will shed light on our areas of growth as an institution. I am making this report while harboring serious concerns about my reputation and potential retaliation moving forward. As a relatively new psychologist in the Bureau of Prisons, I fear my attention to this matter will contribute to others thinking of me as a difficult individual with whom to work or a squeaky wheel. Correctional work cultures often perpetuate silence regarding unethical behavior by shaming and making fun of those who "don't have a sense of humor." Given the negative press the Bureau of Prisons has been facing, I feel an ethical obligation to do whatever is in my power to illuminate behavior that could potentially harm the image, credibility, and reputation of the Bureau of Prisons.

Sincerely,

Lindsay Okonowsky, Ph.D., Staff Psychologist
FCC Lompoc

<p align="center">Page 6 of 48</p>

OKONOWSKY_000354

Attachment A

Page 7 of 48

OKONOWSKY_000355

 

U.S. Department of Justice

Office of the Deputy Attorney General

The Deputy Attorney General        Washington, D.C. 20530

March 24, 2014

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:        James M. Cole
                 Deputy Attorney General

SUBJECT:      Guidance on the Personal Use of
                 Social Media by Department Employees

        This memorandum provides guidance to Department employees regarding their responsibilities when using social media. It is critically important that Department employees understand that engaging in internet and electronic communications regarding matters affecting the Department, as with other forms of communication, implicate the Department's core mission of administering justice in a fair, effective, and even-handed manner. Before using social media to communicate about matters affecting the Department, employees should ask themselves at least two common sense questions: "Is there any risk that I am disclosing confidential or non-public information?" "Might my use of social media adversely affect the Department's mission?" The exercise of sound judgment will go a long way towards ensuring that Department employees meet the high standards we have set for them.

        While the tools and technologies of social media present new ways to connect with friends, colleagues, and the world, Department employees should remain aware that existing policies apply when communicating about matters affecting the Department. Importantly, Department employees are required to adhere to certain government-wide standards of conduct and rules of professional conduct that apply to online communications at all times, regardless of whether they are at work, outside the office, or using government equipment. Additional guidance is discussed in the attached memorandum, but the following standards, rules, and policies warrant particular attention:

- **Protection of Information:** Department employees must properly safeguard confidential, privileged, classified, privacy-protected and/or sensitive Department information. Attorneys must comply with additional rules of professional conduct that prohibit them from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices.

- **Case-Related Comments or Information:** Department employees are generally restricted from publicly releasing any comments or information that may reasonably be expected to influence the outcome of a pending or future trial, including observations about a defendant's character or about their opinion as to a defendant's guilt.

Page 8 of 48

OKONOWSKY_000356

Memorandum for All Department Employees                                    Page 2
Subject: Guidance on the Personal Use of Social Media by Department Employees

- **Comments about Judges:** Department employees should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity.



- **Discrimination or Harassment:** Department employees should not make comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis.



- **Attempts at Anonymous Communications:** Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful. Employees must take care not to engage in activity anonymously (or using a pseudonym) that they otherwise would not be permitted to engage in if their identities were known.

- **Use of Department Computers and Official Time:** Employees using Departmental computer systems and electronic devices are subject to certain guidelines, including restrictions on the use of Department computers and prohibitions on tools that hide the user's identity.

All supervisors should ensure that Department employees receive this guidance, and fully understand these important standards, rules, and policies. If employees have questions or concerns, please contact human resources, a designated ethics or professional responsibility officer, or a supervisor.

Attachment

**Page 9 of 48**

### GUIDANCE ON THE PERSONAL USE OF SOCIAL MEDIA BY
### DEPARTMENT EMPLOYEES

**Introduction**

As the internet and electronic communications take an ever increasing role in our work and personal lives, we must always be mindful of our responsibilities as Department of Justice employees. More specifically, various forms of social media[1] give employees the opportunity to interact with friends and colleagues, but as with other forms of communication, employees need to be aware of the potential for pitfalls. The line between public and private, personal and professional, is often blurred, especially when an employee using social media includes his or  her Department affiliation or title, or comments on matters related to his or her work, or the work of the Department.

As a result, when using social media, Department employees should use caution and, as in everything they do, exhibit sound judgment and common sense. Before using social media to communicate about matters affecting the Department, employees should ask themselves: "Is there any risk that I am disclosing confidential or non-public information?" "Might my use of social media adversely affect the Department's mission?" "Are there Department policies and procedures governing my conduct such that I should consult a supervisor or ethics officer prior to posting, commenting, or blogging online?" By resolving these and other issues discussed more fully below, Department employees will go a long way to assuring that they conduct themselves in a manner consistent with the high standards we have set for Department employees.[2]

Two types of social media commenting merit special attention and should cause Department  employees to exercise extreme care: comments that can be perceived as showing prejudice based on race, gender, sexual orientation, or any other protected basis; and comments on the work of the Department, including cases and investigations. It is critically important that Department employees act, and are perceived to act by the public we serve, in a fair, just, and unbiased manner. Online comments by Department employees exhibiting animus based on any protected basis, including race, gender, or sexual orientation, that adversely affect our ability to

---

[1] For the purposes of this memorandum, "social media" covers tools and technologies that allow an employee to share communications, postings or information, or participate in social networking, including but not limited to: blogs (*e.g.* Twitter, Tumblr), social networks (*e.g.*, Facebook, LinkedIn, Google+), video and photo sharing websites (*e.g* Instagram, Flickr), on-line forums and discussion boards (including commenting on-line using media websites), and automated data feeds. "Social media" does not include non-public tools and technologies, such as Departmental intranet sites.

[2] Based on particular operational concerns, agencies and components may retain existing policies or promulgate additional guidelines on the use of social media so long as they are consistent with the guidance provided in this memorandum.

1

Page 10 of 48

OKONOWSKY_000358

carry out our important mission will not be tolerated, as explained in this policy. Likewise, Department employees should not post or comment about Department cases or investigations when their comments could reveal non-public information, influence the outcome of an investigation or proceeding, or adversely affect the subject of an investigation, a defendant, party, or witness in a case.

In addition, Department employees must recognize that attempts to post, comment, or share information without revealing their names or identities often are unsuccessful. Employees therefore must take care not to engage in activity anonymously, or using a pseudonym, that they otherwise would not be permitted to engage in if their identities were known. The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

**Standards Governing Communications by Department Employees**

Department employees should remain aware that, even though there are new ways to connect with the world, existing policies, rules, and standards are still implicated when communicating about matters affecting the Department. Attorneys should also recognize that they have additional responsibilities under the applicable local court rules and rules of professional conduct, and should consult those rules when considering a particular communication.

It is important to note that while vastly accelerating the speed of communication and greatly broadening the size of the audience, the advent of social media neither restricts nor expands the existing limitations on Department employee speech.[3] Department employees do not surrender their First Amendment rights as a result of their employment; however, the Supreme Court and lower courts have held that the Government may restrict the speech of its employees when employees are not speaking as private citizens on matters of public concern or when the Government's interest in the efficient provision of public services outweighs its employees' interest in the speech. This memorandum is intended to educate and remind Department employees about the limitations in their communications that derive from their status as government employees.[4] To that end, this memorandum on the personal use of social media:

---

[3] While the focus of this memorandum is to provide guidance for communications made on social media, Department employees should recognize that the standards and rules of appropriate professional conduct stated in this guidance are not limited to internet or electronic communications, but rather apply to any public communication, whether written or oral.

[4] The memorandum provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice.

2

**Page 11 of 48**

OKONOWSKY_000359

(1) reinforces the relevant government-wide standards of conduct that apply to all employees' online communications, including when an employee is not at work and not using government equipment;

(2) reiterates the relevant attorney rules of professional conduct that apply to Department attorneys' online communications, including when an attorney is not at work and not using government equipment;

(3) reminds employees of the rules regarding their use of Department computers and equipment and use of official time; and

(4) provides guidelines for personal social media activities that may impact employees' official work for the Department.

This memorandum is not intended to limit or restrict strictly personal social media activities that do not affect the Department and involve the use of personal computers or other devices.[5] Finally, this memorandum is not intended to cover the use of social media by employees in the course of their officially sanctioned work for the Department.

## I.    Government-Wide Standards of Conduct

All Department employees are required to adhere to certain government-wide standards of conduct that apply to online communications at all times. In general, the restrictions on Department employee communications are contained in statute and the Code of Federal Regulations (C.F.R.). While not exhaustive, the following restrictions apply to all employees, and violations may be cause for disciplinary action by the Department:



- **Ethical standards:** Employees shall not engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government. 5 C.F.R. § 735.203.

- **Misuse of Position:** Employees shall not use their public office for private gain, for the endorsement of any product, service, or enterprise, or for the private gain of friends, relatives, or other acquaintances. Also, employees shall not use or permit the use of their Government position or title or any authority associated with their public office in a manner that is intended to coerce or induce another person to provide any benefit, financial or otherwise, to themselves or to friends, relatives, or persons with whom the

---

[5] This memorandum is consistent with and does not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to: (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this memorandum and are controlling. 5 U.S.C. § 2302(b)(13).

3

**Page 12 of 48**

OKONOWSKY_000360

employees are affiliated in a nongovernmental capacity. Finally, with limited exceptions,[6] employees shall not use their Government position or title in a manner that could reasonably be construed to imply that the Government endorses or sanctions their personal activities or those of another. 5 C.F.R. § 2635.702.

- **Use of Non-Public Information:** Employees shall not allow the improper use of non-public information to further their own private interest or that of another, whether by engaging in financial transactions using such information, through advice or recommendation, or by knowing unauthorized disclosure. Non-public information is information that that the employee gains by reason of Federal employment and that he or she knows or reasonably should know has not been made available to the general public. 5 C.F.R. § 2635.703.

- **Political Activity:** Certain restrictions on political activity by Department employees apply regardless of whether they are on duty or on their personal time. Hatch Act (5 U.S.C. §§ 7321-7326). For example, no employee may solicit, accept, or receive political contributions, at any time or in any forum. *Id.* § 7323(a)(2). Other restrictions are discussed further below and in the footnoted memoranda.[7]

- **Discrimination and Harassment:** All employees are responsible for treating fellow employees with basic respect and dignity, and must not harass or discriminate against fellow employees based on race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other non-merit factor. *See* 5 U.S.C. §§ 2301-2302 (prohibited personnel practices); DOJ Order 1200.1, Chapter 4-1, Equal Employment Opportunity Program; Attorney General Memorandum, Prevention of Harassment in the Workplace (Dec. 14, 1998); *see also* American Bar Association Model Rules of Professional Conduct ("Model Rules") Rule 8.4(d) & 8.4 cmt. [3].

- **Case-Related Comments or Information:** Subject to limited exceptions, all Department employees are restricted from publicly releasing any comments or information that "may reasonably be expected to influence the outcome of a pending or

---

[6] *See* 5 C.F.R. § 2635.702(b), (c).

[7] These restrictions are set forth in two memoranda, one for career employees, http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-career-employees.pdf, and one for non-career appointees, http://www.justice.gov/jmd/ethics/docs/pol-activ-dag-noncareer-employees.pdf. Additional information is available on the Department's ethics website, http://www.justice.gov/jmd/ethics/politic.html and the U.S. Office of Special Counsel web site, "Frequently Asked Questions Regarding Social Media and the Hatch Act," U.S. Office of Special Counsel (April 4, 2012) at: http://www.osc.gov/documents/hatchact/federal/Social%20Media%20and%20the%20Hatc h%20Act%202012.pdf.

4

Page 13 of 48

OKONOWSKY_000361

future trial." 28 C.F.R. § 50.2 (b)(2) & § 50.2 (c) (restrictions on extrajudicial speech).[8] In particular, Department employees shall not communicate with non-Department individuals concerning their observations about a defendant's character or about their opinion as to a defendant's guilt. *Id.* § 50.2(b)(6)(iv).

## II.   Rules of Professional Conduct

Department attorneys are required to adhere to applicable rules of professional conduct in their communications, regardless of whether they are at work or outside the office, the medium of communication, the forum in which they are communicating, whether they are using government equipment, and whether they communicate anonymously or pseudonymously. These rules apply to Department attorneys who engage in all types of Department work, including litigation, investigation, and providing legal advice. Moreover, the rules require attorneys to make reasonable efforts to ensure that non-lawyers working with the attorney conduct themselves in a manner that is compatible with the rules. *See* Model Rule 5.3. The Department may discipline attorneys for violations of applicable rules of professional conduct. The following professional conduct principles are contained in the American Bar Association Model Rules of Professional Conduct;[9] although this list is not exhaustive, it highlights rules that attorneys should be particularly mindful of when using social media:

- **Protection of Information:** Department attorneys are required to safeguard and are prohibited from disclosing confidential Department information relating to the representation of the United States (or other clients (*e.g., Bivens* defendants)). *See* Model Rule 1.6(a). The relevant Model Rules also prohibit a Department attorney from disclosing information learned in the course of representing the United States, including confidential case information related to matters personally handled by the attorney or matters handled by all other Department attorneys or offices. *See* Model Rule 1.6 & cmt. [2], [3], [4], [5], [20]; Model Rule 1.10 & cmt. [2]. Confidential information is broadly defined and applies to "all information relating to [a] representation whatever its source," as well as information that reasonably could lead to the discovery of confidential information. Model Rule 1.6 cmt. [3] & [4]. This includes, but is not limited to, information deemed privileged, classified, privacy protected and/or sensitive.

---

[8] *See* 28 C.F.R. § 50.2 (b)(3) & § 50.2 (c) (discussing limited information that may be released to the public).
[9] The Model Rules are cited because most jurisdictions' versions of the professional responsibility rules are based on the Model Rules. A Department lawyer, when confronting an issue of professional conduct, should consider the rules that apply to that particular situation because, in most instances, a specific jurisdiction's rules will govern, rather than (or in some cases, in addition to) the Model Rules.

5

Page 14 of 48

OKONOWSKY_000362

- **False or Misleading Statements:** Department attorneys should not make a false statement of material fact or law regarding their representation of a client to a third person or engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See* Model Rules 4.1 & 8.4(c).
- **Comments about Judges:** Attorneys should not make false statements or statements in reckless disregard for the truth about a judge's qualifications or integrity. Model Rule 8.2.
- **Conflict of Interest:** Attorneys should not make statements that would result in the Department attorney being materially limited or impaired in representing the United States, such as by posting personal opinions contrary to those that the attorney is advocating on behalf of the United States, comments that can be perceived as showing prejudice based on race, gender, sexual orientation or any other protected basis, or comments that may cause the attorney to be called as a witness. *See* Model Rule 1.7(a)(2); Model Rule 8.4(d) & cmt. [3]; Model Rule 3.7(a).[10]
- **Trial Publicity:** Attorneys should not make statements they know or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding, or that are likely to heighten condemnation of an accused in a prosecution being handled by the Department.[11] Model Rules 3.6 & 3.8(f); *see also* USAM §§ 1-7.000 et. seq. (establishing specific guidelines restricting the release of information relating to criminal and civil cases by Department attorneys).

### III.   Use of Department Computers and Official Time

All employees have a duty to protect and conserve Government property and shall not use such property, or allow its use, for other than authorized purposes. 5 C.F.R. § 2635.704. Further, employees shall use official time in an honest effort to perform official duties. 5 C.F.R. §2635.705. Use of Departmental computer systems, including Blackberries and all electronic devices, is subject to the same restrictions on use as are other government-furnished resources provided for the use of employees. While Departmental computer systems are provided for

---

[10] Although the Department may be able to consent to an attorney's continued representation of the United States notwithstanding the conflict of interest created by such comments, the decision whether to consent may involve a time-consuming investigation and assessment of the extent to which the conflict might impair the Department attorney's ability to effectively represent the United States in a particular matter or at all. In addition, the attorney may need to consider whether his or her statements are required to be disclosed subject to the Government's discovery obligations. *See, e.g.,* Deputy Attorney General Memorandum, Guidance on the Use, Preservation, and Disclosure of Electronic Communications in Federal Criminal Cases (March 30, 2011).

[11] The local court rules implemented by courts also govern attorneys' conduct and frequently contain restrictions on attorney speech related to matters pending before the court.

6

**Page 15 of 48**

OKONOWSKY_000363

official use, some personal use of government computer systems is permitted in accordance with existing policy on personal use of government property, where there is negligible cost to the government and no interference with official business. *See* 28 C.F.R. § 45.4; DOJ Order 2740.1A.

Employees must keep the following restrictions and guidelines in mind when using Department computers and computer systems during working hours or nonworking hours. Note that unauthorized or improper use of Department computers and equipment could result in loss of use or limitations on the use of equipment, disciplinary or adverse actions, and/or criminal penalties:

- **Limited expectation of privacy:** Employees should not expect privacy in the use of Department computers or computer systems except in very limited circumstances when the Department has specifically authorized them to engage in attorney-client communications *with private clients*, for example, employees sued in their individual capacity or approved pro bono clients. *See* 28 C.F.R. § 50.15; DOJ Policy Statement on Pro Bono Legal and Volunteer Services. System administrators and others with access privileges may receive authorization from Department senior management officials to review an employee's computer activity, including email communications and internet activity, when there is a legitimate government purpose to do so. DOJ Order 2740.1A, §3(e), (f).

- **Prohibited Uses of Department Computers:** Non-official use of Department computers that could cause congestion, delay, or disruption of service is prohibited.[12] Additional prohibitions include the unauthorized use of internet sites that cause additional charges to the Department, viewing or downloading sexually explicit material, and use for commercial purposes or in support of outside employment or business activities. A list of other prohibited activities on Department computers can be found in DOJ Order 2740.1A, § 3(c).

- **Political Activity:** While on duty, in a Federal facility, using Federal property such as a computer, or while representing the Department, employees are prohibited from engaging in activity directed toward the success or failure of a political party, a candidate for partisan political office, or a partisan political group. Hatch Act (5 U.S.C. §§ 7321-7326).

- **Attempts at Anonymity/Pseudonymity:** Employees must remember that internet activity and posts made from Department computers can be traced back to the Department through the Internet Protocol (IP) address. Note that employees are

---

[12] For example, electronic greeting cards, video, sound or other large file attachments can degrade the performance of the entire network, and should not be viewed or sent on Department computers. Accessing continuous data streams (such as viewing streaming video or listening to streaming audio/radio on a media website) could also degrade the performance of the entire network and is inappropriate when not for official purposes.

7

Page 16 of 48

OKONOWSKY_000364

prohibited from using anonymizer sites or similar tools that hide the user's identity on Department computers (sites that attempt to hide the user's identity from the internet sites being visited).  DOJ Order 2740.1A, § 3(c)(2)(c).

### IV.    Personal Social Media Activity Guidelines

The following guidelines apply to employees' personal social media activities:

- **Department computers:**  Only on a limited basis, where there is negligible expense to the Department and no interference with official business, may personal social media activities be conducted on Department computers, telecommunications devices, and networks, provided such activity does not interfere with the conduct of Department business and does not violate the computer and equipment usage restrictions discussed above in DOJ Order 2740.1A and 28 C.F.R. § 45.4.

- **Use of title and email address:**  Employees may use their official title and Department affiliation on their personal social media page for professional identification or biographic data as long as they do not create an impression that they are speaking in an official capacity.  Employees should not use their government email addresses when setting up personal social media accounts.

- **Communicating in personal capacity:**  Employees must avoid stating, implying, or creating the impression that they are communicating in an official capacity on behalf of the Department in their personal social media activities.[13]  To the extent that there may be confusion about whether an employee is communicating in an official or personal capacity, the employee must include a disclaimer indicating that the employee is communicating in a personal capacity.[14]

-  **Work or Department-related posts:**  Employees may post, comment, or share public information on matters related to their work or the work of the Department provided such communications fully comport with the restrictions set forth in this guidance.  As discussed above, Department employees must properly safeguard privileged, confidential, classified, privacy-protected and/or sensitive Department information. Attorneys must also comply with the applicable jurisdiction's Rules of Professional

---

[13] Implying that one is communicating in an official capacity on behalf of the Department may, for attorneys, also constitute dishonesty, fraud, deceit or misrepresentation, which is prohibited by Model Rule 8.4(c).

[14] For example, DOJ Order 2740.1A provides that "[o]ne acceptable disclaimer is 'The contents of this message are mine personally and do not reflect any position of the Government or my agency.'"  DOJ Order 2740.1A, § 3(d).

8

OKONOWSKY_000365

Conduct. Finally, absent express supervisory approval, employees should not engage in official Department business on personal social media pages.[15]

- **Engaging with colleagues:** Employees are permitted to engage with colleagues, including superiors and subordinates, on their personal social media sites. That said, care must be exercised to ensure that other rules are not inadvertently violated. For example, supervisors who "friend" their subordinates on their social media pages should ensure that they do not solicit contributions for personal causes on their pages in a way that could violate the regulation that prohibits fundraising from subordinates. *See* 5 C.F.R. §2635.808(c)).

- **Political activity:** While most employees can engage in certain political activities while away from the workplace on their own time, including on their social media pages, some prohibitions exist, such as the prohibition on fundraising described above. Employees must understand the prohibitions that apply to their positions and be mindful of them as they engage in personal social media activities. *See* Hatch Act (5 U.S.C. §§ 7321-7326) and other restrictions discussed above in footnote 7 and the associated text.

- **Discrimination and harassment:** As with Department communications, employees may be subject to discipline if they use social media to engage in harassing or discriminatory conduct toward other employees (or individuals or groups) based on their race, color, religion, national origin, sex, gender identity, age, disability (physical or mental), genetic information, status as a parent, sexual orientation, marital status, political affiliation, or any other protected status.

- **Anonymous and pseudonymous postings:** As indicated previously, employees should recognize that attempts to post anonymously or pseudonymously are often unsuccessful, and therefore should take care not to engage in activity that they otherwise would not be permitted to engage in if their identity was known. The applicable rules and standards of conduct apply equally whether an employee uses social media anonymously (or using a pseudonym) or while properly identified.

The exercise of sound judgment and an awareness of applicable rules will go a long way towards avoiding problems that may result in violations of the Standards of Conduct, Rules of Professional Conduct, or Department policy, or potential disruptions to the efficiency of the Department. If you have questions or concerns about the above guidance, or are unsure how it may apply to you, please contact human resources, a designated ethics or professional responsibility officer, or your supervisor.

---

[15] As discussed above, attorneys should also recognize that online communications may need to be reviewed and potentially disclosed in accordance with applicable statutes, the United States Constitution, or Department policies.

9

**Page 18 of 48**

OKONOWSKY_000366

**Attachment B**

**Page 19 of 48**

OKONOWSKY_000367



The name of the Instagram page is 8_and_hitthe_gate.  The page was created on or around January 6th, 2020 and already has over 570 posts.  There are 235 followers as of this date. Many of the followers are employees of FCC Lompoc.  Several employees regularly "like" and comment on the page.  Problematically, the Assistant Human Resource Manager, Union President, and an SIS Technician all follow the page.  The SIS Technician, which is a position of increased trust, frequently likes and comments posts on the page.

OKONOWSKY_000368

Attachment C

Page 21 of 48

OKONOWSKY_000369



This post makes light of the serious issue related to inmate suicide.  Further, the negative press the Bureau of Prisons has been facing subsequent to Mr. Epstein's death calls for employees to exercise a high degree of professionalism both in and out of the workplace.  Bureau of Prison employees are ethnically charged with positively representing the Bureau of Prisons.  Posts like these are exceptionally concerning.

Page **22** of **48**

OKONOWSKY_000370

**Attachment D**

**Page 23 of 48**

OKONOWSKY_000371



This post is certainly directed toward me. Earlier this day, I first reported my concerns about the page to the Chief Psychologist and Acting Warden. Two hours before this post was published, after the work day had concluded, I had a conversation with another staff member about how I was disappointed about the content of the page and that he was "liking" and commenting on the page. Shortly thereafter, this post was published. The caption at the top of the page states, "When you get butthurt by memes." The other caption at the bottom of the meme says, "Tomorrow's forecast? Hot enough to melt a snowflake." The hashtag says, "#youcantakeadickbutnotajoke?" I interpreted this post as menacing and did not feel comfortable going to work the next day. When I read that "tomorrow's forecast" would include a difficult day for me at work, I felt my best course of action was to refrain from putting myself in a potentially hostile work environment.

Page **24** of **48**

OKONOWSKY_000372

Attachment E

Page 25 of 48

OKONOWSKY_000373



I believe this post is targeted toward me. Just before the post was published, the owner of the page blocked me from being able to see the page, further cementing my belief that the post is targeted toward me. This post is derogatory toward women, is critical of women's (specifically my) bodies, and diminishes the role of Psychology Services. The post also makes light of the issue of inmate suicide and challenges the competency of the Psychology Services department.

Page **26** of **48**

OKONOWSKY_000374

Attachment F
Additional Problematic Posts

Page 27 of 48

OKONOWSKY_000375



This post clearly highlights a lack of respect for Psychology Services.  Over the past 1.5 years, I have had conversations with SHU staff about cell assignment recommendations.  More than once, my recommendations have not been considered, resulting in subsequent PREA allegations and inmate-on-inmate assaults.

Page **28** of **48**

OKONOWSKY_000376



This post is also targeted toward me. During a SHU training earlier this year, SHU staff were argumentative regarding their job role of removing inmates from their cells for appointments with Psychology Services. The staff members went as far as recommending that I work on Saturdays so I did not interfere with their daily tasks when I needed to see inmates, per policy. I emphasized that removing inmates from their cells is part of SHU staff members' responsibilities and stated I have attempted, and would continue to attempt, to make every effort to be helpful (assisting with pulling inmates, etc.) and accommodate their schedules. One staff member stated to me, "I intentionally don't help you" after I highlighted my concerns with their problematic feedback and suggestions. The interactions were uncomfortable and hostile; I felt incredibly disrespected as a fellow employee. I expressed my concerns to the former SHU Lieutenant, an Associate Warden, and SHU 1 after the training. One of the SHU staff present during the training commented on this post something to the effect of, "Last quarter's SHU training," signaling that the post is, in fact, directed toward me.

About one month ago, I was working with an inmate in a private office space in SHU. Mr. Hellman entered the office and said he needed to use the space. He undermined me in the presence of the inmate. I expressed my hesitancy to relocate, but complied with the staff member's demand to use the office. The inmate and I relocated to another office. At the time, I was speaking with the inmate about his mother's recent passing. The interaction with the staff member was an inappropriate distraction. I believe this post also highlights that the staff member "got his way" and me, as "Psychology," did not.

OKONOWSKY_000377



This post makes light of inmate suicide and the exceptionally problematic history of slavery.

Page **30** of 48

OKONOWSKY_000378



At the end of last quarter, I decided to talk to SHU staff about having a gathering at my residence to build camaraderie and thank them for their help throughout the quarter. Many staff members were kind and said they looked forward to the gathering. Later, this meme was posted, which led to my decision to cancel the gathering. I am disappointed that I, as a staff member who is a woman, cannot invite people to my home without incredibly sexist and sexually inappropriate jokes being made about things like a "gang bang." Many posts, like this one, reflect conversations or events that have happened in the institution. They are not random posts; they target individuals, departments, executive staff, the bureau, and inmates.

Page **31** of **48**

OKONOWSKY_000379



I believe Mr. Hellman was informed on 02-19-2020 that I expressed my dissatisfaction with the page. These posts attempt to shame individuals who report unethical, problematic, and hostile behavior that violates policy. The message of the memes perpetuates a culture of silence when it comes to addressing behavior that violates policy. Further, the posts demonstrate that Mr. Hellman was aware his posts made staff members uncomfortable, but he chose to continue posting anyway.

Page **32** of **48**

OKONOWSKY_000380



This image depicts a woman, likely in a pornographic video, being choked by a man. The message of the meme is exceptionally inappropriate.

Page **33** of **48**

OKONOWSKY_000381



This meme makes light of inappropriate inmate sexual behavior toward female staff members. The caption at the bottom of the meme insinuates that female staff members are "hoes."

Page **34** of **48**

OKONOWSKY_000382



Page 35 of 48

OKONOWSKY_000383

000383



These posts, and the ones on the previous page, diminish the importance of psychology's role, make light of inmate suicide, and are transphobic.

Page **36** of **48**

OKONOWSKY_000384



This post is blatantly sexist and offensive, comparing female staff members ("girls") to "retards."

Page **37** of **48**

OKONOWSKY_000385



This post is blatantly homophobic.



This post is blatantly transphobic and makes light of inmate deaths.

Page **38** of **48**

OKONOWSKY_000386



This post is derogatory to both working mothers and transgender individuals.

Page **39** of **48**

OKONOWSKY_000387



This post targets a staff member by using his name. Further, the content of the meme is racist, attempting use one's Native American heritage as the punchline in a joke.

Page **40** of **48**

OKONOWSKY_000388



This meme makes light of inmate deaths.  As Bureau of Prison employees, we are charged with caring about the wellbeing of inmates, regardless of their crimes.  This meme highlights a pattern of problematic sentiments toward inmates who are sex offenders.  Posting statements like this, publicly, could pose public relation issues for the Bureau of Prisons.

Page **41** of **48**

OKONOWSKY_000389



I believe these posts are also targeted toward me as the former SHU psychologist. My job required me to request SHU staff to remove inmates from their cells for policy driven clinical contacts. I believe the posts also reflect Mr. Hellman's pattern of critiquing my physical appearance.

Page **42** of **48**

OKONOWSKY_000390



This post jokes about staff members asking inmates to perform physical tasks to avoid getting hurt themselves.  Again, as Bureau of Prison employees, were are charged with keeping inmates safe to the best of our abilities.

Page **43** of **48**

OKONOWSKY_000391



This interaction on the page is clearly directed toward me and Psychology Services.  The interaction also includes problematic racist content.

**Page 44 of 48**

OKONOWSKY_000392



This post is homophobic and also makes light of issues related to the Holocaust.

Page **45** of **48**



This post explicitly jokes about the serious issue of sexual harassment in the workplace.

Page **46** of **48**

OKONOWSKY_000394



This meme is an example of a post that is clearly about an individual, without stating their name. If you are an employee at FCC Lompoc, you likely know who this post is referencing. There are several memes of this nature on the Instagram page.

Page **47** of **48**

OKONOWSKY_000395



This post is exceptionally problematic.  The message of the post likens members of Religious Services to child molesters.

Page **48** of **48**

OKONOWSKY_000396

# EXHIBIT 2

Attachment E



UNITED STATES GOVERNMENT
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

03-27-2020

**MEMORANDUM FOR:**     To whom it may concern

**FROM:**     L. Okonowsky, Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy – Continued Concerns Regarding Institution's Handling of Situation**

On 03-25-2020, after postponing our meeting several times, SIA Gonzales requested to meet with me for an interview pertaining to my previous report of SIS Lieutenant Steven Hellman's problematic use of personal social media creating a hostile work environment. I asked to have union representative, Theo Cintora, present for the interview. Prior to meeting with SIA Gonzales, I briefed Mr. Cintora on the current situation. I expressed my concerns that SIA Gonzales has demonstrated bias and has led me to question his ability to maintain confidentiality (discussed in a previous memorandum). Further, Mr. Cintora and I discussed our concerns that SIA Gonzales conducting the interview would be ill advised given Mr. Hellman is SIA Gonzales' subordinate and that they work in the same department/office. A clear conflict of interest issue is involved if SIA Gonzales investigates a matter related to Mr. Hellman's misconduct.

When Mr. Cintora and I met with SIA Gonzales on 03-25-2020, I immediately raised my concerns related to the conflict of interest and my perception that SIA Gonzales may be biased, given he has shared his unsolicited opinions about the Instagram page with me multiple times. I inquired about whether a member of OIA could come to conduct the interview. SIA Gonzales stated he did not see a conflict of interest and encouraged me to proceed with the interview. He asserted several times that OIA delegated the investigation to him. At that point, Mr. Cintora requested to call Warden Engleman prior to beginning the interview. SIA Gonzales left the room and Mr. Cintora called Warden Engleman. Mr. Cintora raised the conflict of interest issue and requested that Warden Engleman speak with OIA again about bringing someone else in to conduct my interview and the investigation. To my knowledge, Warden Engleman stated he would follow up with Mr. Cintora about this request. As of 03-27-2020, no further information has been provided to me on the status of my request or the interview.

Later in the day, on 03-25-2020, I received a phone call from my co-worker, Dr. Anne Clemmer, NRDAP Coordinator, who stated she ran into SIA Gonzales in a public area of the institution. She stated that SIA Gonzales mentioned that he met with me earlier, but that I did not wish to proceed with the interview at that time. Further, he, again, asserted to Dr. Clemmer, allegedly without being asked, that he did not see anything wrong with Mr. Hellman's Instagram postings. Mr. Gonzales' actions demonstrate continued failure to maintain confidentiality and continued bias regarding my complaint. As I stated in a previous memorandum, I have serious concerns about SIA Gonzales' ability to complete my interview or the

Page **1** of 3

OKONOWSKY_000503

Attachment E

investigation with any sense of fiduciary responsibility.

As of 03-27-2020, I continue to work every day without having been provided any information about where in the institution Mr. Hellman is working.  Further, Mr. Hellman continues to post multiple posts every day on his page that are sexist and use sexually explicit/inappropriate language.  The message of one posts from earlier this week suggests that when female co-workers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?"  Despite the fact that I reported Mr. Hellman's misconduct to Executive Staff on 02-18-2020, his inappropriate posts continue.

The Bureau of Prisons Anti-Harassment Policy (3713.26; dated 06-16-2014) states that the Bureau of Prisons (BOP), "…prohibits not only unlawful harassment, but all harassing conduct in the interest of stopping harassment before it becomes a violation of the EEO laws."  At this point, Mr. Hellman's behavior and Warden Engleman's failure to curb the behavior, perpetuating continued sexism and sexual harassment, is in violation of EEO laws.  Further, the policy states, "BOP employees will work in an environment free from harassing conduct and intimidation from all employees, contract workers and inmates, regardless of their position."  Additionally, the policy states, "Employees who make claims of harassing conduct or provide information related to such claims will be protected against further harassing conduct or retaliation."  Mr. Hellman's harassment continues and I have not been protected or informed, of actions the institution has even considered to protect me.  Further, my (and my supervisor's) request for a workplace violence/threat assessment committee meeting was denied.

Guidelines under "Responsibilities of Supervisors and Management Officials" included in policy 3713.26 indicate, "All supervisors and management officials are responsible for:
- Preventing harassing conduct…
- Preventing retaliation…
- Reporting to the CEO or other appropriate authority any incident of harassing conduct that they witness…
- Receiving and handling allegations of harassing conduct promptly and appropriately…
- Maintaining confidentiality of individual complaints brought to their attention consistent with the other provisions of this policy, and not subjecting the individuals to retaliation for bringing issues forward.
- Providing prompt, interim relief, when necessary, to alleged victims of harassing conduct to ensure that further misconduct does not occur.  To the greatest extent practical, the desires of the alleged victim and any adverse impact to them will be taken into consideration.  If interim relief is provided, the relief will be provided until the investigation/review is concluded, at which point a determination of final relief will be made.
- The BOP is responsible for promptly initiating appropriate corrective and disciplinary action, up to and including removal, against personnel who are found to have engaged in harassing conduct, or who have not carried out their responsibilities under this policy…".

Guidelines under "Responding to Allegations of Harassing Conduct included in policy 3713.26 indicate, "A supervisor or management official who receives an allegation of or witnesses harassing conduct must:
- Speak with the relevant parties…
- Provide appropriate corrective action to stop any harassing conduct and prevent further harassing conduct, including granting appropriate interim relief, when necessary, to the alleged victim if the allegations are being investigated. (Examples include cease and desist letters and schedule changes).
- Consider the concerns of the alleged victim in cases where management is considering separating the alleged victim and the alleged harasser.
- Determine if a threat assessment is needed in accordance with the Program Statement Workplace Violence Prevention, Staff.

Finally, policy 3713.26 emphasizes the importance of confidentiality, stating, "All information will be maintained on a confidential basis to the greatest extent possible."

Page 2 of 3

Attachment E

I believe Warden Engleman has failed to prevent continued harassing conduct; has failed to prevent retaliation; has not handled my allegations promptly; has not maintained confidentiality of my complaint, which has subjected me to retaliation (I believe Mr. Hellman and potentially other staff were informed of my memo and maybe even saw portions of the memo); has failed to provide interim relief to ensure future misconduct does not occur; and has not initiated prompt corrective action.  Further, Warden Engleman and Associate Warden Gutierrez have not responded to my emails, and have therefore failed to consider my concerns regarding being separated from Mr. Hellman.  Finally, my request for a threat assessment and workplace violence committee meeting was denied, without any follow-up contact.  The manner in which my situation has been handled over the past five weeks clearly and repeatedly violates policy, placing me in continued vulnerable and victimizing situations.

Sincerely,

Lindsay Okonowsky, Ph.D., Staff Psychologist

OKONOWSKY_000505

# EXHIBIT 3

Attachment F



**UNITED STATES GOVERNMENT**
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

03-30-2020

**MEMORANDUM FOR:**     To whom it may concern

**FROM:**     L. Okonowsky, Staff Psychologist

**SUBJECT: Concerns about Hostile Work Environment and Social Media Use in Violation of Policy – Continued Concerns Regarding Institution's Handling of Situation**

On the evening of 03-27-2020, I observed an Instagram post on Mr. Hellman's Instagram page that I believed was targeted toward me. The caption of the post stated, "The one staff member that's a giant cunt, loves inmates, and relentlessly tells on staff:". The picture below the caption is of USP Big Sandy's front entrance signage, with the words "Big Sandy" underlined in red. The bottom caption states, "You know, on account of their vaganga." Either Mr. Hellman spelled "vagina" incorrectly, or he was making a reference to a previous post targeting me that referenced a "gangbang" (discussed in previous memos). Several FCC Lompoc staff members "liked" the post, including SIS Technician Justin Bender and Acting Safety Manager Robert Grice, both of whom are mentioned in previous memos I submitted.

I emailed Warden Engleman to express my serious concerns about this post on 03-27-2020 at approximately 9:30pm, from my personal email address (email attached). In my email, I emphasized my discouragement that the problematic posts, clearly targeting me, have continued. I asked Mr. Engleman, explicitly, if anything was going to be done to curb Mr. Hellman's behavior in the interim, while the investigation is completed. I shared my belief that I should not have to work in an environment with someone who refers to me as a "cunt" on a public forum. I also highlighted that policy indicates something should be done to curb Mr. Hellman's behavior and protect me from continued bullying and harassment (relevant policy attached). The attached policy also describes situations in which threat assessments or workplace violence committees are warranted, which I believe is relevant in this case, but did not occur.

Once again, I did not receive a response from Warden Engleman. Despite not receiving any reassurance that my concerns are being taken seriously, that something will be done to stop Mr. Hellman's behavior, and that I will be protected from continuing to experience sexism and sexual harassment, I showed up for work today to complete my job duties. Mr. Hellman was the first person I saw in the parking lot this morning. I saw Warden Engleman at the Training Center this morning, but I did not bring up my concerns to him because the space was not confidential and, at this point, I believe it is Warden Engleman's duty to initiate face-to-face communication about my concerns, of which he is certainly aware. His failure to address my concerns has placed me in continued positions of experiencing sexism and sexual harassment contributing to a hostile work environment.

L. Okonowsky, Ph.D., Staff Psychologist

Page **1** of **12**

OKONOWSKY_000506

Attachment F

Mail From: Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu>

File Edit View Actions Tools Window Help

Close Reply Reply All Forward

Mail Properties Personalize Message Source Discussion Thread

**From:** Lindsay Ann Okonowsky <lindsay.a.okonowsky@wmich.edu> 3/27/2020 9:32:37 P

**To:** Engleman, James

**BC:** Lindsay Okonowsky

**Subject:** Posts

Warden Engleman,

I know you're busy. I understand there is a lot going on right now and I appreciate the difficulties you are facing. That being said, these posts continue on a daily basis and I'm growing more and more discouraged. It is obvious these posts are targeted toward me. Is anything going to be done to curb this behavior as the investigation takes place? I shouldn't have to work in an environment with people who refer to me as a "cunt" on a public forum. I've been nothing but professional and continue to be forced to tolerate this bullying and harassment. Policy says something can be done to protect me in the interim. What will be done? This has gone, and continues to go, too far.

T-Mobile 9:16 PM

8_AND_HITTHE_GATE
Posts Follow

8_and_hitthe_gate ...

The one staff member that's a giant cunt, loves inmates, and relentlessly tells on staff:

3 likes

8_and_hitthe_gate You know, on account of their vaganga

OKONOWSKY_000507

Attachment F



Page **3** of **12**

OKONOWSKY_000508

# EXHIBIT 4



UNITED STATES GOVERNMENT
# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

04-27-2020

**MEMORANDUM FOR:**     To whom it may concern

**FROM:**     L. Okonowsky, Staff Psychologist

**SUBJECT: Continued Postings after Workplace Violence Assessment**

On 04-13-2020, I participated in a Workplace Violence Assessment pertaining to the previously documented situation involving Mr. Hellman.  To my knowledge, he participated in his portion of the meeting later that same week.  I did not receive information on whether a cease and desist letter was provided to him, which I believe was warranted given his continued inappropriate postings on his Instagram page, despite being aware that I was uncomfortable with his behavior.  Not surprisingly, even after the Workplace Violence Assessment, and as recently as this weekend, Mr. Hellman continues to post memes that are sexist and sexually harassing in nature.  Further, he has posted a meme explicitly targeting Psychology Services, a department of which I am a part.  His posts continue to create an exceptionally hostile work environment for female employees, despite him likely being counseled on his behavior.  During the Workplace Violence Assessment, I would imagine he was advised of the problematic nature of his posts, and, I would hope, he was encouraged to discontinue posting offensive, harassing, and discriminatory memes on his Instagram page.  If he was in fact counseled on his behavior, his willful decision to continue posting sexually harassing and sexist memes demonstrates flawed decision-making abilities; defiance toward authority and policy; disregard for the concerns of others; explicit disrespect for women; and a repeated, informed choice to perpetuate sexist and harassing messages on his public Instagram page.  An individual engaging in decision-making and the associated behaviors of Mr. Hellman's, after being informed of the inappropriateness of his behavior by his supervisors, should not continue to serve in a position of trust or as a supervisor of others (especially women).  Attached are examples of his recent posts.

Lindsay Okonowsky, Ph.D.
Staff Psychologist, FCC Lompoc

Page **1** of **6**

OKONOWSKY_000468



When you assault staff and threaten to kill everybody's family, but don't get a shot because you're not responsible for your actions:



8 likes

8_and_hitthe_gate He doesn't adjust well in SHU...

View all 2 comments

5 hours ago



In this post, Mr. Hellman refers to the Institution Disciplinary Process Reports that Psychology Services completes when an inmate with significant mental health issues receives an incident report.  What is notable about this post, other than his continued choice to diminish the role of Psychology Services, is the headline, "Gossip: Why people are taking about you," which is an antagonistic statement. The statement is intended to communicate to members of Psychology Services that they are being negatively discussed among staff, simply for doing their jobs, per policy.

Page **2** of **6**

OKONOWSKY_000469



FCC Lompoc employs two female Unit managers.  This image, likely taken from pornography, carries a highly sexualized message that explicitly disrespects female employees.

OKONOWSKY_000470



Several of Mr. Hellman's posts imply that male staff members view and comment on the appearances of female employees. Female employees, again, are reduced to sex objects. These types of posts, of which there are many, are explicit forms of sexual harassment and perpetuate/condone sexual harassment in the workplace.

Page **4** of **6**

OKONOWSKY_000471



This post is another example of reducing female employees to sex objects and diminishing their roles.

Page **5** of **6**

OKONOWSKY_000472



Mr. Hellman has posted several problematic and discriminatory memes about mothers.  This post is explicitly sexually graphic and is a clear form of sexual harassment.

Page **6** of **6**

OKONOWSKY_000473

# EXHIBIT 5

Attachment B



UNITED STATES GOVERNMENT

# MEMORANDUM

*Federal Correctional Complex Lompoc, California 93436*

05-12-2020

**MEMORANDUM FOR:**     Associate Warden C. Rodriguez

**FROM:**     L. Okonowsky, Ph.D., Staff Psychologist

**SUBJECT: Mr. Hellman's Continued Problematic Social Media Postings/Perpetuation of a Hostile Work Environment**

As of 05-12-2020, Mr. Hellman continues to post significantly problematic content on his Instagram account. A significant portion of the content is explicitly sexist, racist, and homophobic. Many of the posts are unambiguous forms of sexual harassment. More recently, his posts have focused on publicly criticizing Executive Staff's approach to COVID-19 in inappropriate and sexually explicit manners. I attached several of the posts below, but I encourage readers of this memorandum to visit Mr. Hellman's public Instagram page to grasp fully the scope of his behavior.

Notably, Mr. Hellman's decisions to post content in violation of policy and the standards of conduct continues, even after he participated in a Workplace Violence Assessment and after potentially being made aware that he is under investigation. I have outlined my concerns regarding Mr. Hellman's conduct in several previous memos (also attached to this email), so I will not again highlight his past problematic behavior and the potential consequences the Bureau of Prisons/FCC Lompoc could face if his behavior continues (i.e., public relations issues, EEO filings, staff attrition, continued staff misconduct cases, low staff morale, conflict/bullying in the workplace, etc.).

What I will highlight is the following: I am not aware of another workplace as large as the Bureau of Prisons that would allow Mr. Hellman's sexist, racist, and sexually harassing behavior go on for so long (three months now), even during an investigation. I say this while understanding "investigations take time" and while also acknowledging that the Bureau of Prisons/FCC Lompoc are addressing a public health crisis. The current issue began, and was reported, long before COVID-19 was a problem. The Bureau of Prisons must do better to protect employees from discrimination and harassment; as this investigation slowly proceeds, Mr. Hellman continues to put his subordinates in positions of being discriminated against and harassed multiple times per day, with each post he chooses to publish. Every time an FCC Lompoc staff member "likes" or comments on a meme, the sting of the harassment becomes potentially more harmful to employees in protected classes and cements the hostility of our work culture. Further, as a supervisor, he has begun regularly posting in a manner targeting Executive Staff, which only serves to interfere with the cohesiveness of the institution, which is desperately needed given our current situation.

9

OKONOWSKY_000489

Attachment B

The Bureau of Prisons must take a risk by taking a swift stand against Mr. Hellman's behavior.  The Bureau of Prisons must make a point to demonstrate to staff that discriminatory behavior is not tolerated and is addressed expediently.  I understand those working on this case may see Mr. Hellman's behavior as falling into a "gray area," but this is simply an inaccurate reading of the situation.  Policy and the standards of conduct outline his behavior as clear misconduct, especially in his role as a supervisor (a previous memo I submitted crystallizes this fact).  While I adamantly believe Mr. Hellman's behavior is in clear violation of policy, I suggest that policy regarding issues like these is expeditiously updated to avoid any confusion about the wrongfulness of this type of behavior moving forward.  Right now, the Bureau of Prisons is operating on the wrong side of history.  We need to catch up with other organizations and places of employment that clearly and expediently condemn employees' (especially supervisors') uses of social media accounts to create hostile work environments for employees belonging to protected classes. A rudimentary internet search demonstrates that there have been countless cases of employees in various organizations who have been terminated for social media postings far less problematic than Mr. Hellman's posts, of which there are over 900.

The fact that Mr. Hellman maintains his position as an SIS Lieutenant as this investigation proceeds is striking.  I understand that this case may set a precedent, which takes time, intentionality, and thoughtfulness on the parts of all involved.  I also understand the Bureau of Prisons will obviously want to have sufficient evidence of misconduct before potentially imposing sanctions (which I understand could take time), but Mr. Hellman continues to post sexually harassing and other discriminatory content, creating a hostile work environment, as the investigation takes place.  I sincerely hope the costs and benefits of taking a significant amount of time to complete this investigation and waiting to subsequently take action are weighed against the potential consequences of leaving Mr. Hellman in his current position, thereby granting him access to continue discriminating against and harassing subordinates as the investigation continues.

Lindsay Okonowsky, Ph.D.
Staff Psychologist, FCC Lompoc

10

OKONOWSKY_000490

Attachment B

These three memes are explicitly discriminatory and derogatory toward mothers. Mr. Hellman has demonstrated a longstanding pattern of harassing and discriminating against employees who are mothers.

OKONOWSKY_000491

Attachment B









These posts are forms of explicit sexual harassment of employees who are women. The memes reduce women to sex objects and even make light of stalking behavior (figure 3). The pink panther picture (figure 1) is particularly disturbing, painting the imagery of male staff standing in key line with erections as they look at female TDY staff simply walking into work.

12

OKONOWSKY_000492

Attachment B







This page contains additional memes that serve to reduce employees who are women to sex objects. FCC Lompoc employs two Unit Managers who are women.  Figure 1 explicitly targets female Unit Managers using an image pulled from pornography.  The image suggests there is a sexual overtone when female employees work with inmates.  Images like these are sexist and, again, are explicit forms of sexual harassment.  Figure 2 is explicitly homophobic; Mr. Hellman has demonstrated a pattern of posting images of women and referring to them as "dykes" in some way or another.  Figure 3 is another example of Mr. Hellman making light of men ogling at female staff, which is blatant sexual harassment.

13

OKONOWSKY_000493

Attachment B









These memes are problematic for several reasons, but particularly due to the public attention FCC Lompoc and the Bureau of Prisons are receiving.  The posts explicitly target FCC Lompoc Executive Staff in attempts to undermine their leadership.  The posts are hostile, critical, defamatory, and promote dissent among staff.  Given Mr. Hellman is a supervisor, his pattern of perpetuating disregard for authority figures is striking.  If the media were to see these images, they would be able to surmise that FCC Lompoc staff are not united could also posit that "poor decisions" are being made.  It is imperative that we avoid perpetuating that message.

14

OKONOWSKY_000494

Attachment B

These memes are additional examples of Mr. Hellman attempting to undermine Executive Staff and the new Captain using explicitly sexual content.

OKONOWSKY_000495

Attachment B





This post suggests staff are being encouraged to purchase their own PPE with coupons.  What is particularly problematic (outside of Mr. Hellman's continued, targeted, and defamatory posts toward Executive Staff) is that one of the page's followers uses an AW's name in the comments section.  Other staff members support the comment.  Posting staff members' names on a public page could be dangerous for those staff members given our line of work.  Mr. Hellman has demonstrated a pattern of using staff member's names on his page or allowing others to leave comments including staff members' names.

16

OKONOWSKY_000496

Attachment B





These posts demonstrate that Mr. Hellman feels comfortable posting about the previous Workplace Violence Assessment in which he and I previously participated. His comment, "Where's my soldiers" insinuates he is looking for others to rally behind his poor decisions. As a supervisor with influence over subordinates, this is exceptionally problematic; he should be setting a positive example for others. He continues to demonstrate reckless and poor decisions without regarding the consequences of his behaviors.

OKONOWSKY_000497

Attachment B



These posts also demonstrate that Mr. Hellman feels comfortable continuing to post about Psychology Services, even after the Workplace Violence Assessment. Psychology Services staff should be able to perform the duties of their jobs, per policy and under the guidance of the Psychology Services Branch, without facing bullying behavior at the hands of a staff member in a supervisory position.

During the Workplace Violence Assessment meeting, I was informed that Mr. Hellman would be educated on the consequences for continued problematic posts.  The posts above are clearly targeted toward our current situation (especially the second post). His willful decision to make these posts demonstrates disregard for what he was likely told during the meeting, pointing to his compromised ability to make professional decisions, listen to authority figures, and act professionally.

18

OKONOWSKY_000498

Attachment B





These memes should not require an explanation; they are wildly inappropriate and could pose significant public relations problems if community members were to link them to FCC Lompoc. As correctional workers, we are charged with supporting the rehabilitation processes of all inmates, regardless of their crimes.  The meme on the right dances around the "n-word," which is shockingly inappropriate.  Mr. Hellman feels comfortable posting brazenly offensive content (over 930 posts since January, 2020) on his Instagram page; his behavior warrants assessment into his decision-making abilities and reasonably puts into question his ability to serve in a supervisory capacity (especially as SIS Lieutenant).

19

**PROOF OF SERVICE**
UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **DECLARATION OF LINDSAY OKONOWSKY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

_____
Jessica Sanchez

9
**PROOF OF SERVICE**