**BROCK & GONZALES, LLP**
6701 CENTER DRIVE WEST, SUITE 610
LOS ANGELES, CA 90045
Tel: (310) 294-9595
Fax: (310) 961-3673
D. AARON BROCK, STATE BAR NO. 241919
ab@brockgonzales.com
CORY H. HURWITZ, STATE BAR NO. 222026
ch@brockgonzales.com
LINDSAY L. BOWDEN, STATE BAR NO. 318685
lb@brockgonzales.com

**Attorneys for Plaintiff**
LINDSAY OKONOWSKY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

LINDSAY OKONOWSKY, an individual,

        Plaintiff,

    vs.

MERRICK GARLAND, ATTORNEY GENERAL UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS,

        Defendants.

**Case No.: 2:21-cv-07581-VAP-ASx**
Judge: Hon. Virginia A. Phillips

**DECLARATION OF LINDSAY L. BOWDEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

*[Plaintiff's Notice of Opposition and Opposition to Defendant's Motion for Summary Judgment; Plaintiff's Opposition to Defendant's Statement of Undisputed Facts and Conclusions of Law; Declaration of Lindsay Okonowsky; Plaintiff's Written Objections to Defendant's Evidence; and [Proposed] Order re: Plaintiff's Written Objections to Defendant's Evidence.]*

**Hearing: April 3, 2023**
**Time: 2:00 pm**
**Courtroom: 6A**

1

## DECLARATION OF LINDSAY L. BOWDEN

I, Lindsay L. Bowden, do hereby declare as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of California and the Central District of California, and am an associate at Brock & Gonzales, LLP, the attorneys of record for Plaintiff LINDSAY OKONOWSKY ("Plaintiff" or "Ms. Okonowsky") herein. I am familiar with the issues and discovery conducted by all parties in this case. If called as a witness, I could and would testify competently to the matters set forth herein as they are based upon my personal knowledge and belief. This Declaration is submitted in support of Plaintiff's Notice Of Opposition And Opposition To Defendant's Motion For Summary Judgment. *Further, this Declaration serves as "Plaintiff's Compendium of Evidence" in support of Plaintiff's Opposition to Defendant's Motion*.

2.      Attached hereto as **Exhibit A** are true and correct copies of excerpts from the Deposition of Lindsay Okonowsky, taken on October 11, 2022.

3.      Attached hereto as **Exhibit B** are true and correct copies of excerpts from the Deposition of James Engleman, taken on November 16, 2022.

4.      Attached hereto as **Exhibit C** is a true and correct copy of a declaration from Lieutenant Steven Hellman from September 10, 2020, made pursuant to Title 28 U.S.C. §1746 [OKONOWSKY_000322-326].

5.      Attached hereto as **Exhibit D** will be a true and correct copy of the Cease and Desist Order issued to Lieutenant Steven Hellman on April 16, 2020 [USA00000296]. Plaintiff has filed an Application for Leave to File Under Seal pursuant to Local Rule 79-5.1.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed on March 13, 2023 in Los Angeles, California.



Lindsay L. Bowden, Esq.

# EXHIBIT A

1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3   No. 2:21-cv-07581-VAP-AS

4   ------------------------------------x

5   LINDSAY OKONOWSKY,

6            Plaintiff,

7        vs.

8   MERRICK GARLAND, ATTORNEY GENERAL

9   UNITED STATES DEPARTMENT OF JUSTICE,

10  FEDERAL BUREAU OF PRISONS,

11           Defendants.

12  ------------------------------------x

13                   Remote Deposition

14                   October 11, 2022

15                       10:01 a.m.

16

17          DEPOSITION OF LINDSAY OKONOWSKY

18              VIA VIDEOCONFERENCE

19

20

21

22

23               lipka.com, inc.

24               888.lipka.com

25             transcripts@lipka.com

1    page.

2        Q.   And did you have -- and other than being a

3    follower, I should say, was there any other extent of

4    the participation that you believe Mr. McGinnis engaged

5    in?

6        A.   I don't recall at this time, but if there

7    was, I included that in the memos I had previously

8    submitted.

9        Q.   And in terms of the interactions with

10   Mr. McGinnis, did you at all have any conversations

11   with him in person in the office or what was the nature

12   of the interactions or is it similar to Mr. Enos in

13   which it was purely his activity on the page?

14       A.   I don't recall ever having a conversation

15   with Mr. McGinnis about it.

16       Q.   Okay.  And then in terms of Dr. Ann Clemmer,

17   could you describe what your interactions with

18   Dr. Clemmer were?

19       A.   Dr. Clemmer and I had a friendly collegial

20   relationship.

21       Q.   And do you -- did you discuss the Instagram

22   page with her?  Did she also -- are you contending that

23   she also participated in the page?

24       A.   She did not participate in the page, no.  But

25   I did discuss my concerns with her.

```
 1        Q.   And when did you discuss those concerns?
 2        A.   It would have been around February 17th, I
 3   believe.
 4        Q.   And what do you recall from that
 5   conversation?
 6        A.   I recall showing her some of the problematic
 7   posts and talking to her about the content of them and
 8   that they were inappropriate, and I talked to her about
 9   how I felt they were targeting me multiple times.  So
10   yeah, we -- we had extensive conversations about
11   that.
12        Q.   Okay.  And other than that interaction you've
13   described for me, any other interactions that you had
14   with Dr. Clemmer?
15        A.   Yes.  I had talked to Dr. Clemmer about the
16   situation multiple times.  She accompanied me to the
17   first talk that I had with Victor Gonzales, the SIA.
18   And so she was there for that -- that interaction.
19        Q.   Okay.  And then in terms of Acting Warden
20   James Engelman --
21        A.   Yes.
22        Q.   -- what was your interactions with Acting
23   Warden Engelman?
24        A.   I believe I went to him in person for the
25   first time to talk about the content of the page and my
```

1    concerns on the 18th, which was the day after I had

2    become aware.  So I met with him face-to-face and then

3    subsequently sent multiple E-mails to him and multiple

4    memos to him that went unanswered.

5         Q.   And in terms of the Instagram page, do you

6    contend that Acting Warden Engelman participated in the

7    page?

8         A.   No, I do not contend that.  I don't -- no.

9         Q.   In terms of your conversation with Warden

10   Engelman that you mentioned, what do you remember from

11   the conversation?

12        A.   Can you repeat that question?

13        Q.   Sure.  You had mentioned that you had a

14   conversation with AW Engelman and I'm wondering what

15   you remember from that conversation.

16        A.   Okay.  I remember going and talking to him

17   individually and saying, you know, I've become aware of

18   this Instagram page that is inappropriate, it's racist,

19   it's sexist, it's homophobic.  There's some material on

20   that page that could pose a significant public

21   relations issue for the prison and the BOP as a whole

22   if somebody from the public were to see the page.

23   There are, you know, posts that are targeting specific

24   departments.  And that was the most significant parts

25   of our conversation.

1    Q.   And did you ever see that content posted by
2  any of the employees in work rooms or otherwise in the
3  office?
4    A.   No.
5    Q.   So is it fair to say that that -- when you
6  saw that meme at that point and after, it was just on
7  that page?
8    A.   Correct.
9    Q.   Okay.  And what conversations did you have
10  with anyone once you discovered that meme?
11    A.   I reported that meme to Dr. Clegg and I
12  believe I also included it in a memo that I then
13  circulated to executive staff.
14    Q.   And if you could tell me what was your
15  interaction or what do you remember from your
16  conversation with Dr. Clegg?
17    A.   Dr. Clegg, I don't recall specifically.  I
18  can't say specifically.  I think -- actually, no, I do.
19  At that point it became apparent I think to both of us
20  that the meme was targeted, and he suggested a
21  workplace -- that we request a workplace violence
22  committee.  And so that's what we then did to AW
23  Gutierrez, and he also suggested maybe I transition to
24  working at the Low.
25    Q.   Okay.  And so were you reassigned then to the

1    Low facility?

2         A.   Yeah, it wasn't, you know, necessarily

3    formal, but yeah, soon after I did start working at the

4    Low.  But what was exceptionally concerning to me was

5    that the first day I reported to the Low, Hellman was

6    at the Low.  And so I sent an E-mail to AW Gutierrez,

7    asking for more information, like you know, I've

8    been -- I'm moving to Low to be away from Lieutenant

9    Hellman but he's here.  So can you provide -- you know,

10   while maintaining his confidentiality and rights, can

11   you provide me some information about what's going on

12   here so that I can feel comfortable.  And never

13   received any information.

14          And then subsequent to that memo I was given

15   an EAP referral and also Dr. Clegg told me that AW

16   Gutierrez told him that he didn't want to be included

17   on any more of my memos.  He didn't want me to include

18   him on those E-mails.

19        Q.   So in terms of you had mentioned you saw

20   Mr. Hellman in the Low, could you tell me a little bit

21   more about that?  Did you interact with him, did you

22   speak with him or how did you see him in the Low?

23        A.   We passed each other in the parking lot, and

24   then somebody had told me he was in receiving and

25   discharge, but I just kept my head down and I didn't --

1    I was really uncomfortable, so I just tried to get

2    through it and get to my office.

3         Q.    In terms of the interaction in the parking

4    lot, how far apart were you from each other?  Was it

5    just like if you and I walked past each other in the

6    hallway, was it a different part of the parking lot?

7    Can you describe that for me?

8         A.    I don't recall specifically.  I don't recall

9    specifically.

10        Q.    Did he notice you or you noticed him and then

11   you moved the other way?

12        A.    I can't speak to whether he noticed me or

13   not, but I certainly noticed him.

14        Q.    Okay.  And then other than that, did you

15   interact with Lieutenant Hellman at all later in that

16   day or was that the extent of it?

17        A.    Not that day.

18        Q.    Okay.  And then after that day, did you have

19   any other interactions with Lieutenant Hellman?

20        A.    Yes, I did.

21        Q.    In person or I guess could you describe?

22        A.    Yes.  In person.  So the nature of our work

23   as psychologists in prison settings requires us to work

24   on call, and so if an inmate expresses, you know,

25   suicidal thinking or statements, we have to come in.

lipka.com, inc.
(888) 547-5226                    transcripts@lipka.com

38

```
 1    So I was on call and had to come into the Medium
 2    component where Mr. Hellman was working and I had to
 3    have interaction with him about the inmate.
 4         Q.   And generally if you could pinpoint it for
 5    me, when was that interaction?
 6         A.   I couldn't say for sure.
 7         Q.   Would it have been, if you had to guess,
 8    March or in terms of the timeline would it have been
 9    after February or --
10         A.   Yes.  It was after February.
11         Q.   And I guess so when was the, if you remember,
12    the parking lot interaction?
13         A.   It was the day that I reported to the Low for
14    the first time.  I submitted a memo that day that would
15    have that date, but I think it would have been early
16    March, but I can't say for sure.  There's a date
17    with -- there's a memo that's dated that same day.
18         Q.   And in terms of the interaction that you had
19    with Mr. Hellman, separate from the parking lot, the
20    one where you had discussed an inmate, what do you
21    recall from that conversation?
22         A.   It was a neutral conversation.  But it was
23    exceptionally uncomfortable for me.
24         Q.   I'm sorry.  You said it was mutual?
25         A.   It was a neutral conversation.  But it was
```

```
 1   Threat Assessment meeting?
 2        A.    I think her comment and some other people's
 3   comment, you know, just not to look at the page, again,
 4   yes, it was focusing on my emotion.  Right?  Rather
 5   than his behavior.  And also, during that meeting, they
 6   said well, don't look at the page, but then at the --
 7   you know, towards the end of the meeting, they also
 8   said if it continues to happen, of course let us know.
 9   Right?
10             So I was really between a rock and a hard
11   place.  I was being advised not to look at the page,
12   but then they also told me that they didn't have the
13   resources to monitor the page but to tell them if it
14   kept happening.  Right?  So I was kind of like --
15   that's all I could say, I was between a rock and a hard
16   place.  Like I felt nobody was going to -- again,
17   nobody was communicating that they were going to
18   protect me or do any kind of monitoring, and so again,
19   I felt I was on my own and -- and had to take care of
20   myself.
21        Q.    So just to make sure I fully understand,
22   other than the comment or comments that were saying
23   just stop looking at the page or some variation of stop
24   looking at the page, were there any other comments that
25   you felt were sexist that were made at the Threat
```

1    memes that you believe were -- that you believe were

2    directed at you and were subsequently discussed in the

3    workplace?

4         A.   Not that I can recall.  And it's like

5    while -- while I can't recall conversations happening

6    in the workplace, there were -- there's comments on the

7    posts from people who work in the workplace referencing

8    the workplace.  Right?  So it's bidirectional.

9         Q.   And I'm just clarifying.  So there was no

10   other memes that you felt were directed at you and

11   subsequently discussed in the workplace other than what

12   you just --

13        A.   Not that I can recall, in my presence.

14        Q.   Okay.  And in terms of the meme that you had

15   mentioned with referencing the psychology department,

16   how did you find out about this meme?

17        A.   I saw it on the page.

18        Q.   Did anyone send you the meme?

19        A.   No, but if I'm in the workplace violence

20   assessment and they tell me to continue to monitor the

21   page and let them know if any additional behavior comes

22   up.  Right?  Then I'm in a position of having to look

23   at that page.  Furthermore, I don't want to be kind of

24   a sitting duck.  If there is going to be content on

25   that page that's about me, juxtaposed with a previous

1    meme about tomorrow's forecast hot enough to melt a
2    snowflake.  Right?  I felt that I needed to know what
3    was going on on that page to -- to potentially protect
4    myself from a heated situation.
5            If everybody in the institution knows and not
6    me, that's potentially an unsafe situation because we
7    rely on each other as coworkers, especially in a prison
8    environment.  Right?  So if there are things
9    circulating on this page that are about me that are,
10   you know, characterizing me in a problematic manner.
11   Right?  And I potentially have an emergency in the
12   institution and it's -- it's these employees who engage
13   with this page who are going to be responding to the
14   emergency, I have to rely on them.  And so I felt like
15   I needed to know what was going on on that page to --
16   to -- I needed to be well informed.
17        Q.   In terms of that post specifically, though,
18   did you feel that that post was sexist?
19        A.   I -- the -- I don't recall.  I think the post
20   did have something to do with emotionality, but I don't
21   have it in front of me, so I can't say specifically.
22        Q.   So other than -- I guess what do you mean by
23   emotionality?
24        A.   I don't have the post in front of me, so I
25   don't know, but if it included some reference to

1    with you without your consent?

2        A.    Did they discuss the post with me, and then

3    what was the last part of your question?

4        Q.    Without your consent.

5        A.    No.

6        Q.    And in terms of the paragraph here, which if

7    you'd like to take some time to read it, my question is

8    does this capture why you believe the post was directed

9    at you or are there other reasons other than what's

10   written here?

11       A.    Can I read it?

12       Q.    Of course.  And just let -- take your time

13   and just let me know when you've had a chance to read

14   it.  If you want me to adjust the screen, I can do that

15   as well.

16       A.    It's fine the way it is.  Okay.  Yes, I felt

17   this post was targeted towards me.  The staff member

18   that I'm referencing in this memo is Mr. Grice.  So two

19   hours before this post was made, I had had a

20   conversation with Mr. Grice about the post, and on that

21   same day, I had talked to Warden Engelman and the chief

22   psychologist about it.

23       Q.    And anything else?

24       A.    No, I just think the timing makes it quite

25   obvious that it's related to me and my report.

```
 1        Q.   Okay.  And did anyone ever expressly say this
 2   was specifically directed at you?
 3        A.   No, I don't recall.
 4        Q.   Okay.  So the next one is 168.  So we'll go
 5   to 168.  And just so Lindsay can see as well, this is
 6   168.  And similarly in terms of formatting, there's a
 7   post and then a paragraph.  This paragraph was written
 8   by you.  Right?
 9        A.   Yes.
10        Q.   Okay.  So more series of questions.  How did
11   you learn about this post?
12        A.   I saw it on the Instagram page.
13        Q.   And no one sent it to you before you saw it
14   on the Instagram page.  Is that right?
15        A.   That's correct.
16        Q.   And no one sent it to you after?
17        A.   Correct.
18        Q.   And this post was not displayed in the
19   workplace.  Right?
20        A.   Correct.
21        Q.   And it was also never shown to you in the
22   workplace either.  Right?
23        A.   Correct.
24        Q.   And no one approached you to discuss the post
25   without your consent.  Right?
```

1         A.    Correct.

2         Q.    And in terms of what's written here, this

3    paragraph that you wrote, are there any other reasons

4    as to why you believe the post was directed at you or

5    does this paragraph that you've written here capture

6    it?

7         A.    Let me -- can I read it?

8         Q.    Of course.  Of course.

9         A.    Yes.  So again, this one comes down to

10   timing.  So Mr. Hellman had blocked my Instagram page

11   from being able to look at the posts, which I didn't

12   even know he knew the name of my own Instagram page.

13   So there had to be some conversations with other staff

14   members about what my Instagram name was.  But right

15   before this was posted, he blocked me from being able

16   to look at the page.  So the timing indicates that it's

17   about me or targeting me.  I believe the woman in the

18   photo is kind of like, you know, it exaggerated

19   likeness to some degree.

20        And I -- you know, my role was frequently to

21   be involved in suicide risk assessments at the

22   institution.  So yes, you know, especially given he had

23   blocked me from being able to see the page right before

24   posting this, that led me to believe that it absolutely

25   targets me.

```
 1   171 is the next one.  Okay.  So -- so if you could just
 2   take a second to review and read the paragraphs which I
 3   believe were written by you, and then whenever you're
 4   ready, just let me know.
 5           A.   Okay.  Okay.
 6           Q.   Okay.  So how did you learn of this post?
 7           A.   I saw it on the Instagram page.
 8           Q.   And no one sent it to you before you saw it
 9   on the Instagram page.  Right?
10           A.   That's correct.
11           Q.   And no one sent it to you after you saw it on
12   the Instagram page.  Right?
13           A.   That's correct.
14           Q.   And it was never displayed at the workplace.
15   Right?
16           A.   Correct.
17           Q.   And it was also never shown to you at the
18   workplace -- I'm sorry.  It was never shown to you at
19   the workplace either.  Right?
20           A.   That's correct.
21           Q.   And no one discussed it with you without your
22   consent.  Right?
23           A.   That's correct.  But I don't think, you know,
24   these -- this line of questioning about these posts and
25   whether it was shown to me in the workplace or not
```

1    really captures, you know, the situation.  Like with

2    this post in particular, there was a comment from an

3    employee referencing a meeting that did happen in the

4    workplace.  So this is kind of what I'm referencing

5    with that kind of bidirectional relationship with the

6    workplace and the Instagram page.  It was a page

7    created by a Lompoc employee for Lompoc employees where

8    Lompoc matters were discussed.  So I just think that's

9    important.

10        Q.   And in terms of why you believe the post was

11   directed at you, is that captured in this paragraph or

12   is there additional information?

13        A.   Yeah, I mean I think it's captured in what's

14   written, that I had interactions with Hellman where,

15   you know, he had asked me in the middle of me doing a

16   task to move offices when a captain before him had told

17   me to work in that office, and then the SHU training

18   that I reference in the paragraph as well.  I was the

19   only psychologist present for that SHU training.  So

20   again, that employee's comment references a meeting

21   that I was part of and not any other psychologist.

22        Q.   And in terms of the interaction you mentioned

23   with Hellman, that was prior to discovering -- your

24   discovery of Instagram things.  Right?

25        A.   I do not recall.

1   Q.   Okay.  And did anyone ever say this post was

2   specifically directed at you?

3   A.   No, but the employee's comment references a

4   SHU meeting that I and only I, the only psychologist,

5   was part of.  So that to me indicates that yes, other

6   people had the idea that it targeted me as well.

7   Q.   And what was the name of that employee?

8   A.   I don't recall, but it's definitely included

9   as a screen shot in another memo that I submitted.

10   Q.   It wasn't Hellman, just to be clear.

11   Right?

12   A.   No, Hellman create -- created the post.

13   Q.   And in terms of why you believe Hellman

14   created the post, that's again, just to be clear, so

15   we're on the same page, that's what's captured here.

16   Right?  Those are your reasons why you believe Hellman

17   created it?

18   A.   Yes.

19   Q.   Okay.  In -- yeah.  Yeah.

20   Q.   And then in terms of -- the next set I want

21   to show you is 173.  Okay.  So this is -- just you can

22   see, Lindsay, 173.  And then after you have a chance --

23   as before, after you have a chance to look at it, let

24   me blow this up a little bit more so you can see, just

25   let me know.

```
 1        Q.   After you have a chance to look at this, just
 2   let me know.
 3        A.   Okay.
 4        Q.   Okay.  So let me flip it back so we can --
 5   sorry.  Okay.  There we go.  All right.  Sorry.  Are
 6   you getting dizzy?  Oh, my gosh.  Okay.  Sorry.  All
 7   right.  Apologies for that.  Okay.  So as before,
 8   Ms. Okonowsky, how did you learn of this post?
 9        A.   I saw it on the page.
10        Q.   And did anyone send it to you before you saw
11   it on the page?
12        A.   No.
13        Q.   Did anyone send it to you after you saw it on
14   the page?
15        A.   No.
16        Q.   And was this post ever displayed at the
17   workplace?
18        A.   No.
19        Q.   And --
20        A.   Again, I don't believe it has to be.  All of
21   the people on the next page that liked the post are
22   Lompoc employees.  So whether it's displayed or not,
23   it's something that permeated the workplace.
24        Q.   I'm just trying to understand what happened.
25   That's all.  And in terms of this post, was this post
```

```
 1        A.    No.
 2        Q.    And did anyone send it to you after you saw
 3   that page?
 4        A.    No.
 5        Q.    And was that post ever displayed in the
 6   workplace?
 7        A.    No.
 8        Q.    And was it ever shown to you in the
 9   workplace?
10        A.    No.
11        Q.    And did anyone ever approach you to discuss
12   that post without your consent?
13        A.    No.
14        Q.    And did anyone ever say that that post was
15   specifically directed at you?
16        A.    No.  But I will say about that post, it left
17   me feeling exceptionally concerned and scared honestly
18   because him and I -- Hellman and I both went through a
19   workplace violence committee meeting where the nature
20   of the situation was discussed at length with me and
21   then, you know, about a week later, to my knowledge,
22   him.  And he was, you know, advised -- I don't know
23   what he was advised of, but I -- for me the situation
24   seemed very serious because of who was involved, who
25   was present, so on and so forth.
```

```
 1          And they had -- the committee showed Hellman
 2    all of my memos.  He was able to see it all.  And so to
 3    see that him and I have both been through a very
 4    serious meeting and then he was, like, kind of
 5    flaunting his disregard for that meeting with a post
 6    and had seen everything I had written left me feeling
 7    scared because it kind of demonstrated to me that like
 8    where his thinking was.  Like he didn't care what they
 9    said about the situation.  He didn't take it seriously
10    and he didn't stop posting at that point.  So it made
11    me feel -- yeah, it made me feel scared.
12          Q.   And in terms of the post on the page, I just
13    want to make sure for completeness we walk through it.
14    Other than the post we've discussed, were any of the
15    posts sent to you before you viewed them on the page?
16          A.   No.
17          Q.   And were any of them sent to you after you
18    viewed them on the page?
19          A.   I -- no.
20          Q.   And were any of the posts displayed in the
21    workplace?
22          A.   No.
23          Q.   Were any of them ever shown to you in the
24    workplace?
25          A.   No.
```

```
 1   it was when the legal proceedings and all that had
 2   started.
 3       Q.   Okay.  And I wanted to ask you about a few
 4   things that are mentioned in here which I've
 5   highlighted for ease of reference, but just generally,
 6   and we'll walk through some of the memo, but what do
 7   you remember about the threat assessment meeting, for
 8   lack of a better phrase?  You were in the meeting.
 9   Right?
10       A.   Yeah.  Yeah.
11       Q.   Just to help --
12       A.   I remember a lot about it.
13       Q.   Okay.
14       A.   But yeah, I sat down with a group of people
15   and they asked me questions and -- yeah.
16       Q.   And in terms of the questions that you were
17   asked, what questions do you remember being asked?
18       A.    I don't remember the specific questions that
19   I was asked.
20       Q.   Okay.  Totally fair.  And then in terms of
21   the threat assessment team, were all -- when you did
22   your interview with them, were all these individuals
23   present?  Let me zoom in so you can see them.
24       A.   Yes.  They were.
25       Q.   Okay.  And we've talked about Dr. Clegg
```

1    before.  Did you talk with Dr. Clegg after the threat

2    assessment meeting?

3         A.    Not about the threat assessment meeting.  I

4    think there were either instructions or it was kind of

5    implied that it's something we don't discuss after the

6    meeting is held.

7         Q.    Okay.  Totally understand.  And in terms

8    of -- I guess here too, did the threat assessment team

9    disclose to you that they reviewed your memorandum?

10        A.    Yes.  I remember specifically the lawyer,

11   Mr. Blau (phonetic). He kicked the meeting off and said

12   that he reviewed everything and he made some kind of

13   statement about how he wouldn't want to fight this

14   case, which I thought was striking and always stuck

15   with me and kind of validated some of my concerns.

16        Q.    And in terms of the concerns you expressed to

17   the threat assessment team, we'll walk through those as

18   well, but a few things I wanted to clarify based on

19   what we've been discussing today.  In the interviews it

20   notes that you admitted that you had no personal or

21   direct knowledge that Lieutenant Hellman is, in fact,

22   the sole owner of and contributor to the Instagram

23   account.  So does this refresh your recollection that

24   at the time of this meeting, which is, just so we have

25   it in front of us, April 16, 2020, that you did not at

1          REPORTER'S CERTIFICATE

2

3   STATE OF CALIFORNIA      ) ss:

4   COUNTY OF SAN BERNARDINO )

5          I, Terri L. Emery, a Certified Shorthand

6   Reporter within and for the State of California, do

7   hereby certify:

8          That Lindsay Okonowsky, the witness whose

9   testimony is hereinbefore set forth, was duly sworn by

10  me, and that such testimony given by the witness was

11  taken down stenographically by me and then transcribed.

12         I further certify that I am not related by

13  blood or marriage to any of the parties or counsel in

14  this matter and that I am in no way interested in the

15  outcome of this matter.

16         That any copy of this transcript obtained

17  from a source other than the court reporting firm,

18  including from the adversary or co-counsel in the

19  matter, is uncertified and may not be used at trial.

20         IN WITNESS WHEREOF, I have hereunto set my

21  hand this 23rd day of October, 2022.

22  (SIGNED ELECTRONICALLY)

23  _____

24  Terri L. Emery,

25  California CSR No. 11598

# EXHIBIT B

James Engleman                                               November 16, 2022

```
 1                    UNITED STATES DISTRICT COURT

 2           CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

 3

 4    LINDSAY OKONOWSKY, an         )
      individual,                   )
 5                                  )
                Plaintiff,          )
 6                                  )
                vs.                 )Case No. 2:21-CV-07581-VAP-ASx
 7                                  )
      WILLIAM P. BARR, ATTORNEY     )
 8    GENERAL, UNITED STATES        )
      DEPARTMENT OF JUSTICE,        )
 9    FEDERAL BUREAU OF PRISONS,    )
                                    )
10              Defendants.         )
      _____)

11

12

13

14

15                 VIDEOCONFERENCE DEPOSITION OF

16                         JAMES ENGLEMAN

17                      NOVEMBER 16, 2022

18

19

20

21

22

23
      Reported by:  Joyce A. Griffith
24    CSR No.:       11010
      NDS Job No.:  267160
25
```

                                                                    1

1    but you never know in this agency.

2         Q    You worked for the Federal Bureau of Prisons at

3    FCC Lompoc in 2020 with Ms. Okonowsky, the plaintiff in

4    this lawsuit, correct?

5         A    That's correct.

6         Q    What was your position at that time?

7         A    I was associate warden.

8         Q    In February 2020, Ms. Okonowsky made some

9    complaints to you, correct, regarding harassment and

10   discrimination?

11        A    Correct.

12        Q    And at some point you were involved in

13   investigating those complaints; is that also correct?

14        A    I don't do the investigations, ma'am.  I just

15   refer on to investigators.

16        Q    Did you have any participation in the

17   investigation into Ms. Okonowsky's complaints?

18        A    No.  I don't do the investigations.

19        Q    So you had no involvement in the investigation

20   into her complaints?

21        A    No.  Not the investigation, no.

22        Q    Did you take any action in response to any

23   complaints that she made to you?

24        A    Yeah.  I referred her allegations to the

25   investigator.

7

1      Q    Understood.

2           That's the extent of your involvement; is that

3    correct?

4      A    Correct.

5      Q    Backing up a little bit.

6           Are you represented by counsel today?

7      A    No.

8           I'm sorry.  I have got Zak here, so my bad.

9      Q    So you are represented by counsel today; is that

10   correct?

11     A    Yes.

12     Q    Have you ever had your deposition taken before?

13     A    No.

14     Q    I'm sure that your attorney has gone over some

15   rules with you already.  I just want to go over some brief

16   rules, just to make sure that we are all on the same page

17   as we move forward today.

18          A couple of things are really important because

19   we are on Zoom and there's a court reporter that's taking

20   down everything being said.

21          Just a reminder, let me finish my question before

22   you start answering the question, and I will do my best to

23   let you finish any answers before I ask my next question.

24          Again, it's really important that we speak one at

25   a time.  Okay?

8

James Engleman                                              November 16, 2022

```
1   STATE OF CALIFORNIA        )
                               ) ss:
2   COUNTY OF ORANGE           )

3

4           I, JOYCE GRIFFITH, do hereby certify:

5

6           That I am a duly qualified Certified Shorthand

7   Reporter, in and for the State of California, holder of

8   certificate number 11010, which is in full force and

9   effect and that I am authorized to administer oaths and

10  affirmations;

11          That the foregoing deposition testimony of the

12  herein named witness was taken before me at the time and

13  place herein set forth;

14          That prior to being examined, the witness named

15  in the foregoing deposition, was duly sworn or affirmed

16  by me, to testify the truth, the whole truth, and

17  nothing but the truth;

18          That the testimony of the witness and all

19  objections made at the time of the examination were

20  recorded stenographically by me, and were thereafter

21  transcribed under my direction and supervision;

22          That the foregoing pages contain a full, true

23  and accurate record of the proceedings and testimony to

24  the best of my skill and ability;

25
```

95

# EXHIBIT C

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS
REPORT OF INVESTIGATION

| | | |
|---|---|---|
| Lindsey Okonowsky | * | |
| | * | |
| Complainant, | * | |
| | * | |
| vs. | * | Agency Case Number: BOP-2020-01035 |
| | * | |
| United States Department of Justice | * | |
| Federal Bureau of Prisons | * | |
| 320 First Street, Northwest | * | |
| Washington, District of Columbia 20534 | * | |
| | * | |
| | * | |
| Agency | | |

---

## INTERROGATORY FOR STEVEN HELLMAN, LIEUTENANT

---

### INSTRUCTIONS FOR ANSWERING INTERROGATORY

Pursuant to the Equal Employment Opportunity Commission's Management Directive 110, dated August 5, 2015, the Investigator may use Interrogatories in conducting investigations. The use of this Interrogatory is to give you an opportunity to "respond fully" with your testimony as if you were being interviewed by the Investigator. Should you fail to fully answer the questions in this Interrogatory, the Investigator may either issue you a Supplemental Interrogatory and/or require your participation in an oral interview in which an affidavit will be drafted from the interview for your signature.

Should you refuse without good cause to respond fully to this Interrogatory, a Supplemental Interrogatory, or participate in an oral interview, sanctions may be imposed. Pursuant to 29 C.F.R. § 1614.108(c)(3) "a party to a complaint - the complainant as well as the agency - may be subject to sanctions where it fails without good cause shown to respond fully and in a timely fashion to a request of the investigator for documents, records, comparative data, statistics, affidavits, or the attendance of witnesses." In addition, you are declaring under the penalty of perjury that your answers are both truthful and correct.

The Investigator may or may not know the full extent of your involvement or your knowledge of the allegations being investigated, prior to drafting these Interrogatory questions. Consequently, there may be questions asked in general terms, but still specific to the issue(s) fully identified

below.  Therefore, you should be forthcoming in your answers and provide as much information as you have regarding the issue(s) under investigation.  The last question asked gives you an opportunity to add any information you have regarding the issue(s) being investigated; and you should provide that additional information, regardless if there were any direct questions posed to you regarding that specific information.

If after answering these questions and returning a signed copy of the Interrogatory to the Investigator, you determine your answers were incorrect or you failed to provide your full testimony, you should immediately contact the Investigator to amend your answers via an Addendum to your Interrogatory.  Keep in mind, your original answers to the Interrogatory may still be included in the Report of Investigation.

## ACCEPTED ISSUES UNDER INVESTIGATION

Complainant alleges management subjected her to sexual harassment from January 2020 through May 2020, when her reports of inappropriate behavior were minimized, often ignored, and delayed in processing. Complainant further alleges that her requests for a workplace violence committee were initially denied, she was provided an Employee Assistance Program (EAP) referral, and encouraged to ignore her aggressor's behavior.

## INTERROGATORY QUESTIONS

Q1.  What is your name, current position title, series, grade, and organizational unit?

A.   Steven Hellmann, GS-11 Lieutenant, Department of Justice, Federal Bureau of Prisons.

Q2.  How long have you been in this position? How long have you worked for the Agency?

A.   12 years for the agency, 5 as a Lieutenant.

Q3.  Who are currently your first **and** second-level supervisors, by name (first/last) and position title?

A.   Captain Ryan Taillon and Associate Warden Brannon Grady.

Q4.  As of the date of the alleged discrimination, who were your supervisors? Please identify by name, position title, organizational units.

A.   Acting Captain Josh Robsion and Associate Warden Brannon Grady.

Page 2 of 5

**Adept Services, Inc.**

Affiant Initials

Q5.  What is your sex/gender?

A.   No comment.

Q6.  Have you ever participated in EEO activity before?

A.   Never.

Q7.  Are you aware of Complainant complaining about you allegedly posting memes?
A.   Yes.

Q8.  Did you post memes that targeted Complainant?
A.   Never.

Q9. Was there an investigation?
A.   Apparently there is one going on, but I have not been interviewed.

Q10. Who investigated?
A.   I have no idea.

Q11.  What was the outcome?
A.   My understanding is that it is still ongoing.

Q12.  Did you ever speak to any managers about this claim? Wardens? If so, who?

A.   I was notified of the claims during a workplace violence threat assessment.  This was
      attended by Executive Assistant Suzanna Scott, Associate Warden Catalina Rodriguez,
      Chief Psychologist Carl Clegg, Drug Abuse Program Coordinator, and Assistant General
      Counsel Darrel Waugh.

Q13.  What did the mangers tell you?
A.   They let me read the complainant's memo detailing the extent of her complaints.

Q14.  Did the Complainant notify you that she felt harassed?
A.   Never.

Q15.  If so, what action(s) did you take? What was your response?
A.   I was never given the opportunity to explain myself or remedy the situation.

Q16.  Did you harass Complainant in any way?

Page 3 of 5                                                      Affiant Initials _____

**Adept Services, Inc.**

OKONOWSKY_000324

A.   Never.  I avoid her due to her habit of making inappropriate statements about my appearance at previous times.

Q17.  Do you have any witnesses you would like to suggest?
A.   Justin Bender, Special Investigative Services Technician.

Q18.  Do you have anything you wish to add?

A.   I believe the complainant has a personal grudge against me.  Sometime around January 2020 she began making comments to me in passing about my hair and noting how tan I looked.  Being a married man, this made me feel very uncomfortable, so I attempted to avoid her as much as possible.  At some point she was given temporary access to an office in the Special Housing Unit that belongs to my department and is intended to be used for confidential inmate interviews.  This created tension, as she began to move her personal items into the office and remained in there all day every day, making it impossible for myself and other investigators to do their job.  She would often tell me to go find a different office.  After talks with Acting Captain Josh Robsion, her key to the office was taken.  It was around this time that she was moved from the Special Housing Unit to the Low security institution across the street.  This is the point where she began making allegations against me.  I know this because it was when I was informed that I was no longer allowed at the Low.  From this point on, she has used every avenue at her disposal to attack and harass me.  I was banned from the Low institution where I was assigned.  I was removed from the Special Investigative Office.  I have been passed over for promotion.  I was forced to come in while on vacation and was interrogated by several people, two of which are her friends and colleagues in the Psychology Services department.  Dr. Clegg, her supervisor, is involved in the ongoing investigation as a witness for her allegations.  He was allowed to be present during this "Workplace Violence Committee" meeting, despite my protests.  I was made to answer questions about my personal life and social media activity that is unrelated to my workplace.  I have never sent this person anything on social media and I have never said or done anything unprofessional towards her in the workplace or out of it.  When I became aware of the complainants displeasure at the content of the social media account in question, I removed some of the content and blocked the complainant to avoid any problems and also to not cause her any further distress.  By her own admission, she circumvented my attempt at distancing myself from her by opening a second account in order to be able to continue to monitor the page she finds so offensive.  I have never sent her a friend request nor have I ever attempted to follow her on social media.  The page in question never mentions her name, my name, the agency's name, the institution's name, or any other staff's name.  All posts are satire and aimed to entertain Correctional Officers, not psychologists.  Due to this matter, the page was taken down several months ago.

Page 4 of 5

Affiant Initials

**Adept Services, Inc.**

Pursuant to Title 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing statement, consisting of _____ pages, is true and correct to the best of my knowledge and belief. I understand the information I have given is not considered confidential and that it may be shown to interested parties.

_____
Signature of Affiant
Steven Hellman, Lieutenant

_____
09·10·2020
Date Signed

_____
Signature of Investigator
Natosha Farrell, EEO Investigator

_____
9-10-20
Date Signed

Page 5 of 5

**Adept Services, Inc.**

Affiant Initials_____

OKONOWSKY_000326

# EXHIBIT D

*Plaintiff has filed an Application for Leave to File Under Seal pursuant to Local Rule 79-5.1*

**PROOF OF SERVICE**

UNITED STATES DISTRICT COURT

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 6701 Center Drive West, Ste. 610, Los Angeles, CA 90045.

On March 13, 2023, I served the foregoing document described as **DECLARATION OF LINDSAY L. BOWDEN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action, addressed as follows:

Zak Varshovi
**UNITED STATES ATTORNEY'S OFFICE**
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Zakariya.varshovi@usdoj.gov
*Attorneys for Defendants, MERRICK B. GARLAND, ATTORNEY GENERAL, UNITED STATES DEPARTMENT OF JUSTICE, BUREAU OF PRISONS*

☒ **By E-Mail**, I transmitted the document to the e-mail address of the addressee(s).

☒ **By CM/ECF** Notice of Electronic Filing by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on March 13, 2023, at Los Angeles, California.

_____
Jessica Sanchez