**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JS-6

Lindsay Okonowsky,

　　　　　Plaintiff,

　　　v.

Merrick Garland,

　　　　　Defendant.

Case No. 2:21-cv-07581-VAP-ASx

**Order GRANTING Defendant's Motion for Summary Judgment (Dkt. 38)**

Before the Court is a Motion for Summary Judgment ("Motion") filed by Defendant Merrick Garland ("Defendant").  (Doc. No. 38.)  Plaintiff Lindsay Okonowsky ("Plaintiff") filed an Opposition on March 13, 2023.  (Doc. No. 42.)  Defendant filed a Reply on March 20, 2023.  (Doc. No. 47.)

After considering all the papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced at the hearing, the Court GRANTS the Motion.

## I.　　BACKGROUND

Plaintiff filed this action in this Court on September 22, 2021.  (Compl., Doc. No. 1.)  Plaintiff's Complaint alleges the following: Plaintiff started working as a staff psychologist at the Federal Correctional Complex in Lompoc ("FCC Lompoc"; "the prison") in 2018.  (*Id.* ¶ 6.)  On February 17, 2020, Plaintiff became aware of an Instagram page ("the page") run by

1

Steven Hellman, a lieutenant at the prison.  (*Id.* ¶¶ 7-8.)  The page contained sexist and vulgar posts, which other FCC Lompoc employees frequently liked and commented on.  (*Id.* ¶¶ 10-11.)  While Plaintiff reported the page to various supervisors and the Office of Internal Affairs (*id.* ¶¶ 12, 15, 18), the page posted three derogatory memes targeted at Plaintiff (*id.* ¶¶ 13, 17, 20).  Despite a Threat Assessment Team being convened and recommending remedial actions, Hellman nevertheless continued to post sexist and offensive memes—including one targeting the prison's psychology services—until the page was taken down after May 12, 2020.  (*Id.* ¶¶ 21, 23, 25-26.)  Accordingly, Plaintiff's Complaint asserts one claim for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for sexual discrimination and harassment under a hostile work environment theory.  (Compl. ¶¶ 5, 28-33.)

On March 6, 2023, Defendant filed a Motion for Summary Judgment (Doc. No. 38) and a Statement of Undisputed Facts ("Def. SUF," Doc. No. 38-1).  Defendant also filed three declarations: Declaration of Carl Clegg ("Clegg Decl."), attaching Exhibits A and B, (Doc. No. 38-2); Declaration of James Engleman ("Engleman Decl."), attaching Exhibits A through E (Doc. No. 38-5); and Declaration of Zakariya Varshovi ("Varshovi Decl."), attaching Exhibits A-1 to A-8, B-1 to B-6, and C (Doc. No. 38-11).

On March 13, 2023, Plaintiff filed an Opposition to the Motion (Doc. No. 42), a Statement of Genuine Issues ("Pl. SGI," Doc. No. 42-1 at 1-55), and her own Statement of Undisputed Facts ("Pl. SUF," Doc. No. 42-1 at 56-72).  Plaintiff also filed Written Objections to Defendant's Evidence ("Pl. Objs.,"

Doc. No. 42-4) and two declarations: Declaration of Lindsay Okonowsky ("Okonowsky Decl.," Doc. No. 42-2); and Declaration of Lindsay L. Bowden ("Bowden Decl.," Doc. No. 42-3), both with accompanying attachments.

On March 20, 2023, Defendant filed a Reply (Doc. No. 47), a Reply in Support of his Statement of Undisputed Facts ("Def. SUF Reply", Doc. No. 47-1 at 1-43), and a Response to Plaintiff's Statement of Facts ("Def. Resp.," Doc. No. 47-1 at 44-69).  Defendant also filed a Supplemental Declaration of Zakariya Varshovi ("Varshovi Suppl. Decl."), attaching Exhibit D (Doc. No. 47-2).

On March 23, 2023, Plaintiff filed a Supplemental Declaration of Lindsay Bowden, attaching Exhibit D.  ("Bowden Suppl. Decl.")

## II.    LEGAL STANDARD

A motion for summary judgment or partial summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire &*

*Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (reconciling *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  The nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the material facts" but must show specific facts which raise a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

### III.   EVIDENTIARY OBJECTIONS

#### A.   Declaration of Zakariya Varshovi

Plaintiff objects to Exhibits A-1 through A-6 attached to Defendant's Declaration of Zakariya Varshovi.  (*See* Pl. Objs. Nos. 6-12.)  Varshovi's declaration states that the exhibits are "true and correct copies of excerpted portions from [Plaintiff]'s certified deposition transcript."  (Varshovi Decl. ¶ 2.)  Plaintiff argues (1) the exhibits lack proper authentication from a reporter's certification and (2) Varshovi otherwise lacks personal knowledge of Plaintiff's deposition.  (Pl. Objs. Nos. 6-12.)

Defendant has submitted the relevant reporter's certification as part of his March 31, 2023, Notice of Errata.  (Doc. No. 54-2.)  Defendant has also provided an excerpt from Plaintiff's deposition transcript demonstrating that Varshovi was the attorney who deposed Plaintiff and thus had personal knowledge of the deposition.  (*See* Varshovi Suppl. Decl. Ex. D, at 2.)  The Court accordingly overrules Plaintiff's objections Nos. 6 through 12 as to Defendant's Exhibits A-1 through A-6.

### B.   Declaration of Carl Clegg

Plaintiff objects to paragraph 4 of Defendant's Declaration of Carl Clegg, arguing that the statements in that paragraph are inadmissible hearsay.  (*See* Pl. Objs. No. 4.)  Paragraph 4 explains that during Dr. Clegg's February 18, 2020, meeting with Plaintiff, Plaintiff expressed her belief that a Special Housing Unit staff member was likely making the page's posts and that Plaintiff agreed to be reassigned immediately to the prison's Low Facility.  (Clegg Decl. ¶ 4.)

The Court overrules this objection.  The statements are derived from a record maintained in the ordinary course of business as part of regularly conducted business activities, as Dr. Clegg attests to in his declaration.  *See* Fed. R. Evid. 803(6); Clegg Decl. ¶¶ 1, 7.  The statements are also not hearsay under the Federal Rules of Evidence because they are statements of a party opponent offered against the party opponent.  *See* Fed. R. Evid. 801(d)(2).

United States District Court
Central District of California

5

**C. Declaration of James Engleman**

Plaintiff objects to paragraph 12 of Defendant's Declaration of James Engleman, arguing that Engleman lacks personal knowledge of the statement therein.  (*See* Pl. Objs. No. 3.)  Paragraph 12 of the declaration states: "On March 11, 2020, as a result of [Plaintiff]'s allegation in her memo as to the identity of the Page's creation, that individual [Hellman] was assigned to a different facility at FCC Lompoc while her complaints were investigated."  (Engleman Decl. ¶ 12.)

Engleman's declaration avers that "as Acting Complex Warden of FCC Lompoc" he was "responsible for day-to-day oversight, supervision, and management of all correctional staff at FCC Lompoc."  (*Id.* ¶ 2.)  In this capacity, Acting Warden Engleman's personal knowledge of the prison's employment practices and activities, including Hellman's reassignment, can be inferred.  *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (demonstrating that personal knowledge can be shown by the nature of the declarant's position and participation in the matter).  The Court further has no basis for doubting Engleman's sworn declaration that he has personal knowledge of this fact.  (*See* Engleman Decl. ¶ 1.)  The Court thus overrules Plaintiff's objection to this evidence.

The Court need not consider Plaintiff's other evidentiary objections as it did not rely on those underlying facts or exhibits to adjudicate this matter.

# IV.   FACTS

Both Defendant and Plaintiff filed Statements of Undisputed Facts. ("Def. SUF," Doc. No. 38-1; "Pl. SUF," Doc. No. 42-1 at 56-72.)  Plaintiff filed a Statement of Genuine Issues.  ("Pl. SGI," Doc. No. 42-1 at 1-55.) Defendant filed a Reply in Support of his Statement of Undisputed Facts ("Def. SUF Reply", Doc. No. 47-1 at 1-43), and a Response to Plaintiff's Statement of Facts ("Def. Resp.," Doc. No. 47-1 at 44-69).  To the extent certain facts or contentions are not mentioned in this Order, the Court has not found it necessary to consider them in reaching its decision.

## A.   Uncontroverted Facts

The following material facts are supported adequately by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purposes of this Motion.  *See* Local Rule 56-3.

### 1.   Discovery of the Instagram Page

Dr. Lindsay Okonowsky began working as a staff psychologist at FCC Lompoc on September 17, 2018.  (Def. Resp. ¶ 1.)

On February 16, 2020, Plaintiff was browsing on her personal Instagram account when she discovered an Instagram page named "8_and_hitthe_gate."  (*Id.* ¶ 4.)  The page often posted memes regarding the FCC Lompoc workplace or referring to women in a sexual manner, or both. (*Id.* ¶¶ 14-27.)  One post, for example, depicted a man choking a woman with the caption: "When an inmate puts dope in their mouth [and] tries to

United States District Court
Central District of California

swallow."  (*Id.* ¶ 15.)  The page's memes were often "liked" and commented on by other FCC Lompoc employees.  (*Id.*)

### 2.   Plaintiff's First Reports and the Nancy Pelosi Meme

The day after she discovered the page, Plaintiff reported it to her immediate supervisor, Dr. Carl Clegg, and Drug Abuse Program Coordinator Dr. Anne Clemmer.  (*Id.* ¶ 32.)  Plaintiff showed some of the page's posts to Dr. Clemmer and told her that they were inappropriate and targeted Plaintiff at times.  (Bowden Decl. ¶ 2, Ex. A, at 25:21-26:11.)

On February 18, 2020, Plaintiff met with FCC Lompoc's Acting Warden ("AW") James Engleman and complained that the page was "inappropriate" and "sexist," contained material that "target[ed] specific departments," and "could pose a significant public relations issue" for the prison.  (Pl. SGI ¶ 1.) That same day, AW Engleman instructed Special Investigative Agent ("SIA") Victor Gonzales to investigate Plaintiff's complaint.[1]  (*Id.* ¶ 3.)  Dr. Clegg also reassigned Plaintiff with her consent from FCC Lompoc's Medium Facility to its Low Facility because Plaintiff believed that a staff member in the prison's Special Housing Unit ("SHU") likely posted the memes on the page.[2]  (*Id.* ¶ 4.)

---

[1] Plaintiff disputes this fact in her Statement of Genuine Issues, citing only her Written Objections to Defendant's Evidence.  Plaintiff's Written Objections, however, do not state any objection to the proffered fact.  Since Plaintiff otherwise fails to dispute the fact properly by not offering evidence that contradicts the proffered fact, the Court will deem the fact undisputed for purposes of the Motion.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56-3.

[2] Plaintiff similarly disputes this fact with only a reference to her Written Objections.  As covered above, the Court has overruled Plaintiff's objection.

United States District Court
Central District of California

Later that day, Plaintiff observed a meme on the page depicting former House Speaker Nancy Pelosi ripping up former President Trump's State of the Union address ("the Nancy Pelosi meme").  (Def. Resp. ¶ 37.)  The post included the captions: "When you get butthurt [sic] by memes," and "Tomorrow's forecast: hot enough to melt a snowflake" with the hashtag "#youcantakeadickbutnotajoke."  (*Id.*)  Plaintiff felt that the meme was posted in response to the complaints she had lodged just hours earlier.  (*Id.* ¶ 38.)  She emailed the meme to AW Engleman on February 19, 2020, who forwarded it on to SIA Gonzales.  (Pl. SGI ¶¶ 7-8.)  Plaintiff later admitted that the meme was never sent to her directly, never displayed in the workplace at FCC Lompoc, never shown to her in the workplace, and never discussed with her in the workplace without her consent.[3]  (Varshovi Decl. ¶ 2, Ex. A-1, at 1-2.)

Plaintiff eventually met with SIA Gonzales and showed him some of the page's memes.  (Def. Resp. ¶ 42.)  He stated that he had "looked at the page and [didn't] really see anything that [was] a problem."  (*Id.* ¶ 43.)  Plaintiff met with SIA Gonzales again later that same week and shared that

Since Plaintiff otherwise fails to dispute the fact properly by not offering evidence that contradicts the proffered fact, the Court will deem the fact undisputed for purposes of the Motion.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56-3.

[3] Plaintiff disputes this fact by offering only noncontradictory facts and impermissible legal argument regarding whether the page constituted an "extended workplace" as an "unofficial FCC Lompoc Instagram page."  (*See* Pl. SGI ¶ 6.)  The Court deems this fact undisputed.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56-3.

the page contained posts referencing FCC Lompoc that prison employees were commenting on.  (*Id.* ¶ 45.)

3.  <u>Plaintiff's Second Reports, the "Feeling Cute" Meme, and a Workplace Interaction with Hellman</u>

On March 7, 2020, Plaintiff discovered that the page had posted a meme depicting a curvy woman in minimal clothing, coyly posed with a caption stating, "Feeling cute, might put one on watch later" ("the Feeling Cute meme").  (*Id.* ¶¶ 59-60, 62.)  The post also included a comment stating, "If psychology had to cover the morning watch shifts all weekend, nobody'd ever go on [suicide] watch #changemymind."  (*Id.* ¶¶ 60, 62.)  Some FCC Lompoc employees "liked" the post, and two FCC Lompoc employees commented on the post.  (*Id.* ¶ 63.)  The page's creator also blocked Plaintiff's account from viewing the page on that day.  (Pl. SGI ¶ 15.)  Plaintiff later admitted that the meme was never sent to her directly, never displayed in the workplace at FCC Lompoc, never shown to her in the workplace, and never discussed with her in the workplace without her consent.[4]  (Varshovi Decl. ¶ 2, Ex. A-2, at 1-2.)  That same day, Plaintiff reported to Dr. Clegg and AW Engelman that the page continued to post content targeting her.  (Def. Resp. ¶ 63.)  On March 9, 2020, AW Engleman forwarded Plaintiff's complaint to SIA Gonzales and directed him to refer Plaintiff's complaints to the Bureau of Prison's Office of Internal Affairs ("OIA").  (Pl. SGI ¶¶ 16-17.)

---

[4] The Court deems this fact undisputed.  (*See supra* note 3.)

United States District Court
Central District of California

On March 9, 2020, Plaintiff was called into the Medium component where Hellman was working while working an on-call shift.  (Def. Resp. ¶ 67; Bowden Decl. Ex. A, at 39:1-10.)  She had a "neutral conversation" with Hellman about an inmate, though it made her "exceptionally uncomfortable."  (Bowden Decl. Ex. A, at 39:1-23.)

4.   Plaintiff's First Memorandum and Five Other Memes

On March 11, 2020, Plaintiff submitted a forty-eight-page memorandum to AW Gutierrez containing over thirty examples of posts from the page that Plaintiff considered sexist and harassing.  (Def. Resp. ¶¶ 70-71.)  In addition to the Nancy Pelosi and Feeling Cute memes, Plaintiff addressed five other posts purportedly targeting her.  (Okonowsky Decl. Ex. 1, at 33, 35, 37-38, 40, 51.)

The first post depicted a traffic sign reading "Stay In Your Lane" with the caption: "When Psychology tries to tell you, where you can [and] can't cell somebody" ("the traffic sign meme").  (*Id.* at 37.)  The second depicted a cartoon character with the caption: "When psychology services doesn't get their way and they cry" ("the cartoon meme").  (*Id.* at 38.)  One FCC Lompoc employee had left a comment on the post directly referencing a SHU meeting that Plaintiff had attended.  (Def. Resp. ¶ 72.)  The third post stated, "When a female co-worker invites guys only for an 'End of Quarter' Party" and provided an image of a man captioned, "I'm here for the gang bang" ("the invite meme").  (Okonowsky Decl. Ex. 1, at 40.)  Plaintiff stated that this meme was posted after she invited SHU staff members to an event hosted at her residence.  (*Id.*)  The fourth meme provides a photo of a

United States District Court
Central District of California

woman with the caption: "5 minutes into count time [and] chill, and she gives you this look" ("the count time meme").  (*Id.* at 51.)  The fifth meme depicts a woman wearing a sweater reading "the struggle is real" with the caption: "When you piss off the SHU crew, and now you have to pull your own inmates" ("the sweater meme").  (*Id.*)  Plaintiff stated that the fourth and fifth posts were targeted at her because she was required to ask SHU staff to remove inmates from their cells as part of her previous assignment.  (*Id.*)  Plaintiff's memorandum also suggested that Lieutenant Steven Hellman was the person running the account.  (Okonowsky Decl. Ex. 1, at 5.)  Plaintiff later admitted that these memes were never sent to her directly, never displayed in the workplace at FCC Lompoc, never shown to her in the workplace, and never discussed with her in the workplace without her consent.[5]  (Varshovi Decl. ¶ 2, Exs. A-3, at 1-2, A-4, at 1, A-5, at 1-2, A-6, at 1.)

The same day Plaintiff submitted her memorandum to AW Gutierrez, AW Engleman forwarded it to SIA Gonzales and directed him to provide the memorandum to OIA as well.  (Pl. SGI ¶¶ 27-28.)  Hellman was also reassigned to a different facility at FCC Lompoc.[6]  (*Id.* ¶ 29.)

---

[5] The Court deems this fact undisputed.  (*See supra* note 3.)

[6] Plaintiff disputes this fact by citing (1) her own declaration that she was required to work with Hellman in the Receiving and Discharge Department on March 9, 2020, and (2) her deposition testimony that she encountered Hellman briefly on the first day she reported to her reassignment to the prison's Low Facility—a reassignment that undisputedly occurred on February 18, 2020.  (*See* Pl. SGI ¶ 29.)  Neither of these facts controverts Hellman being reassigned on March 11, 2020. The Court thus deems the fact undisputed.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56-3.

On March 13, 2020, Plaintiff was referred to the prison's Employee Assistance Program ("EAP"), which provides employee counseling to help address concerns that may be affecting job performance and well-being negatively.  (Def. Resp. ¶ 75.)

5.   Plaintiff's Second and Third Memoranda and the Penitentiary Meme

On March 27, 2020, Plaintiff submitted another memorandum to Defendant detailing Hellman's continued posts, including a new post suggesting that when female coworkers say, "Call me if you need anything," male staff think, "Do you have anywhere I can put my boner?"  (Def. Resp. ¶¶ 76-77.)  That same day, the page posted another meme depicting the front entrance sign for the United States Penitentiary building in Big Sandy, Kentucky with the caption: "The one staff member that's a giant c***, loves inmates, and relentlessly tells on staff" ("the penitentiary meme").  (*Id.* ¶¶ 79, 81.)  The words "Big Sandy" were underlined in red, and the post included a comment stating, "You know, on account of their vaganga [sic]."  (*Id.* ¶ 81; Okonowsky Decl. Ex. 3.)  Plaintiff immediately complained via email to AW Engleman, who forwarded the message on to SIA Gonzales.  (*Id.* ¶ 83; Pl. SGI ¶ 31.)  She also submitted another memorandum to Defendant on March 30, 2020, regarding the penitentiary meme. (Def. Resp. ¶ 81.)

6.   The Threat Assessment Team

In early April 2020, Barbara Von Blanckensee became FCC Lompoc's Warden.  (Pl. SGI ¶ 34.)  AW Engleman soon apprised her of Plaintiff's complaints regarding the page and the related ongoing investigation.  (*Id.*

13

United States District Court
Central District of California

¶ 35.)  On April 13, 2020, Warden Von Blanckensee convened a six-member Threat Assessment Team ("TAT") to review Plaintiff's "concerns about [a] hostile work environment and social media use in violation of policy," as detailed in Plaintiff's March 11 memorandum.  (Def. Resp. ¶ 85.)  The TAT interviewed Plaintiff about her concerns that same day.[7]  (Pl. SGI ¶ 37.)  During the meeting, members of the TAT advised Plaintiff to avoid viewing the page but encouraged Plaintiff to let them know if issues continued to occur.  (Bowden Decl. Ex. A, at 60:1-20.)  Two days later, the TAT spoke with Hellman, who readily admitted that he was the page's owner and that no one else contributed to it.  (Pl. SGI ¶¶ 39-40.)  Hellman also denied that any of his memes were directed at Plaintiff.  (*Id.* ¶ 41.)

On April 16, 2020, the TAT issued a report stating that "Hellman's actions towards [Plaintiff] (i.e., the posting of several memes that reasonably appear to have been directed solely at her) fall within [the] 'bullying' language/definition" in the Bureau of Prisons' Anti-Harassment Policy.  (*Id.* ¶ 90; Engleman Decl. Ex. E, at 4.)  The report also noted the TAT's opinion that Hellman unconvincingly denied that any of the memes he posted were directed to Plaintiff.  (Engleman Decl. Ex. E, at 4.)  The TAT made several recommendations, including referring Hellman to the OIA and the EAP, and issuing him a cease-and-desist letter regarding social media posts violating Bureau of Prisons' policy.  (Def. Resp. ¶ 91.)

---

[7] Plaintiff disputes this fact by offering only noncontradictory facts.  (*See* Pl. SGI ¶ 37.)  The Court deems the fact undisputed.  *See* Fed. R. Civ. P. 56(e)(2); Local Rule 56-3.

14

United States District Court
Central District of California

7.   <u>Cease-and-Desist Order and Termination of the Page</u>

Defendant subsequently followed the TAT's recommendations.  (Def. Resp. ¶ 92.)  On April 16, 2020, Defendant issued Hellman a Cease-and-Desist Order, ordering him to cease and desist from posting social media content in violation of Defendant's policies, including content that could reasonably be deemed as harassing or bullying another employee.  (*Id.* ¶ 93.)  The Order reminded Hellman that he was held to a higher standard of conduct as a "supervisor."  (*Id.*)  Defendant also referred Hellman to the EAP that same day.  (*Id.* ¶ 94.)

Hellman's page continued to make posts after April 16, including one targeting FCC Lompoc's Psychological Services and one mocking the workplace violence committee process.  (Def. Resp. ¶ 95.)  Hellman eventually took the page down some time after May 12, 2020, based on Plaintiff's complaints and the related investigation.  (*Id.* ¶¶ 96, 99.)

Plaintiff was promoted to a new position at FCC Seagoville on January 24, 2021.  (Pl. SGI ¶ 50; Def. Resp. ¶ 97.)  She resigned from the Bureau of Prisons on July 6, 2022.  (Def. Resp. ¶ 98.)

**B.   Disputed Facts**

Setting aside numerous legal disputes the parties include in their Statements of Undisputed Facts and their accompanying responses, the parties genuinely dispute the following facts.  The parties dispute whether hundreds of FCC Lompoc employees followed the page.  (*Id.* ¶ 10.)  They

also dispute whether on March 8, 2020, SIA Gonzales called Plaintiff and informed her that he had not yet submitted a referral to OIA.  (*Id.* ¶ 65.) They further dispute whether several FCC Lompoc staff liked the penitentiary meme around March 27, 2020.  (*Id.* ¶ 80.)

The parties also dispute certain events during Plaintiff's meeting with the TAT.  Plaintiff disputes whether she told the TAT that she had "no personal or direct knowledge" of who ran the page.  (Pl. SGI ¶ 38.) The parties also dispute whether Plaintiff explained to the TAT that her harassment "bled into the workplace because interactions she was having at work were showing up on the page and people were talking about the page at work."[8]  (Def. Resp. ¶ 86.)

## V.    DISCUSSION[9]

### A.  Hostile Work Environment

Plaintiff brings a Title VII sex discrimination and harassment claim under a hostile work environment theory.  Compl. ¶¶ 5, 28-33; *see* 42 U.S.C. § 2000e-2(a)(1).  To succeed on her claim, Plaintiff is required to establish

---

[8] Defendant's Response to Plaintiff's Statement of Facts purports to cite contradictory deposition testimony from Plaintiff's deposition, but it does not appear that this page of the deposition transcript was included in any of the exhibits attached to his Motion or Reply.

[9] Plaintiff requests that the Court strike Defendant's Motion as untimely because Defendant filed it almost eight hours after the 4:00 p.m. deadline stated in the Court's Standing Order.  (Opp'n at 3-4.)  Plaintiff does not demonstrate any specific prejudice she experienced from this error.  The Court declines to strike Defendant's Motion on this basis, noting Defendant's contrition regarding this oversight (Reply at 1 n.2).  Defendant is reminded to review and comply with the Court's Standing Order when submitting future e-filings to this Court.

that: "(1) [she] was subjected to a hostile work environment; and

(2) [Defendant] was liable for the harassment that caused the hostile

environment to exist." *Fried v. Wynn Las Vegas, LLC,* 18 F.4th 643, 647

(9th Cir. 2021).  For the first prong of this analysis, Plaintiff must show:

"(1) [s]he was subjected to verbal or physical conduct of a sexual nature;

(2) the conduct was unwelcome; and (3) the conduct was sufficiently severe

or pervasive to alter the conditions of employment and create an abusive

working environment." *Id.*  As to the second prong, "[i]f . . . the harasser is

merely a co-worker, the plaintiff must prove that the employer was negligent,

*i.e.* that the employer knew or should have known of the harassment but did

not take adequate steps to address it." *Swinton v. Potomac Corp.*, 270 F.3d

794, 803 (9th Cir. 2001).  Thus, an employer may "avoid liability for [co-

worker] harassment by undertaking remedial measures 'reasonably

calculated to end the harassment.'" *McGinest v. GTE Serv. Corp.*, 360 F.3d

1103, 1120 (9th Cir. 2004) (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th

Cir.1991)).

1.   Sufficiently Severe or Pervasive

To establish a "pattern of ongoing and persistent harassment severe

enough to alter the conditions of employment," Plaintiff must prove that her

workplace was "both objectively and subjectively offensive, [that is] one that

a reasonable person would find hostile or abusive, and one that the victim in

fact did perceive to be so." *Nichols v. Azteca Rest. Enterprises, Inc.*, 256

F.3d 864, 871–72 (9th Cir. 2001) (quoting *Faragher v. City of Boca Raton*,

524 U.S. 775, 787 (1998)).  The "objective severity of harassment should be

judged from the perspective of a reasonable person in the plaintiff's

17

position . . . .' " *Id.* at 872 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)).  Courts must further "look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

Plaintiff's multiple complaints to AW Engleman and other supervisors regarding Hellman's posts clearly establish that she subjectively perceived her work environment as hostile, *see McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004); thus only the objective severity of the harassment is at issue here.

Plaintiff points to nine total posts that she perceived as directed towards her during the time the page existed.[10]  To succeed on her hostile work environment claim, however, Plaintiff is required to show that the conduct directed towards her was "of a sexual nature" or "because of sex".  *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002); *Ochs v. Eugene Emeralds Baseball Club, Inc.*, 774 F. App'x 1026, 1028 (9th Cir. 2019).

---

[10] These posts are as follows: the Nancy Pelosi meme, the Feeling Cute meme, the traffic sign meme, the cartoon meme, the invite meme, the count time meme, the sweater meme, the penitentiary meme, and the final meme Plaintiff alleges targeted FCC Lompoc's Psychological Services after Defendant issued its Cease-and-Desist Order to Hellman.

United States District Court
Central District of California

United States District Court
Central District of California

1

2       Drawing all reasonable inferences in Plaintiff's favor, it is clear that at

3   most five of the posts at issue possibly were made because of Plaintiff's

4   sex.[11]  The other posts, while addressing matters in the workforce, have no

5   perceivable sex-based motive and, at most, qualify as "mere offensive

6   utterances" or "offhand comments" that are not actionable under Title VII.

7   *See, e.g.*, *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003); *see*

8   *also Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 992

9   (C.D. Cal. 2000) ("Although the harassment need not be of a sexual

10  content, [Plaintiff] must present some evidence that ties the conduct to

11  gender.  For the most part, she fails to do so.").  While the traffic sign meme,

12  for example, references the prison's psychology department, it merely

13  depicts a traffic sign and expresses frustration with the decision-making

14  process regarding inmate cell assignment.  The cartoon meme further

15  teases the psychology department after an argumentative training between

16  that department and SHU staff.  Though these posts do not appear to be in

17  good taste and may reflect a workplace conflict between the prison's SHU

18  staff and its psychology department, they provide no indicia that Plaintiff's

19  sex motivated their creation (or even that Plaintiff, as opposed to the

20  psychology department as a whole, was being targeted).  Indeed, Plaintiff's

21  March 11, 2020, memorandum confirms this reasoning, as Plaintiff states

22  only that these posts "highlight[ed] a lack of respect for Psychology

23  Services" and involved "argument[s] regarding [SHU staff]'s job role of

24  removing inmates from their cells" (Okonowsky Decl. Ex 1, at 37-38.).  Thus,

25  _____

26      [11] These posts are the Nancy Pelosi meme, the Feeling Cute meme, the invite meme, the count time meme, and the penitentiary meme.

United States District Court
Central District of California

the Court considers the five posts possibly based on Plaintiff's sex in assessing the severity and pervasiveness of Hellman's conduct.

Even assuming that these five posts were directed to Plaintiff, this circuit's case law demonstrates that Hellman's conduct towards Plaintiff was neither objectively severe nor pervasive enough to maintain a hostile work environment claim.

First, the posts occurred entirely outside of the workplace, as they were posted to Hellman's personal Instagram page.  Plaintiff further conceded during her deposition that these posts were never sent to her directly, never displayed in the workplace, never shown to her in the workplace, and never discussed with her in the workplace without her consent.  (Varshovi Decl. ¶ 2, Exs. A1-A-6.)  Where "[m]uch of the evidence relied on by [Plaintiff] . . . involves conduct away from the workplace or outside business hours," granting summary judgment on a hostile work environment claim is appropriate.[12] *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992).  Further, courts in this circuit have granted or upheld summary judgment on hostile work environment claims involving much more severe alleged conduct because the conduct occurred outside of the workplace.  *See Fuller v. Idaho Dep't of Corr.*, 694 F. App'x 590, 591 (9th

---

[12] For this reason, Plaintiff's factual allegations that she "heard conversations among co-workers discussing Lt. Hellman's page" and "witnessed co-workers discussing the content of the page during working hours" (Pl. SUF ¶¶ 56-58) do not raise a genuine issue of fact as to the objective severity of her work environment.  Even accepting these assertions as true, the lion's share of Plaintiff's allegations take issue with social media posts made to a personal account outside of the workplace.

Cir. 2017) ("Fuller argues that her rapes created a hostile work environment. . . .  Because [plaintiff] does not claim that [her harasser] sexually harassed her in the workplace or a related environment . . . the district court properly granted summary judgment to the [defendant] on this claim.")[13]; *Alvarez v. Joy*, No. 2:20-cv-10132-FWS-JEMx, 2022 U.S. Dist. LEXIS 236221, at *12-17, *38-39 (C.D. Cal. Dec. 20, 2022) (granting summary judgment where plaintiff alleged a coerced romantic relationship and subsequent stalking over a period of years).  Further, cases involving conduct outside the workplace that deny summary judgment also generally rely on some form of direct contact between the plaintiff and the alleged harasser outside of work.  *See, e.g.*, *Brodus v. Mar. Inn & Air Force Servs. Agency*, No. 2:21-cv-03112-JAK-JPRx, 2022 WL 2286476, at *9 (C.D. Cal. May 2, 2022) (noting direct social media and text message contact between plaintiff and alleged harasser); *Luke v. Dough Boy Inc.*, No. 2:18-cv-07456-ODW-GJSx, 2020 WL 70832, at *4 (C.D. Cal. Jan. 7, 2020) (discussing text message video sent directly to plaintiff).  Plaintiff fails to allege any such interactions with Hellman, demonstrating the weakness of her claim.[14]

---

[13] Plaintiff argues that this case is inapposite because the published portion of *Fuller* vacated summary judgment (Opp'n at 15-16 n.7), but that opinion only did so based on the employer's continued affirmative support of its plaintiff's assailant and the employer's failure to take any disciplinary action prior to the assailant resigning.  *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1162 (9th Cir. 2017).  *Fuller v. Idaho Dep't of Corr.*, 694 F. App'x 590 nevertheless affirmed summary judgment as to Plaintiff's claim that conduct outside the workplace created a hostile work environment.  The proposition from that case—that harassing conduct occurring exclusively outside of work cannot support a hostile work environment claim—still stands.

[14] Plaintiff cites only out-of-circuit and state law authority to argue that Plaintiff's work environment extended to Hellman's Instagram page.  (Opp'n at 14-15.)  The Court declines to apply this theory, as it has not been adopted in this circuit.

1

2      Second, courts in this circuit regularly grant and affirm summary

3  judgment for hostile work environment claims involving conduct of greater

4  severity and scope than present here.  In *Kortan v. California Youth*

5  *Authority*, for instance, the Ninth Circuit affirmed summary judgment where

6  the plaintiff's supervisor yelled at her; forced her to listen to a tape with

7  offensive language; read a letter to her containing the phrase "masturbate

8  yourself;" referred to a female superintendent as a "castrating bitch" and

9  "regina;" called women generally "bitches" and "histrionics;" looked at the

10  plaintiff and stared; accused the plaintiff of being an evil character; gave the

11  plaintiff a negative performance evaluation; and laughed outside her door,

12  saying "Yeah, she got me on sexual harassment charges."  217 F.3d 1104,

13  1107, 1111 (9th Cir. 2000).  There are many other pertinent examples of

14  conduct more severe and frequent than at issue here failing to support a

15  hostile work environment claim as a matter of law.  *See Lappin v. Laidlaw*

16  *Transit Inc.*, 179 F. Supp. 2d 1111, 1120-21 (N.D. Cal. 2001) (granting

17  summary judgment where two co-workers directed several sexual

18  comments and sex-based expletives at plaintiff and other co-workers while

19  in the workplace); *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d

20  970, 992-93 (C.D. Cal. 2000) (noting "fifteen to twenty different incidents

21  over an eighteen-month period in which residents . . . made some comment

22  in reference to sex or gender"); *Steinmetz v. Golden State Supply, Inc.*, No.

23  2:07-cv-6155-JFW-Ex, 2008 WL 11336824, at *5 (C.D. Cal. Apr. 15, 2008)

24  (granting summary judgment where alleged harasser directed sexually-

25  charged comments and jokes at plaintiff for over a year); *see also*

26  *Westendorf v. W. Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 419 (9th

United States District Court
Central District of California

Cir. 2013) (affirming summary judgment despite two co-workers directing several sexual comments at plaintiff while at work); *Siam v. Potter*, No. 3:04-cv-00129-MHP, 2005 WL 8166268, at *1-5, *15 (N.D. Cal. May 17, 2005). Given these holdings, Hellman's five posts to his personal social media page over two months that were not sent directly to Plaintiff or presented to her in the workplace fall short of establishing an objectively abusive work environment.

Plaintiff argues that the Court should consider other allegedly discriminatory posts that Hellman made in analyzing the objective severity of her work environment.  Plaintiff's cited cases, however, either involve plaintiffs asserting discrimination based on more than one protected class, which is not the case here, *see Hafford v. Seidner*, 183 F.3d 506, 514-15 (6th Cir. 1999), or take into account harassment directed at other colleagues that occurred *in the workplace*, *see, e.g.*, *McGinest*, 360 F.3d at 1117. Further, many cases in this circuit have granted summary judgment despite assessing more severe *in workplace* conduct directed at *both* plaintiffs and their colleagues.  *See Kortan*, 217 F.3d at 1107, 1111; *Lappin*, 179 F. Supp. at 1120; *Pieszak*, 112 F. Supp. 2d at 992-93; *see also Hathaway v. Multnomah Cnty. Sheriff's Off.*, 123 F. App'x 806, 808 (9th Cir. 2005) ("But even if this additional evidence is taken into account, it does not suffice to raise a triable issue concerning the objective abusiveness of [plaintiff's] work environment.").  The Court reaches the same result here where the conduct allegedly directed at Plaintiff was less severe and all alleged conduct took place outside the workplace.

1    The language in the posts described above is unquestionably offensive

2    and degrading.  Controlling case law nevertheless reveals that Plaintiff has

3    failed to demonstrate a triable issue of fact as to Hellman's conduct being

4    sufficiently severe or pervasive to establish a hostile work environment

5    claim.  Summary judgment may be granted for this reason alone.

6

7        2.   Remedial Measures

8        Even if Plaintiff has established a triable issue of material fact as to

9    whether she was exposed to a hostile work environment, Defendant may

10   still avoid liability for Hellman's alleged harassment if the prison fulfilled its

11   obligation to take remedial measures "reasonably calculated to end the

12   harassment."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir.

13   2004).  In assessing the reasonableness of a defendant's remedial

14   measures, courts look to both "the temporary steps the employer takes to

15   deal with the situation" and "the permanent remedial steps the employer

16   takes once it has completed its investigation."  *Swenson v. Potter*, 271 F.3d

17   1184, 1192 (9th Cir. 2001).  "[T]he reasonableness of the corrective action

18   will [also] depend on, *inter alia*, the employer's ability to stop the harassment

19   and the promptness of the response."  *Freitag v. Ayers*, 468 F.3d 528, 539-

20   40 (9th Cir. 2006).  Here, Plaintiff fails to create a triable issue of fact that

21   Defendant did not take adequate steps to address the alleged harassment.

22

23       "[A]n employer can only be liable for harassment of which it knows or

24   should know," *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir. 1995),

25   thus Defendant was not obligated to take remedial measures regarding

26   Hellman's alleged harassment until February 18, 2020, when Plaintiff first

United States District Court
Central District of California

24

reported Hellman's page to AW Engleman.[15]  The undisputed facts

otherwise demonstrate that Defendant engaged a methodical, albeit

relatively lengthy, investigative and disciplinary process.  It is undisputed

that, on the day Plaintiff first complained about Hellman's page, AW

Engleman instructed SIA Gonzales to begin an investigation, while Dr.

Clegg arranged a voluntary reassignment of Plaintiff to the prison's Low

Facility.  *See Swenson*, 271 F.3d at 1193 ("The most significant immediate

measure an employer can take in response to a sexual harassment

complaint is to launch a prompt investigation to determine whether the

complaint is justified.").  SIA Gonzales soon met with Plaintiff twice to

discuss her concerns, and when Plaintiff raised the possibility that Hellman

was the page's creator in her March 11, 2020, memorandum, Hellman was

reassigned to another facility at the prison.  *See, e.g.*, *Bottenberg v. Carson*

*Tahoe Hosp.,* No. 3:05-cv-00684-HDM-VPCx, 2007 WL 9771085, at *1, *4

(D. Nev. May 17, 2007), *aff'd*, 303 F. App'x 470 (9th Cir. 2008) (changing

employees' working parameters to prevent encounters at work sufficient to

deter sexual harassment).

---

[15] Plaintiff argues that Defendant was aware of Hellman's alleged harassment "long before" Plaintiff's reports based on FCC Lompoc's Human Resources Manager Taulbee McGinnis being an "active follower" of Hellman's page.  (Opp'n at 22.)  Plaintiff, however, fails to provide any evidence demonstrating when exactly McGinnis knew of the page or its posting of allegedly harassing content.  Since it remains Plaintiff's burden to demonstrate that Defendant took inadequate remedial measures, *see Mockler v. Multnomah Cnty.*, 140 F.3d 808, 812 (9th Cir. 1998), the Court rejects Plaintiff's argument that Defendant was aware of the alleged harassment long before February 18, 2020.

Eventually, after Hellman posted one final meme potentially directed at Plaintiff (the penitentiary meme), Warden Von Blanckensee convened the TAT, which interviewed both Plaintiff and Hellman and issued recommendations within three days.  Defendant then implemented those recommendations the same day they were released, issuing Hellman a Cease-and-Desist Order and referring him to the EAP.  *See, e.g.*, *Lappin v. Laidlaw Transit Inc.*, 179 F. Supp. 2d 1111, 1122 (N.D. Cal. 2001) (issuing a mere warning to offending employees sufficient to address several instances of verbal sexual harassment).  Defendant's actions proved effective too: Hellman stopped posting memes of a sexual nature potentially directed to Plaintiff, and he soon deleted the page altogether because of Defendant's investigative efforts.  *See Fuller*, 47 F.3d at 1526, 1528 (affirming that harassment had ceased as a matter of law despite evidence that harasser continued with certain conduct that arguably constituted petty harassment).  Plaintiff continued to work at FCC Lompoc for two years thereafter, and there is no evidence that she reported any other issue with Hellman—a strong indicator that Defendant's actions were well-tailored to the magnitude of Hellman's conduct.  Defendant's overall conduct and the subsequent end to the alleged harassment, taken as a whole, demonstrate that Defendant took reasonable remedial actions sufficient to defeat Plaintiff's hostile work environment claim.  *See Swenson*, 271 F.3d at 1197 ("In considering whether the employer's response was appropriate, we consider the overall picture. . . .  The harassment stopped.")

United States District Court
Central District of California

1      Plaintiff takes issue with the length of Defendant's investigation and

2 remedial actions, namely that it took roughly three months[16] from the time of

3 her first complaint for Hellman to delete the page.  Plaintiff's argument,

4 however, overlooks the gradual approach Defendant used in addressing the

5 three complaint memoranda that Plaintiff presented to Defendant over time:

6 first instituting an investigation, then reassigning Hellman to another facility,

7 and finally convening the TAT that assisted Defendant in issuing a Cease-

8 and-Desist Order to Hellman.  *See Intlekofer v. Turnage*, 973 F.2d 773, 780

9 (9th Cir. 1992) (discussing how employers must take gradually more severe

10 disciplinary measures as harassment persists).  Further, courts have denied

11 hostile work environment claims where investigations of similar length have

12 occurred, *see, e.g.*, *Swenson*, 271 F.3d 1184 at 1194 (three to fourth

13 months); *Jordan v. Clark*, 847 F.2d 1368, 1371, 1375 (9th Cir. 1988) (two

14 months for harassment occurring in the workplace), and once the TAT was

15 assembled, Hellman was disciplined within three days.

16

17      Plaintiff also argues that, regardless of any remedial actions, Defendant

18 is strictly and vicariously liable for Hellman's conduct under Title VII because

19 Hellman was a supervisor at FCC Lompoc.  This argument is meritless.  The

20 cases Plaintiff relies on specifically state that employees are supervisors for

21 purpose of Title VII vicarious liability only where the alleged harassing co-

22 worker is Plaintiff's immediate supervisor and takes a tangible employment

23 action against the victim.  *Vance v. Ball State Univ.*, 570 U.S. 421, 431

24

25     [16] The relevant period of analysis is, in fact, only two months, as Defendant

26 sent Hellman the Cease-and-Desist Order on April 16, 2020, and Hellman
ceased the alleged harassing conduct towards Plaintiff thereafter.

(2013) ("We hold that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.,* to effect a 'significant change in employment status, such as hiring, firing, failing to promote, [or] reassignment.'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").  Plaintiff presents no evidence that Hellman ever served as her immediate supervisor; indeed, she instead states in her Statement of Undisputed Facts that Dr. Clegg was her immediate supervisor (Pl. SUF ¶ 32).  Plaintiff further does not allege that Hellman took or had the ability to take any tangible employment action like hiring, firing, or reassigning her, as required for Title VII vicarious liability based on misuse of supervisory authority.  Plaintiff's attempt to extinguish the effect of Defendant's remedial measures thus fails.

Accordingly, no genuine issue of material fact exists concerning Plaintiff's allegations of a hostile work environment, and the Court must grant summary judgment in favor of Defendant.

# VI.    CONCLUSION

The Court therefore GRANTS Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated:    4/4/23

_____

Virginia A. Phillips
Senior United States District Judge

United States District Court
Central District of California