**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LINDSAY OKONOWSKY, | No. 23-55404 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-07581-VAP-AS |
| v. | |
| MERRICK B. GARLAND, Attorney General, United States Attorney General, | OPINION |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted May 8, 2024
Pasadena, California

Filed July 25, 2024

Before: Kim McLane Wardlaw, Morgan Christen, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Title VII / Hostile Work Environment

The panel reversed the district court's summary judgment in favor of the government in a sex discrimination action, under Title VII of the Civil Rights Act of 1964, filed by plaintiff, a staff psychologist in a federal prison, alleging that the Bureau of Prisons failed to take adequate measures to address a hostile work environment at the prison.

The panel held that the district court erred by considering only some of the evidence, and by applying incorrect legal standards that circumscribed the law concerning hostile work environment claims. The panel reaffirmed that the totality of the circumstances in a Title VII sexually hostile work environment claim includes evidence of sexually harassing conduct, even if it does not expressly target the plaintiff, as well as evidence of non-sexual conduct directed at the plaintiff that a jury could find retaliatory or intimidating. The panel rejected the notion that only conduct that occurred inside the physical workplace can be actionable, especially in light of the ubiquity of social media and the ready use of it to harass and bully both inside and outside of the physical workplace.

The panel held that plaintiff had raised triable issues of fact as to whether she experienced a hostile work environment and whether the Bureau of Prisons failed to take prompt and effective remedial measures to address it.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Accordingly, the panel reversed and remanded for further
proceedings.

## COUNSEL

Andrew S. Pletcher (argued), Pletcher Law APC, Westlake
Village, CA; Cory H. Hurwitz and Lindsay L. Bowden,
Brock & Gonzales LLP, Los Angeles, California; for
Plaintiff-Appellant.

Zakariya K. Varshovi (argued), Assistant United States
Attorney; David M. Harris, Assistant United States
Attorney, Chief, Civil Division; E. Martin Estrada, United
States Attorney; United States Department of Justice, Los
Angeles, California; for Defendant-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Lindsay Okonowsky, a staff psychologist in a federal
prison, discovered that a corrections Lieutenant with whom
she worked, and who was responsible for overseeing the
safety of guards, prison staff, and inmates in the unit where
she worked, operated an Instagram account, which was
followed by more than one hundred prison employees. She
learned that the Lieutenant had posted sexually offensive
content about work, and that she was a personal target.
When Okonowsky complained about the page to prison
leadership, management told her the page was "funny"; the
investigator whom the prison appointed to investigate

Okonowsky's complaint told her the page's content was not
"a problem"; and the Lieutenant began to increasingly target
her with his posts in what Okonowsky reasonably perceived
to be an effort to intimidate her and discourage her from
making further complaints. Two months after Okonowsky
first reported the Lieutenant's behavior, the prison directed
the Lieutenant to cease acting in violation of the prison's
Anti-Harassment Policy. The Lieutenant continued posting
sexually hostile conduct for another month with no action by
the prison. The Lieutenant's conduct and the prison's lack
of a curative response to it ultimately drove Okonowsky to
leave the prison in search of a different job.

Okonowsky sued the Bureau of Prisons under Title VII
of the Civil Rights Act of 1964, claiming that the Bureau
failed to take adequate measures to address a hostile work
environment at the prison. The district court granted the
government's motion for summary judgment, and
Okonowsky appealed.

We reverse and remand. The district court erred by
considering only some of the evidence, and by applying
incorrect legal standards that circumscribed the law
concerning hostile work environment claims. We take this
occasion to reaffirm that the totality of the circumstances in
a Title VII sexually hostile work environment claim includes
evidence of sexually harassing conduct, even if it does not
expressly target the plaintiff, as well as evidence of non-
sexual conduct directed at the plaintiff that a jury could find
retaliatory or intimidating. We also reject the notion that
only conduct that occurs inside the physical workplace can
be actionable, especially in light of the ubiquity of social
media and the ready use of it to harass and bully both inside
and outside of the physical workplace.

## I. BACKGROUND

### A. Factual Background

We begin by describing the events leading to this lawsuit, assuming the version of the facts most favorable to the non-moving party, here Okonowsky. *See Little v. Windermere Relocation*, *Inc.*, 301 F.3d 958, 964 (9th Cir. 2002).

Okonowsky began working as a psychologist at the Bureau of Prison's ("Bureau" or "BOP") Federal Correctional Complex Lompoc ("Lompoc" or "prison") in Lompoc, California in September 2018. When she arrived at Lompoc, Okonowsky was assigned as the psychologist for the Special Housing Unit ("SHU"), meaning she was responsible for all of the duties of the prison's psychology department in the SHU.

As the SHU psychologist, Okonowsky worked with custody staff to determine where inmates would be housed within the SHU so as to avoid conflict and violence among the inmates in the Unit. Okonowsky relied on SHU custody officers to take incarcerated individuals from their cells and transport them to their clinical appointments with her. She also conducted suicide risk assessments of incarcerated persons. If Okonowsky determined that a SHU inmate was at risk of self-harm, she could direct that the inmate be placed on suicide watch. Suicide watch requires continuous, around-the-clock observation of the individual by custody staff, and can only be terminated upon an assessment and recommendation of the clinical team. *See generally* 28 C.F.R. §§ 552.40–552.42; Fed. Bureau of Prisons, *Program Statement: Suicide Prevention Program*, U.S. Dep't of Just. 1, 9 (Apr. 5, 2007) (last visited May 27, 2024),

https://perma.cc/A8UK-VDAZ; Fed. R. Evid. 201(b)(2), (c)(1), (d).

Steven Hellman, a corrections Lieutenant who also worked in the SHU at Lompoc, supervised custody staff in the SHU. He was also a member of the Bureau's Special Investigative Services, responsible for investigating suspected violations of law and prison policy by both inmates and staff. Hellman was not Okonowsky's direct supervisor, as Hellman was a corrections Lieutenant and Okonowsky a staff psychologist. But as a corrections Lieutenant, Hellman was responsible for the safety of inmates and staff, including staff members like Okonowsky, and he oversaw the corrections officers who worked in the SHU with Okonowsky. Hellman and Okonowsky's jobs occasionally required them to collaborate or, at a minimum, to work side-by-side in the SHU.

Around January 2020, Hellman and Okonowsky had apparent disagreements over how to manage "difficult inmates" in the SHU. Hellman also became frustrated when Okonowsky was granted access to an office in the SHU. Hellman believed that Okonowsky's use of the office made it "impossible" for him and other corrections officers "to do their job" in the SHU.

During this time, on January 6, 2020, Hellman created an Instagram page titled "8_and_hitthe_gate."[1] The page did not name or identify its creator. On February 16, 2020, Okonowsky became aware of the "8_and_hitthe_gate" page

---

[1] "Eight and hit the gate" refers to putting in eight hours at work and then leaving, an expression well known among prison employees. *See* Dasha Lisitsina, *'Prison guards can never be weak': the hidden PTSD crisis in America's jails*, The Guardian (May 20, 2015, 3:15 PM EDT) (last visited July 12, 2024), https://perma.cc/H6TC-BUTB.

when Instagram "suggested" that Okonowsky view and follow the page from her personal Instagram account. Despite the page's relatively recent creation, the page contained hundreds of posts, many of which were overtly sexist, racist, anti-Semitic, homophobic, and transphobic memes that explicitly or impliedly referred to the Bureau of Prisons, Lompoc staff, and Lompoc inmates. The page was followed by more than one hundred Lompoc employees, including the Human Resources Manager, the Union President, and a member of the prison's Special Investigative Services.[2] Approximately half or more of the followers of the page were Lompoc employees.

Posts or comments on Hellman's page occasionally referred to interactions between the SHU custody team, the SHU psychologist, and/or SHU inmates or inmates on suicide watch, strongly suggesting that the person who ran the page worked in the SHU at Lompoc. As the SHU psychologist, Okonowsky understood that certain Instagram posts referring to the psychology department or "the psychologist," including some posts that referred to previous conversations Okonowsky had with staff in the SHU and/or

---

[2] The government contends that Okonowsky's assertion that more than one hundred employees followed the page, which is supported by Okonowsky's declaration based on her personal knowledge, is "disputed" because Okonowsky's declaration does not specifically name the more than one hundred employees that Okonowsky identified as "followers." The government offers no evidence that would negate Okonowsky's assertion or place it in dispute, and the government articulates no specific evidentiary objection to the statement in Okonowsky's declaration. We therefore consider the statement as an assumed fact for the purposes of this appeal. *See* Fed. R. Civ. P. 56(c)(2), (e)(2).

posts containing derogatory images resembling her likeness, referred to Okonowsky specifically.

Some of the posts Okonowsky witnessed on the page displayed or suggested violence against and/or sexual contacts with women co-workers, or violence against women generally. These posts were graphic, suggestive of rape and physical harassment, and depicted scenes of violence against women in general, but also against "the SHU psychologist" in particular. Posts ridiculed the "Psychologist" in a coarse and degrading manner simply for doing her job, such as one crude joke depicting a cowboy figure holding two guns pointing in opposite directions, with text suggesting he would shoot both the SHU psychologist and a particular inmate.

Most of the posts are too graphic and disturbing to republish here, but we will recount one that particularly disturbed Okonowsky. Prior to discovering the Instagram page, Okonowsky had invited members of the SHU custody staff to an end-of-the-quarter celebration at her home. When Okonowsky found Hellman's Instagram page, she discovered that he had made a post joking that the all-male custody officers would "gang bang" Okonowsky at her home during the party. That a supervisor openly joked about his law enforcement subordinates "gang banging" Okonowsky at her home on a platform followed by more than one hundred co-workers including upper-level prison management—and that the post was openly "liked" and thereby endorsed by staff members—upset Okonowsky to such an extent that she cancelled the gathering.

After discovering the page, Okonowsky forwarded images from the page to her supervisor, Chief Psychologist Carl Clegg, the very next day—February 17, 2020.

Okonowsky also messaged the prison's Acting Safety
Manager, Robert Grice, on Instagram to express her concern
that he was following the page, "liking" posts, and
commenting on posts. Manager Grice responded to her on
Instagram, telling Okonowsky that the posts were funny, that
he was "Sorry, not sorry," and that Okonowsky needed to
toughen up or get a sense of humor.

The following day, on February 18, 2020, Okonowsky
met with Supervisor Clegg to discuss the page. Recognizing
that the operator of the Instagram page was likely a
corrections officer in the SHU, Clegg suggested that
Okonowsky transfer to a different facility within Lompoc.
After the meeting, Clegg, with Okonowsky's assent,
reassigned Okonowsky from Lompoc's medium security
facility, where the SHU is located, to Lompoc's low security
facility. That same day, Okonowsky also met with the
prison's Acting Complex Warden, James Engleman,
regarding the Instagram page. Warden Engleman told
Okonowsky that he would direct Special Investigative Agent
Victor Gonzales, who was Hellman's supervisor, to
investigate the issue and refer the matter to the Bureau's
Office of Internal Affairs.

Later that day, Safety Manager Grice, whose spouse
worked at the prison as Engleman's secretary and was also a
follower of the "8_and_hitthe_gate" page, sent Okonowsky
a message on Instagram asking if Okonowsky was angry
with him. Okonowsky responded by reiterating her concern
to Grice about Hellman's page. In a matter of hours, a post
appeared on the "8_and_hitthe_gate" page threatening
Okonowsky, sexually debasing her, and denigrating a well-
known woman in public leadership, with the captions, "when
you get []hurt by memes" and "Tomorrow's forecast: hot
enough to melt a snowflake." The post included a sexually

obscene hashtag referring to someone who could not take a joke. It was clear from the post that someone had alerted Lieutenant Hellman to Okonowsky's complaint. Okonowsky found the post to be "menacing" and intended to intimidate her from further complaining about the page. Because of the post, Okonowsky no longer felt safe at work. She decided not to go to work the next day.

Okonowsky sent Warden Engleman a copy of the menacing post the following day, asking the Warden for a phone call. The Warden never responded to or contacted Okonowsky. Instead, he forwarded her email to Special Investigative Agent Gonzales. Gonzales called Okonowsky that day to set up an initial meeting to discuss the Instagram account. During their phone conversation, he told Okonowsky that he had reviewed the Instagram page and didn't "really see anything that's a problem" with it.

Okonowsky returned to work and reported to the low security facility, where she had been reassigned. On her first day back at work, she ran into Lieutenant Hellman. Believing that Hellman likely was behind the "8_and_hitthe_gate" account, Okonowsky emailed Associate Warden Gutierrez asking for information about why Hellman was at the low security facility when he typically worked in the SHU at the medium security facility. Associate Warden Gutierrez never responded to Okonowsky. He later told Clegg, Okonowsky's supervisor, that Okonowsky should stop emailing him with her concerns.

Agent Gonzales, who had been directed to investigate Okonowsky's complaint, arranged to meet with Okonowsky on February 26, 2020, to discuss the page. When it was time for their meeting, Gonzales summoned Okonowsky over the

staff-wide radio system, which others could hear.   The
meeting took place while other prison staff were nearby, and
during the meeting Gonzales had copies of Hellman's
memes printed at a public printer in the office.   The meeting
made Okonowsky feel uncomfortable about Gonzales's
ability to maintain her confidentiality, and she perceived that
Gonzales was not taking her complaint seriously.

As time passed, Okonowsky felt less and less safe at
work.   Hellman continued to post disturbing content on his
Instagram page, including multiple posts that appear to have
been intended to target and intimidate Okonowsky for
reporting Hellman to prison management, such as a sexually
suggestive meme of a group of men staring at a woman
wearing a short skirt, with the text "Walking back to your
area after you just got done telling" and "The Walk of
Shame."   Okonowsky witnessed her colleagues discussing
the content of the page at work.   When she raised the issue
of Hellman's page with Human Resources Manager Taulbee
McGinnis, who was an active follower of the page, the
Human Resources Manager told Okonowsky that he thought
the memes were "funny."   McGinnis also confirmed that he
knew who ran the page: Lieutenant Hellman.   Okonowsky
felt ostracized at work and concerned that she could be in
danger in her physical workspace.   She worried that if she
were attacked by an inmate, the guards who openly derided
her, her physical appearance, and her sex online would not
assist her in an emergency because they saw her as a "female
joke."   Okonowsky's productivity suffered, and she had to
work harder to get the same tasks completed.

On the morning of March 7, 2020, during the working
hours of the weekend suicide watch shift, Hellman used a
feature on Instagram to block Okonowsky from being able
to view his Instagram page.   Okonowsky quickly created a

new Instagram account that would permit her to continue to
monitor Hellman's page for posts that targeted her, before
an audience of more than one hundred colleagues, and
continued or escalated to a potentially unsafe situation.
Indeed, shortly after Hellman blocked Okonowsky, he
posted a photo of a woman in short shorts whom Okonowsky
described as sharing her likeness.    The post ridiculed
Okonowsky for thinking that she's "cute" and for putting
inmates on suicide watch.   A number of Lompoc employees
"liked" the post and two Lompoc employees commented on
the post.[3]

Okonowsky emailed a copy of the post to Warden
Engleman, asking for an update on the investigation and
stating that she was "growing increasingly more
uncomfortable" due to Hellman's persistent targeting of her.
Warden Engleman did not reply to Okonowsky.   The
following day, on March 8, 2020, Gonzales called
Okonowsky.   During the phone call, Agent Gonzales
informed Okonowsky that, although nearly three weeks had
passed since he had been directed by Warden Engleman to
refer the matter to the BOP's Office of Internal Affairs,
Gonzales had yet to do so because he "had other things going
on" and "could not figure out how to print the memes."
Gonzales submitted the referral the following day, on March
9, 2020.

On March 10, 2020, Okonowsky and her supervisor,
Clegg, met with Associate Warden Gutierrez to discuss
Hellman's conduct.    Clegg expressed his concern for
Okonowsky's safety and suggested that the prison convene
a workplace violence Threat Assessment Team.  Later that
day, Gutierrez informed Clegg and Okonowsky that Warden

---

[3] The record does not reflect the content of the comments.

Engleman decided that a Threat Assessment was not warranted.

On March 11, 2020, Okonowsky sent a memorandum to Associate Warden Gutierrez in which she named Hellman as the creator and operator of "8_and_hitthe_gate" based on information she received from the Human Resources Manager. Gutierrez never responded to Okonowsky's memo. According to Warden Engleman, Hellman "was assigned to a different facility at FCC Lompoc" on March 11, 2020, "as a result of Ms. Okonowsky's allegation in her memo as to the identity of the Page's creator."**[4]** Although the prison transferred Hellman to a different part of Lompoc, Hellman continued to post sexist material containing sexually explicit language and suggesting sexual relations with or violence against women co-workers, especially new co-workers, which many Lompoc employees continued to "like."

On March 25, 2020, more than a month after Okonowsky first made her complaint about Hellman's conduct, Okonowsky met with Agent Gonzales and a union representative to ask about the prison's investigation. Okonowsky raised the concern that Gonzales may have a conflict of interest in investigating Hellman because Hellman was Gonzales's subordinate. Gonzales told Okonowsky that he saw no conflict of interest, left without finishing the meeting, and later that day told a co-worker of Okonowsky's that he did not see anything wrong with Hellman's Instagram posts.

---

[4] The district court overruled Okonowsky's evidentiary objection to this paragraph of Engleman's declaration. Okonowsky does not argue on appeal that this was an abuse of discretion.

Two days later, Okonowsky copied Warden Engleman on a memo addressed "to whom it may concern," describing her meeting with Gonzales, providing examples of Hellman's recent Instagram posts, and stating her belief that the prison was not properly investigating or addressing Hellman's conduct. The memo recounted that "Warden Engleman and Associate Warden Gutierrez have not responded to my emails"; "my request for a threat assessment and workplace violence committee meeting was denied, without any follow-up contact"; the prison "failed to provide interim relief to ensure future misconduct does not occur"; and the prison did "not maintain[] confidentiality of my complaint." Engleman forwarded Okonowsky's memorandum to Gonzales; he did not reply to Okonowsky.

Later that day, Hellman posted on Instagram with an image referring to Okonowsky's likeness accompanied by a sexually vulgar and profanity-ridden diatribe against "the one staff member" for "relentlessly tell[ing] on staff." Several Lompoc employees, including the prison's Safety Manager, "liked" the post. Okonowsky sent an email to Warden Engleman that night with a picture of the post, asking whether anything could "be done to curb this behavior as the investigation takes place," stating that the behavior had gone "too far," that she felt "targeted" and "discouraged." Engleman never replied to Okonowsky's email. Engleman later admitted at his deposition that, although he was the Acting Warden throughout this period, he had no involvement in the investigation into Okonowsky's complaint and took no action other than referring the matter to Agent Gonzales.

In early April 2020, two months after Okonowsky first complained of Hellman's conduct, a new warden, Barbara Von Blanckensee, arrived at Lompoc. On April 13, 2020,

Warden Von Blanckensee convened a six-member Threat
Assessment Team, which included Engleman, to investigate
Okonowsky's complaint.    The Threat Assessment Team
interviewed Okonowsky that day, and it interviewed
Hellman two days later, on April 15, 2020.    The Threat
Assessment Team issued its report and recommendation to
Warden Von Blanckensee the following day, on April 16,
2020.

During their interview with Okonowsky, members of the
Threat Assessment Team advised Okonowsky not to look at
Hellman's page anymore.    The Team simultaneously told
Okonowsky that it lacked the resources to monitor
Hellman's page, and, contradictorily, directed that
Okonowsky should inform the prison's leadership if
Hellman's posts continued.

In its report, the Threat Assessment Team concluded that
"numerous FCC Lompoc employees appear to be well aware
that [Hellman] is [the Instagram page's] owner," and it found
Hellman's denial that he directed any posts at Okonowsky
"unconvincing[]."    The Team concluded that Hellman's
conduct constituted impermissible "harassing conduct"
within the Bureau of Prisons' definition and that Hellman's
conduct likely violated the BOP's standards of conduct for
supervisors and law enforcement officers.    The Team
recommended that management take a variety of responsive
actions, including maintaining the separation of Hellman
and Okonowsky, and issuing a letter to Hellman from his
supervisor ordering him to cease posting in violation of the
Bureau's Anti-Harassment Policy and Standards of
Employee Conduct.

On April 16, 2020, the prison issued Hellman a cease-
and-desist letter stating that his posts on social media

appeared to have violated the Bureau's Anti-Harassment
Policy.  The letter ordered Hellman to cease such conduct
immediately and stated that any failure to comply with the
letter would not be tolerated and could result in removal.

The letter did not stop Hellman.  For at least three weeks
after receiving the letter, Hellman continued to make near-
daily posts on his Instagram page, including posts mocking
the prison psychology department and the Threat
Assessment Team and posts suggesting sexual relations with
and/or sexually harassing behavior toward female co-
workers.  Hellman's conduct elicited no response from the
prison—at least none in the record before us.  His conduct
made Okonowsky exceptionally concerned and scared at
work, because it meant that Hellman was flouting the
prison's workplace policies.

As directed by the Threat Assessment Team,
Okonowsky alerted prison management to Hellman's
continued conduct in a letter on April 27, 2020.  The prison
never responded, and Hellman's conduct continued.  He
made an additional three posts mocking the Threat
Assessment Team, one of which called for the support of his
"soldiers" at the prison.  And he continued to make sexually
overt posts targeting female co-workers, including one that
depicted a line of pink panthers with erections and a caption
that described male staff standing in line and looking at
women staffers as they walked into work.

On May 12, 2020, Okonowsky again informed prison
leadership of Hellman's continued posts, as she had been
directed to do by the Threat Assessment Team.  The record
does not reflect that Okonowsky received any reply.  At
some point after Okonowsky sent her May 12, 2020,
memoranda—that is, one month or more after Hellman had

been informed that continued violations would "not be
tolerated," and nearly three months after Okonowsky first
lodged her complaint—Hellman took down his Instagram
page for reasons unexplained in the record.

The Threat Assessment Team in its April 2020 report to
Warden Von Blanckensee had indicated that "an
investigation into Hellman's actions" would need to be
"completed, and if misconduct [were] sustained, any
resulting discipline [be] implemented." The record does not
reflect that any investigation was ever completed by the
prison or the BOP's Office of Internal Affairs. As late as
September 2020, Hellman told investigators that he believed
an investigation by the prison may have been ongoing but
that he had "not been interviewed."

On January 24, 2021, because of the harassment she
experienced at Lompoc, Okonowsky transferred to a BOP
facility in Texas.

## B.  Procedural History

Okonowsky filed this action on September 22, 2021,
asserting a single claim under Title VII of the Civil Rights
Act of 1964 for discrimination on the basis of sex. After the
parties engaged in discovery, the government filed a motion
for summary judgment, which the district court granted.

The district court limited its consideration of the
evidence to just five posts made on the "8_and_hitthe_gate"
account that, in the district court's view, (1) targeted
Okonowsky specifically and (2) did so because of her sex.
The district court concluded that the five posts "occurred
entirely outside of the workplace" because the posts were
made on a staff member's personal Instagram page and none
of the five posts was ever sent to Okonowsky, displayed in

the workplace, shown to Okonowsky in the workplace, or discussed with Okonowsky in the workplace without her consent. Because in its view the five posts did not amount to severe or frequent harassment in the physical workplace, the district court concluded that there was no triable issue as to whether Okonowsky's work environment was objectively hostile.

The district court found, in the alternative, that there was no genuine dispute that the Bureau took reasonable, prompt, and corrective steps to end the harassment. Cabining its analysis to the undisputed facts and the same five posts—all made prior to the cease-and-desist letter—the district court concluded that the Bureau took "reasonable remedial actions sufficient to defeat [Okonowsky's] hostile work environment claim." These remedial actions included investigating Okonowsky's claim with "a methodical, albeit relatively lengthy" investigation, reassigning Hellman to a different part of Lompoc, convening the Threat Assessment Team, and issuing the cease-and-desist letter, which the district court characterized as successfully resulting in the cessation of Hellman's conduct.[5]

Okonowsky timely appealed.

## II. STANDARD OF REVIEW

We review a district court's order granting summary judgment *de novo*. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 343 (2021). "[V]iewing the evidence in the light most favorable

---

[5] The district court rejected Okonowsky's alternative argument that the Bureau is strictly and vicariously liable for Hellman's conduct because Hellman was a supervisor. Okonowsky has not appealed the district court's conclusion with respect to this issue, so we do not address it.

to the non-moving party," we must decide "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). We may not weigh the evidence or determine the truth of any matter. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). "[I]n a case involving a hostile work environment claim . . . 'what is required to defeat summary judgment is simply evidence such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor.'" *Fuller v. Idaho Dep't of Corrections*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017)), *cert. denied*, 584 U.S. 904 (2018).

### III.  DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating on the basis of sex regarding "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). To defeat the government's motion for summary judgment on her hostile work environment claim, Okonowsky must adduce evidence from which a reasonable juror could conclude that (1) she was subjected to a sexually hostile work environment; and (2) the government is liable for the harassment that caused the hostile work environment to exist. *See Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 647 (9th Cir. 2021); *Little*, 301 F.3d at 966. We address each element in turn.

### A.  Hostile Work Environment

To determine whether Okonowsky was subjected to a sexually hostile work environment, we examine three factors: 1) whether Okonowsky was subjected to verbal or physical conduct of a sexual nature; 2) whether the conduct

was unwelcome; and 3) whether the conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Fried*, 18 F.4th at 647. The third factor requires that Okonowsky "show that her work environment was both subjectively and objectively hostile." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005). The parties do not dispute that Okonowsky was subjected to unwanted verbal conduct based on her sex, or that Okonowsky subjectively perceived her work environment to be hostile. We thus focus only on part of the third factor—whether Okonowsky adduced evidence of sufficiently severe or pervasive sexually offensive conduct from which a reasonable juror could conclude that Okonowsky's work environment was objectively hostile from the perspective of a reasonable woman. *See Little*, 301 F.3d at 966.

In analyzing the objective hostility of a working environment, we must look to the totality of the circumstances surrounding the plaintiff's claim. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam). That includes assessing the "frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Id.* (citation omitted). "No single factor" in this non-exhaustive list "is required." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (alteration omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Courts also must consider that the "required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct," *id.* (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)), and the cumulative effect of conduct

over time, *see Zetwick*, 850 F.3d at 444; *Fried*, 18 F.4th at 652; *see also Clark Cnty. Sch. Dist.*, 532 U.S. at 270 ("Workplace conduct is not measured in isolation."). In all cases, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not trigger Title VII's protections. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation omitted).

### 1. *The Totality of the Circumstances*

We begin by considering the scope of the evidence relevant to Okonowsky's claim. The government contends that Okonowsky has failed to establish an objectively hostile work environment because the only relevant conduct at issue—the five Instagram posts identified by the district court—all "occurred entirely outside of the workplace." This argument is grounded on legally and factually erroneous assumptions.

#### a. The Physical Workplace

The government relies on our unpublished decision in *Fuller v. Idaho Department of Corrections* (*Fuller II*), 694 F. App'x 590, 591 & n.1 (9th Cir. 2017), *cert. denied*, 584 U.S. 904 (2018), to argue that evidence of conduct occurring entirely separate from and unrelated to the workplace cannot, standing alone, suffice to preclude summary judgment in favor of the employer on a hostile work environment claim.[6]  Whether or not the unprecedential decision in *Fuller II* stands for that principle, and whether or

---

[6] In *Fuller*, the plaintiff adduced evidence that she was raped twice outside of work by a person who was both her co-worker and romantic partner. 694 F. App'x at 590–91. At the time of the rapes, the co-worker was on administrative leave pending a criminal investigation of him for another alleged rape.

not that principle is correct, that "principle" has no application to this case.

For one, it makes little sense to describe a social media page that includes overt comments about a specific workplace, like Hellman's, as "occurring" in only a discrete location, as the district court did below and the government now asserts on appeal. Social media posts are permanently and infinitely viewable and re-viewable by any person with access to the page or site on which the posts appear. No matter where Hellman was or what *he* was doing when he made his posts, Lompoc employees who followed the page were free to, and did, view, "like," comment, share, screenshot, print, and otherwise engage with or perceive his abusive posts from anywhere. The Instagram page also served as a record of which co-workers subscribed to the page and commented on posts, showed their comments and their "likes," and could be seen at any time from any place—including from the workplace.[7]

---

[7] In point of fact, here, a reasonable factfinder could infer that Hellman posted to his account, and his co-workers viewed and engaged with his content, while *at work*. Approximately half of Hellman's 235 followers were Lompoc employees who subscribed to Hellman's near daily posts about the prison where he and Okonowsky were co-workers. His posts referred to individual Lompoc staff members and inmates, as well as timely events that only Lompoc employees would recognize or understand. Okonowsky witnessed co-workers discussing Hellman's page at work. And Hellman appears to have posted from work on at least one occasion. Given that many employees in today's world occasionally use or view personal social media from work, a factfinder could infer from the record that Hellman's harassing conduct did not "occur" entirely outside of the prison walls. As the non-moving party, Okonowsky was entitled to have such an inference drawn in her favor at summary judgment. *See Dominguez-Curry*, 424 F.3d at 1035. But, even so, as we explain above, the crucial inquiry is not whether Hellman

For another, we have held that conduct that took place outside of the physical work environment is part of the totality of the circumstances we evaluate when considering a hostile work environment claim. *Little*, 301 F.3d at 966–68. In *Little*, the rape occurred outside of the physical workplace but the reaction of the plaintiff's employer "would have made a reasonable woman feel that her work environment had been altered" so as to defeat summary judgment for the employer. *Id.* at 966–67. Moreover, the Supreme Court has instructed us to consider a non-exhaustive list of the circumstances and characteristics of alleged harassment which does not distinguish between conduct occurring on or off the physical or digital worksite. *See Clark Cnty. Sch. Dist.*, 532 U.S. at 270–71. The relevant standard requires us to assess whether harassing conduct had an unreasonable *effect* on the working environment and, if so, to consider whether and how the employer responded to that effect. *See id.*; *see also Fried*, 18 F.4th at 650 ("Several circuit courts, including our own, have recognized that an employer's response to a third party's unwelcome sexual advances toward an employee can independently create a hostile work environment.") (emphasis omitted).

Applying that standard, we have concluded that offsite and third-party conduct can have the effect of altering the working environment in an objectively severe or pervasive manner. *See, e.g.*, *Galdamez v. Potter*, 415 F.3d 1015, 1023–24 (9th Cir. 2005) (concluding that a reasonable juror could find racially hostile comments made by third parties, including comments outside of the workplace, "both

---

posted from work or his co-workers interacted with his page while at work, but whether his and his co-workers' discriminatory conduct had an unreasonable effect on Okonowsky's work environment.

subjectively and objectively severe or pervasive"). And we have found that evidence of management-level, intra-workplace ratification of or acquiescence to offsite conduct by employees, customers, or third parties can be particularly relevant to both the hostile work environment and employer liability elements of a Title VII claim. *See, e.g.*, *Fuller*, 865 F.3d at 1162–63 (vacating grant of summary judgment for employer based on evidence that the employer "punish[ed] the [plaintiff]" for taking leave after she was raped twice outside of work and the employer "both vocally and financially support[ed] her rapist" after the fact); *Little*, 301 F.3d at 967–69 (reversing grant of summary judgment for employer based on evidence that employer "ratified" a business client's off-site rape of the plaintiff "by failing to take immediate and effective corrective action" to protect the employee); *Fried*, 18 F.4th at 651–53 (reversing grant of summary judgment for employer where plaintiff presented evidence that the employer condoned "a customer's overt sexual proposition" of the plaintiff in the workplace and directed the employee to continue to serve the customer). In cases where the plaintiff has experienced offensive conduct from a non-employee (as in *Galdamez*, *Little*, and *Fried*), or harassment outside of and unrelated to the workplace (as in *Fuller*) that had a foreseeable, adverse impact on the plaintiff's working conditions, our "focus" in assessing the Title VII claim has centered on "the employer's response to the [offensive] conduct." *Fried*, 18 F.4th at 650.

Thus, even if discriminatory or intimidating conduct occurs wholly offsite, it remains relevant to the extent it affects the employee's working environment. Here, Okonowsky has adduced ample evidence that Hellman's sexually discriminatory conduct "ma[de] it more difficult for her to do her job, to take pride in her work, and to desire to

stay in her position." *Fuller*, 865 F.3d at 1162 (quoting *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017)). The prison itself concluded as much when its Threat Assessment Team and leadership determined that Hellman's supposedly "offsite" behavior violated the Bureau's Anti-Harassment Policy. That violation, the prison believed, authorized it to take employment action against Hellman precisely because of his conduct's damaging effect on Okonowsky's working environment.

The Threat Assessment Team also found, and the prison stated in its cease-and-desist letter, that Hellman violated the Bureau's Standards of Employee Conduct, which apply to conduct both within and outside of work. The Bureau's standards require employees to "conduct themselves in such a manner that their activities *both on and off duty* do not discredit the agency," but instead "foster[] respect for the Bureau of Prisons, the Department of Justice, and the U.S. Government." Bureau of Prisons, *Standards of Employee Conduct*, U.S. Dep't of Just. 5 (Dec. 6, 2013) (last visited July 9, 2024), https://perma.cc/Z6G3-VWSZ (emphasis added). In a March 24, 2014, memorandum titled "Guidance on the Personal Use of Social Media by Department Employees," the U.S. Department of Justice explained that "government-wide standards of conduct . . . apply to online communications at all times, regardless of whether they are at work, outside the office, or using government equipment." The memorandum emphasizes that "Department employees do not surrender their First Amendment rights as a result of their employment; however, the Supreme Court and lower courts have held that the Government may restrict the speech of its employees when employees are not speaking as private citizens on matters of public concern or when the Government's interest in the efficient provision of public

services outweighs its employees' interest in the speech." It
explains that "[t]he line between public and private, personal
and professional, is often blurred, especially when an
employee using social media . . . comments on matters
related to his or her work, or the work of the Department."
And it urges employees to "exercise extreme care" when
making "comments that can be perceived as showing
prejudice based on race, gender, sexual orientation, or any
other protected basis," as such communications "implicate
the Department's core mission of administering justice in a
fair, effective, and even-handed manner."

Lompoc's Threat Assessment Team found that Hellman
made numerous posts, including but not limited to "jokes on
social media regarding inmate suicide," such as a post
mocking the suicide of Jeffery Epstein in BOP custody, that
"are highly inappropriate and reflect poorly upon the BOP—
especially when coming from supervisory-level employees
who work in [the] SHU." Prison leaders agreed, informing
Hellman in the cease-and-desist letter that he "posted
memes/information on social media that appear to violate
Agency policy, including Program Statement 3420.11,
Standards of Employee Conduct, and Program Statement
3713.26, Bureau of Prisons Anti-Harassment Policy."
Okonowsky has adduced ample evidence showing that
prison leaders were well aware of such posts long before the
prison convened the Threat Assessment Team. Construing
all inferences in Okonowsky's favor, a reasonable juror
could conclude that the Bureau's failure to take reasonably
prompt and effective steps to address conduct that plainly
violated numerous Bureau and Department of Justice
policies signaled to Okonowsky that the Bureau had no
intention of protecting her from Hellman's harassing
conduct and that Hellman could act with impunity.

A reasonable juror could also conclude that the Bureau's lackluster response to Okonowsky's complaint "reinforced rather than remediated" Hellman's sexually harassing conduct, cementing the discriminatory effect of his behavior within the workplace. *Little*, 301 F.3d at 967–68. For all of these reasons, the government's argument that Hellman's social media posts "occurred" outside of work, and thus could not be considered in the totality of the circumstances surrounding Okonowsky's Title VII claim, rings hollow.

b.  Limited Consideration of Hellman's Harassing Instagram Posts

The district court limited its consideration of the evidence to the five posts it believed were both (1) directed at Okonowsky personally, and (2) made based on Okonowsky's sex. The district court erred in two ways by so constricting the universe of the evidence relevant to Okonowsky's claim.

First, the district court disregarded the well-established principle that the totality of the circumstances surrounding a Title VII claim includes offensive or retaliatory conduct which would not, in isolation, violate Title VII, *Fuller*, 865 F.3d at 1163 & n.9, as well as discriminatory conduct not specifically directed at the plaintiff, *see Reynaga*, 847 F.3d at 687 ("We have held that . . . hostility need not be directly targeted at the plaintiff to be relevant to his or her hostile work environment claim."); *e.g.*, *Dominguez-Curry*, 424 F.3d at 1036, 1038 (finding that the district court "erroneously disregarded evidence of discriminatory comments that [the harasser] directed to other women in the division").

Second, the district court failed to draw all reasonable inferences in Okonowsky's favor when it determined that

Hellman's posts about the prison's psychology department did not target Okonowsky specifically. The record shows that staff members at the prison understood that the creator of the "8_and_hitthe_gate" page was a custody officer in the SHU based on the page's content. Because Okonowsky was *the* psychologist assigned to the SHU, responsible for all of the duties of the department in the SHU, a reasonable juror could infer—just as Hellman's followers and the prison's Threat Assessment Team did—that Hellman's posts targeting "the psychologist" and the psychology department were aimed at Okonowsky specifically. Okonowsky was entitled to have this inference drawn in her favor. *See Dominguez-Curry*, 424 F.3d at 1035.

\* \* \*

In sum, the evidentiary record in support of Okonowsky's claim includes, but is not limited to, evidence that employees holding management-level positions and those who were charged with investigating violations of workplace policy condoned, acquiesced to, or otherwise reinforced Hellman's conduct in the workplace. It also includes posts made by Hellman (as well as associated comments and "likes" by Lompoc employees) that endorsed or made light of violence against and/or sexually discriminatory views toward women; targeted Okonowsky based on her appearance; targeted Okonowsky as the SHU psychologist; reasonably appear to have been intended to intimidate or discourage Okonowsky against further complaints; and flaunted the prison's Threat Assessment Team and workplace policies.

## 2.  *The Bureau of Prisons is not entitled to summary judgment.*

Viewing the evidence in the light most favorable to Okonowsky, we conclude that Okonowsky has raised triable issues of fact as to the existence of a hostile work environment.

### a.  Hellman's Conduct

Hellman made hundreds of posts on his Instagram account over a five-month period, often posting multiple times per day.  Many of his posts about women in the workplace were denigrating, suggestive of violence, and encouraged or at the very least made light of sexual harassment in the workplace.  Hellman posted about Okonowsky's all-male co-workers "gang banging" her; he described her in vulgar sexual terms; he humiliated and intimidated her for reporting his conduct to management; and he called for his "soldiers" to rally in support of him after Okonowsky complained to management.  A reasonable factfinder could conclude, just as the Lompoc Threat Assessment Team and leadership ultimately did, that numerous of Hellman's posts about Okonowsky were intended to, and had the effect of, harassing Okonowsky on the basis of her sex, humiliating and degrading her, and intimidating her in an effort to shape her behavior in the workplace and discourage future complaints about Hellman's conduct.[8]

---

[8] Okonowsky presses us to consider additional discriminatory posts made by Hellman, such as the many racist, homophobic, and anti-Semitic posts.  We need not address this argument, because the posts we do consider are more than sufficient to create a triable issue as to whether Okonowsky experienced objectively severe and/or pervasive harassment

The government analogizes Okonowsky's case to *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000), in which we found no triable issue as to harassment because "the plaintiff alleged [only] that a supervisor referred 'once or twice' to another female as a 'castrating bitch,' 'Madonna,' and a 'regina,'" and the "plaintiff herself *did not regard this as harassing*, and the supervisor never directed a sexual insult *at plaintiff*." *Arizona ex rel. Horne v. Geo Grp., Inc.*, 816 F.3d 1189, 1207 (9th Cir. 2016) (emphases added) (citing *Kortan*, 217 F.3d at 1106–07, 1110–11). Given the government's concessions that Okonowsky subjectively viewed Hellman's conduct as harassing and that Hellman directed at least five sexually discriminatory posts at Okonowsky specifically, we fail to see how *Kortan* is on point.

We find more guidance in our opinion in *Dominguez-Curry*. There, we concluded that evidence of a supervisor making "numerous demeaning comments about women in the workplace" that were similar in both severity and frequency to the comments made by Hellman, including comments directed at the plaintiff, was "more than sufficient" to preclude summary judgment to the employer on the hostile work environment element of a Title VII claim. 424 F.3d at 1033–35. Although Hellman was not Okonowsky's direct supervisor as was the case in *Dominguez-Curry*, his role as a high-ranking law enforcement officer charged with protecting Okonowsky's safety and enforcing workplace policy enhanced the objective severity and pervasiveness of his harassing conduct. *See Zetwick*, 850 F.3d at 445 ("[T]he Court has

---

on the basis of sex that altered the terms or conditions of her employment.

recognized that 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)); *see also Fuller*, 865 F.3d at 1163. A reasonable juror could credit Okonowsky's testimony that, because Hellman supervised the corrections officers tasked with protecting Okonowsky within the prison, and within the SHU in particular, she found certain of his posts to be particularly "threatening," *Little*, 301 F.3d at 966 (citing *Breeden*, 532 U.S. at 270–71), and menacing; she did not feel safe at work; and she worried that she could not trust Hellman and his direct reports to protect her if an emergency arose. A juror could also credit Okonowsky's testimony that Hellman's actions made it more difficult for her to complete basic tasks and ultimately drove her to leave Lompoc. *See Reynaga*, 847 F.3d at 687 (explaining that unwanted discriminatory conduct that "make[s] it more difficult for [the plaintiff] to do her job, to take pride in her work, and to desire to stay in her position" is "enough" to "create an actionable claim under Title VII"). These facts alone raise a genuine dispute as to whether the work environment was sufficiently hostile to implicate Title VII. *See Davis*, 520 F.3d at 1096 ("[Even] where the severity of frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment.").

b.  The Conduct of Management and Other Co-workers

As we have already explained, Okonowsky's evidence does not start and end with Hellman's conduct. Both management and Okonowsky's co-workers contributed to the altered workplace. Many employees at Lompoc "liked" Hellman's posts and commented favorably upon them. Okonowsky witnessed co-workers discussing and laughing

about Hellman's posts at work. And managers and staff members in charge of enforcing workplace policy and investigating Okonowsky's complaint acquiesced to and at times even endorsed Hellman's conduct. The Human Resources Manager, the Union President, and the prison's Safety Manager subscribed to Hellman's page despite its offensive content. The Safety Manager and Human Resources Manager both told Okonowsky the page was "funny," even as Okonowsky expressed her concerns about being targeted and harassed. The Special Investigative Agent tasked with investigating Okonowsky's complaint told her that he did not "see anything that's a problem" with Hellman's page despite recent posts targeting Okonowsky and joking about the SHU officers sexually assaulting her. Prison officials made no apparent effort to protect Okonowsky's confidentiality after she made her complaint. The investigating officer told Okonowsky that he failed to refer her complaint to the Bureau's Office of Internal Affairs for three weeks because he "had other things going on" and "could not figure out how to print the memes." The warden testified that he "took no action" on Okonowsky's complaint for at least two months, and the Lompoc prison apparently tolerated Hellman's harassing conduct for another month after telling him that any further harassment would "not be tolerated."

c.  The Cumulative Effect of the Discriminatory Conduct

We must also consider "the cumulative effect of the conduct at issue." *Zetwick*, 850 F.3d at 444 (emphasis omitted). That includes three months of posts targeting Okonowsky, intimidating her, joking about "gang bang[ing]" her, possibly shooting her, as well as myriad posts endorsing sexual harassment and/or violence toward women co-workers or women generally. It includes the

reactions of management-level officials who endorsed Hellman's conduct even as Okonowsky expressed her concerns, and the refusal of prison officials to respond to or update Okonowsky on the status of the investigation even as Okonowsky expressed that she no longer felt safe at work.

Just as an "employer's reaction to a single serious episode" of sexual harassment "may form the basis for a hostile work environment claim," *Little*, 301 F.3d at 968, so too may an employer's response to more frequent but less severe conduct, *see Fuller*, 865 F.3d at 1163–64 (distinguishing *Brooks v. City of San Mateo*, 229 F.3d 917, 921–22, 924, 926 (9th Cir. 2000), in which an employer "took no actions which could be perceived as supportive of the harasser"). Based on the record as we must view it, we hold that a reasonable juror could find Okonowsky's work environment objectively hostile.

### B. The Bureau's Remedial Measures

Considering all the evidence in the light most favorable to Okonowsky, a reasonable juror could also conclude that the Bureau's response to Okonowsky's harassment was neither reasonably immediate nor effective, triggering liability under Title VII. "All federal circuits are in accord" that an employer is liable for a hostile work environment "by failing to take immediate and corrective action in response to a co-worker's or third party's sexual harassment . . . [that] the employer knew or should have known about." *Fried*, 18 F.4th at 647. "[T]he reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment." *Little*, 301 F.3d at 968 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). If "the remedy attempted is ineffectual, liability will attach." *Id.* (quoting *Fuller v. City of Oakland* (*Fuller*

*Oakland*), 47 F.3d 1522, 1528–29 (9th Cir. 1995)).   "In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct."   *Id.* (quoting *Ellison*, 924 F.2d at 882).

The district court concluded based on "undisputed facts" that the Bureau "engaged [in] a methodical, albeit relatively lengthy, investigative and disciplinary process."   Examining only five posts made by Hellman prior to the issuance of the cease-and-desist letter, the district court concluded that Hellman's conduct "posting memes of a sexual nature potentially directed to [Okonowsky]" stopped "because of [the Bureau's] investigative efforts."   This conclusion is unsupported and applies the wrong legal standard.   The facts viewed most favorably to Okonowsky lead to the opposite finding.   Moreover, the district court was required to determine whether Okonowsky adduced sufficient evidence for a reasonable juror to conclude that the prison's investigation was, in fact, not methodical or effective—not to make its own findings of fact.   *See Fuller*, 865 F.3d at 1165 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### 1.  *Management's Initial Response*

Okonowsky has adduced ample evidence that the Bureau's response to Hellman's harassing conduct and management figures' endorsement of it was "equivocal at best."   *Little*, 301 F.3d at 968.   On the one hand, Warden Engleman met with Okonowsky the day she requested a meeting and immediately directed Agent Gonzales to investigate Okonowsky's complaint and make a referral to the Office of Internal Affairs.   The prison transferred Okonowsky to the low security facility with her consent that

same day.   Eventually, Gonzales made a referral to the
Office of Internal Affairs as directed.   And the prison
convened a Threat Assessment Team which, within a matter
of days, determined that Hellman's conduct likely violated
the Bureau's Anti-Harassment Policy and recommended
issuing a cease-and-desist letter, which the prison promptly
did.

On the other hand, Warden Engleman testified that he
had "no involvement" at any time with Okonowsky's
complaint while he was the Acting Warden, which was a
period of over two months after she complained to him.   At
most, he referred her complaint to Gonzales, who then did
almost nothing to resolve the situation, telling Okonowsky
from the get-go that he believed there was nothing wrong
with Hellman's behavior.   Consistent with that view,
Gonzales slow-walked the investigation and demonstrated a
lack of care for Okonowsky's confidentiality and safety.
The prison's Safety Manager and Human Resources
Manager both told Okonowsky that they found Hellman's
page to be "funny," and each continued to subscribe to
Hellman's page on Instagram after Okonowsky made her
complaint, even as Hellman posted harassing content that
increasingly targeted Okonowsky.   Prison officials
immediately suggested transferring Okonowsky, and
ultimately did so with her consent, but Okonowsky
continued to see Hellman at work, and he continued to make
discriminatory and retaliatory posts.   Despite the fact that
numerous Lompoc employees, including the Human
Resources Manager, were well aware that Hellman operated
the page, it was not until Okonowsky herself identified
Hellman as the creator of the page that the prison transferred
Hellman to a different part of the facility—more than three

weeks after Okonowsky initially made her complaint.**9**  In whole, three months passed after Okonowsky made her complaint before Hellman's harassing conduct ceased.  Such "equivocal" evidence—particularly evidence that some of the initial steps taken by the prison "reinforced rather than remediated the harassment," *Little*, 301 F.3d at 967, and were "ineffectual" to stop Hellman's conduct or managers' endorsement of it, *Fuller Oakland*, 47 F.3d at 1528–29— precludes granting summary judgment to the prison.

### 2. *Management's Permanent Remedial Steps*

In addition to reviewing "the temporary steps the employer takes to deal with the situation," we must also look at "the permanent remedial steps the employer takes once it has completed its investigation." *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001).  "Remedial action must include some form of disciplinary measures." *Reynaga*, 847 F.3d at 689 (citing *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1482 (9th Cir. 1997)).  The remedial measures must also be effective. *Id.* at 690.

The district court appears to have concluded that the Threat Assessment Team's report ended the prison's investigation and that the cease-and-desist letter was a "disciplinary measure" for the purposes of Title VII.  In so concluding, the district court overlooked evidence that the Threat Assessment Team's report was not a completed

---

9 Warden Engleman suggests in his declaration that Hellman was transferred to a different facility as soon as Okonowsky, in a memo dated March 11, 2020, identified Hellman as the likely operator of the Instagram account.  But Okonowsky stated in her March 11, 2020, memo that her information came from McGinnis, the head of Human Resources, indicating that prison leadership knew Hellman was responsible for the page before Okonowsky did.

investigation into Hellman's conduct.   The Threat
Assessment Team noted in its report that "an investigation
into Hellman's actions" was yet to be "completed," and any
discipline would need to be "implemented" "if misconduct
is sustained."   Five months later, Hellman told Bureau
authorities that he believed an investigation was ongoing but
that he had "not been interviewed" and "ha[d] no idea" who
was investigating.   To the extent the Bureau's investigation
continued after the Threat Assessment Team made its
recommendations to the Warden, the record is silent as to
whether the Bureau ever completed that investigation or
whether it made any final determination as to discipline.

Even if the Threat Assessment Team report were a
"completed [] investigation," *Swenson*, 271 F.3d at 1192,
and the cease-and-desist letter a "disciplinary measure[]" for
the purposes of Title VII, *Reynaga*, 847 F.3d at 689, a
reasonable juror could conclude that neither was sufficiently
prompt or adequate to remedy Okonowsky's hostile work
environment.   Neither actually stopped Hellman from
posting. The Threat Assessment Team did not investigate
the conduct of management-level or investigatory
employees who subscribed to and/or endorsed or condoned
Hellman's conduct.  And the Bureau's statement to Hellman
that further harassing conduct would "not be tolerated" was
belied by the prison's continued tolerance of Hellman's
harassing conduct for more than a month following the
cease-and-desist letter.  Hellman's behavior and the facial
endorsement of that behavior by high-level managers in
charge of enforcing the prison policies which the Bureau
believed Hellman violated, demonstrates that the remedies
undertaken by the Bureau likely would not deter potential
harassers from similar conduct in the future. *See Reynaga*,
847 F.3d at 690 (finding a genuine dispute of fact as to

whether the employer's response was effective when the harassing conduct continued "even after meeting with management").

Finally, the district court relied upon an impermissible inference when it concluded that Hellman deleted his Instagram page "*because of* [the Bureau's] investigative efforts." (Emphasis added). The record is silent with respect to Hellman's motive for deleting his Instagram page after four months of publishing multiple hundreds of posts. Because Hellman continued posting harassing content, including content targeting Okonowsky, for approximately one month after receiving the cease-and-desist letter with no apparent penalty, acknowledgement by prison officials, or signs of any continuing investigation, a triable issue exists as to whether Hellman's decision to delete his Instagram account was in fact motivated by reasons other than fear of the prison's "investigative efforts."

For all of these reasons, a reasonable juror could conclude that the prison "failed to take prompt and effective remedial action" to address Okonowsky's hostile work environment. *Reynaga*, 847 F.3d at 689.

## IV. CONCLUSION

Okonowsky has raised triable issues of fact as to whether she experienced a hostile work environment and whether the Bureau of Prisons failed to take prompt and effective remedial action to address it. Accordingly, we reverse the district court's grant of the government's motion for summary judgment and remand for proceedings consistent with this opinion.

**REVERSED and REMANDED.**